Docusign Envelope ID: FBA21F19-C16D-49B9-9887-01B14B805935

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MyCard, Inc. d/b/a Knot,<br><br>    Plaintiff,<br><br>v.<br><br>Atomic FI, Inc.,<br><br>    Defendant. | Civil Action No. 26-290-CFC |

**<u>DECLARATION OF KIERAN O'REILLY</u>**

I, Kieran O'Reilly, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am the co-founder and Chief Technology Officer of MyCard, Inc. d/b/a Knot ("Knot"), the Plaintiff in this action.

2.      I submit this Declaration in support of Knot's Motion for Temporary Restraining Order and Preliminary Injunction. The facts set forth herein are based on my personal knowledge, my review of Knot's business records, and information provided to me by Knot's employees and advisors in the ordinary course of business.

3.      I have served as Chief Technology Officer of MyCard, Inc. since it was incorporated in 2020. In that capacity I have direct, personal knowledge of Knot's business operations, competitive position, technology development, products, and user behavior.

4.      Based on my position and experience, I also have direct, personal knowledge of the merchant connectivity market and a good understanding of Knot's competitors in the merchant connectivity marketplace.

5.     I have reviewed John Anderson's and Jordan Wright's declarations submitted in support of Atomic's Opposition to Knot's Motion for Temporary Restraining Order and Preliminary Injunction.

6.     I am aware that Mr. Anderson asserts, based on his knowledge and belief, that Atomic engineers have not created Knot accounts or signed into any of Knot's systems. Declaration of John Anderson ("Anderson Decl.") ¶ 37. Mr. Anderson also asserts that he is not aware of any Atomic engineers signing, agreeing to, or being subject to Knot's Terms and Conditions. Anderson Decl. ¶ 37.

7.     After reviewing Mr. Anderson's declaration, I reviewed Knot's records to attempt to identify names of Atomic employees.

8.     Knot's records reveal how many accounts a specific user created with Knot; how many transactions a specific user completes; and how long each user interfaces with a Knot product.

9.     A Knot user typically spends approximately one minute interacting with Knot's product. That is the benefit of Knot: It allows users to quickly and seamlessly update their saved payment information across merchants and subscription services when they change credit or debit cards.

10.     I have identified at least two individuals that use Knot with names identical to Atomic employees.

11.     JJ Berrett is a Knot user. Mr. Berrett became a Knot user by at least May 2024 and has continued to actively use it since then.

12.     The area code associated with JJ Berrett's information is 385. According to publicly available information, that area code encompasses Salt Lake City, Utah.

Docusign Envelope ID: FBA21F19-C16D-49B9-9887-01B14B805935

13. Mr. Berrett's LinkedIn page states he is a Senior Software Engineering Manager at Atomic (based in Salt Lake City) and has worked full time at Atomic since 2021. A true and correct copy of Mr. Berrett's LinkedIn profile is attached hereto as **Exhibit A.**



14. Mr. Berrett was required to agree to and abide by Knot's Terms and Conditions.

15. Mr. Berrett created at least four accounts with card issuers that use Knot.

16. Mr. Berrett agreed to Knot's Terms and Conditions at least four times.

17. Mr. Berrett uses Knot far more frequently and much longer than the average Knot user. Over the last 90-day period, Mr. Berrett has used Knot's product approximately once every two business days.

18. Mr. Berrett spent an unusual amount of time interacting with Knot's products. Specifically, Mr. Berrett interfaced with Knot's products approximately 180 times longer than the average user—spending more than three hours interfacing with Knot's products.

19. The amount of time Mr. Berrett used Knot's product suggests he uses it to steal or copy Knot's authentication flows, behavior, and new features.

20. When I reviewed Knot records on March 26, 2026, they showed that Mr. Berrett most recently used Knot that same day. Mr. Berrett opened the software development kit.

21.     Mike Grice is a Knot user and became a Knot user by at least November 8, 2024. Knot's records confirm that Mr. Grice's address is Salt Lake City, Utah.

22.     According to Mike Grice's LinkedIn page, he has worked in Research and Data Analysis at Atomic since October 2021. A true and correct copy of Mr. Grice's LinkedIn profile is attached hereto as **Exhibit B**.



23.     Mr. Grice was required to agree to and abide by Knot's Terms and Conditions.

24.     Mr. Grice created at least four accounts with card issuers that use Knot.

25.     Mr. Grice agreed to Knot's Terms and Conditions at least four times.

26.     Like Mr. Berrett, Mr. Grice's interactions with Knot's products are unusual compared to Knot users in several ways.

27.     Mr. Grice has spent approximately four hours using Knot products.

28.     Mr. Grice has completed more than 143 card switches since he first began using Knot's product. That is an abnormally high switch rate. Based on my calculations, Mr. Grice is in the top 99.9996% of Knot users in terms of card switches per user.

29.     This amount of card switches (across a variety of merchants) suggests that Mr. Grice has been attempting to steal Knot's source code beyond Knot's Authentication Integrations Source Code ("AISC").

30.     Mr. Grice's interactions with Knot's product also indicate he is intentionally failing tasks, which decreases Knot's successful conversion rate. For example, Mr. Grice repeatedly sent failing card-switch attempts at least five times on the same day for a Knot customer that Atomic is actively courting for potential additional business opportunities.

31.     This intentional failing of card-switch attempts affects Knot's success rate, which Knot customers consider when deciding whether to select Knot.

32.     As of March 26, 2026, Mr. Grice last used Knot on March 21, 2026.

33.     After reading Mr. Anderson's declaration denying Atomic employees used Knot, I began trying to identify Knot users associated with Atomic. I expended substantial time and effort to locate accounts maintained by Atomic employees. Identifying and confirming Knot accounts maintained by Atomic employees was made difficult based on the number of accounts each Atomic employee maintains.

34.     I investigated activities associated with IP addresses linked to Messrs. Grice and Berrett. My investigation reveals that there are likely about 20 additional accounts connected to or associated with Messrs. Grice and Berrett.

35.     Mr. Anderson states that Knot's Face ID-based authentication implementation stopped working in February 2026, that Knot cannot support Face ID authentication after recent API changes, and that Knot needs additional time to develop updated implementations. Anderson Decl. ¶¶ 43, 46, 47. These statements are not accurate.

36.     Knot's Face ID-based authentication implementation continues to work for most Apple iOS versions.

37.     Thousands of Knot users use Knot's Face-ID-based authentication implementation each day.

38. Knot's Face ID authentication presently does not support only one (out of many) Apple iOS version.

39. Knot has already updated its source code that will successfully work with the latest iOS version.

40. Based on Knot's legitimate fear that Atomic will steal Knot's updated source code, Knot has chosen to delay releasing the updated source code.

41. Mr. Anderson asserted that the AISC containing the honeypot code was "publicly accessible." Anderson Decl. ¶ 25. Mr. Anderson also stated that he "believe[s]" that certain information Knot transmits through its SDK was transmitted publicly. Anderson Decl. ¶ 40. Neither statement is accurate.

42. The AISC was not publicly accessible. Knot primarily offers a Software Development Kit ("SDK") that functions as a widget embedded inside a client's mobile app. Knot's customers implement the Knot SDK to add Knot's functionality to their mobile app for their end users. To a typical end user, mobile apps do not visibly expose their API calls, internal pages, or underlying code. Furthermore, the AISC is and remains encrypted via Transport Layer Security, a cryptographic protocol designed to provide secure, encrypted communications over the internet. Encryption is a process by which data is mathematically scrambled using an algorithm and a secret key, rendering the underlying information completely unreadable to anyone who does not possess the corresponding decryption key. The data transmitted between the Knot SDK and its servers is secured using Transport Layer Security ("TLS"), which encrypts data in transit. Further, the Knot SDK is integrated directly into the mobile app's codebase, and for end users, the API calls, internal pages, or underlying code of such a widget are not visibly exposed. Because the underlying code and network communications are encrypted via TLS, the functionality and data

cannot be readily intercepted or read by simply observing the application's behavior. Therefore, because the communication is encrypted and the SDK is integrated by the customer, users cannot access the underlying code and API calls through ordinary operation of the mobile app.

43. Gaining access to the substance of Knot's encrypted AISC was therefore not a passive or incidental act. Rather, it would have required Atomic to deliberately employ one or more specialized tools and techniques that are commonly associated with malicious or unauthorized access—not with legitimate software development or competitive research. Based on my industry experience, obtaining the AISC in the manner Atomic apparently did would have required an orchestrated, multi-step effort involving significant planning, technical expertise, and the conscious decision to circumvent Knot's security measures. Specifically, Atomic would likely have needed to employ some or all of the following:

a. A Mobile Device Configured to Intercept Knot's Application Traffic. To access the encrypted AISC, Atomic would likely have needed to operate the Knot application on a mobile device—such as a cell phone—while simultaneously running tools on a connected laptop computer designed to intercept and capture the data that the Knot application transmits. This setup would require coordination and planning, as it involves pairing multiple devices together in a specific configuration for the purpose of intercepting protected communications.

b. A Man-in-the-Middle Attack. A man-in-the-middle attack is a method by which a bad actor secretly inserts themselves into the communications between two parties without either party's knowledge or authorization. The attacker effectively intercepts and reads the communications as they pass between the two parties.

Docusign Envelope ID: FBA21F19-C16D-49B9-9887-01B14B805935

c. A Man-in-the-Middle Proxy Tool. A proxy tool is software that acts as an intermediary between a device and the internet, routing all of the device's communications through the proxy so that they can be monitored, captured, and analyzed. A man-in-the-middle proxy tool—a specific type of proxy tool designed for intercepting secure communications—when used in combination with a certificate pinning bypass, allows an actor to intercept and read encrypted communications that would otherwise be completely unreadable. Atomic would likely have needed such a tool in order to intercept Knot's encrypted AISC in transit.

d. A Jailbroken Device. A "jailbroken" device is a mobile phone or tablet on which the device manufacturer's built-in security restrictions have been deliberately removed or circumvented. Mobile device manufacturers—such as Apple and Google—design their devices with layers of security that prevent unauthorized software from being installed or executed and that prevent protected data from being accessed without authorization. Jailbreaking a device removes these protections, allowing the user to install unauthorized tools and access data that would otherwise remain protected.

e. A Packet Sniffer. A packet sniffer is a software tool that captures the individual units of data, known as "packets," as they travel across a network. Just as a recording device might capture audio from a private conversation taking place nearby, a packet sniffer captures data as it moves between a device and a server. In the context of Knot's encrypted AISC, the packets captured by a packet sniffer would themselves be encrypted, meaning that Atomic would have needed to use

additional tools and techniques to decrypt the captured data in order to read the underlying source code.

44.     These tools and techniques represent a coordinated, deliberate, and technically sophisticated effort to circumvent Knot's security measures and access protected source code without authorization. In my professional experience, these tools or techniques are not necessary or appropriate for accessing genuinely publicly available code. A developer who legitimately seeks to understand how a competitor's publicly available software functions has no need for man-in-the-middle attacks, certificate pinning bypasses, jailbroken devices, proxy tools, or packet sniffers.

45.     Mr. Berrett has attempted to use a laptop while using Knot's product. (Most Knot users do not use a laptop while using Knot.) Utilizing a laptop for purposes of using a Knot product is highly suspicious because Knot users primarily integrate Knot on mobile devices.

46.     Mr. Anderson's declaration includes a screengrab of a Wayback Machine webpage. Anderson Decl. ¶ 27. I have several responses to this image.

47.     *First*, the source code identified in Paragraph 27 of Mr. Anderson's declaration is **not** the AISC that Atomic stole from Knot because it lacks the 37-character honeypot. *Second*, the fact that Atomic has this link demonstrates an Atomic employee agreed to Knot's Terms and Conditions and improperly used Knot's SDK. The only way an individual could have obtained that specific URL in the screengrab is by (1) using Knot and (2) violating Knot's Terms and Conditions by improperly accessing Knot's SDK by decompiling Knot's SDK or by employing man-in-the-middle attacks. *Third*, the screengrab is dated February 24, 2026 *after* Atomic stole Knot's AISC. Atomic stole Knot's AISC much earlier than February 24, 2026 because Knot observed the honeypot in Atomic's source code no later than February 25, 2026 and because Atomic launched its Face ID feature at least by December 2025. Compl. ¶¶ 51; 109.

48. Mr. Anderson's declaration states that the honeypot code "exists solely as inactive fallback code . . . ." Anderson Decl. ¶ 31. Knot used a fallback in its code as early as October 27, 2025. In fact, Knot intentionally inserted the honeypot string as a fallback code. Mr. Anderson's admission that Atomic uses the honeypot code in its fallback code is another example of Atomic copying Knot's code and features.

49. Mr. Anderson's declaration states that Atomic did not "unlawfully" scrape Knot's source code. Anderson Decl. ¶ 28. Mr. Anderson does not explain what he means by "unlawfully."

50. After reading Mr. Anderson's declaration, I visited the website for Browserless. https://www.browserless.io/automation. Browserless touts its ability to "Scrape HTML from protected sites with BrowserQL[.]" Specifically, it offers "[e]verything you need for web scraping[.]" https://www.browserless.io/scraping.

Powerful Features

**Everything you need for web scraping**

51. Browserless's website includes a testimonial from Atomic's Co-Founder and CTO, Scott Weinert.



"Browserless helped us focus on the problem we were trying to solve, and less on scaling an automation infrastructure. Browserless's developer focused approach has been a key to us bringing our product to market at the speed we were able to do so. Joel and team are some of the most customer-centric partners I've worked with."

SW **Scott Weinert**
Co-Founder & CTO, Atomic

52. I have reviewed Atomic's job postings after reading Mr. Anderson's declaration. Atomic has posted one job opening for an Automation Engineer position that includes the following responsibilities: "Reverse engineer web APIs when necessary, using tools like Burp

Suite, Postman, or Fiddler, and conduct reconstructive analysis from a QA perspective." These tools are commonly associated with man-in-the-middle attacks, which occurs when an intermediary secretly intercepts and relays communication between a user and a server, allowing the attacker to observe or alter the data being transmitted.

53. Mr. Anderson's declaration states that analyzing and reviewing other companies' SDK is commonplace. Anderson Decl. ¶ 23.

54. In my experience, stealing and utilizing another company's source code is not common.

55. In fact, utilizing another company's source code—especially by simply copying it, as Atomic appears to have done—is extremely dangerous and problematic because it exposes the company's product to data exfiltration, loss of data, and inability to maintain products.

56. Moreover, the fact that Atomic has been unable to maintain the code Atomic stole from Knot for the iOS updates is evidence that Atomic does not understand what it took to build the code.

57. Mr. Wright's declaration states that a temporary restraining order specific to the AISC supporting Atomic's Face ID authentication code would cause substantial harm to its business and that Atomic's customers rely on Face ID authentication for consumer-facing products. Declaration of Jordan Wright ¶ 32.

58. As a result of my industry experience, I am aware of Atomic having potentially only one or perhaps two customers that use Atomic's product that utilizes a Face ID authentication feature for merchants.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 03/30/2026

Signed by:

*Kieran O'Reilly*
81904829C123431

Kieran O'Reilly