**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MYCARD, INC. d/b/a KNOT, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ATOMIC FI, INC., | ) | Civil Action No. 26-cv-00290-CFC |
| | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| ATOMIC FI, INC., | ) | |
| | ) | |
| *Counterclaim Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MYCARD, INC. d/b/a KNOT | ) | Civil Action No. 26-cv-00290-CFC |
| | ) | |
| | ) | |
| | ) | |
| *Counterclaim Defendant.* | ) | |
| | ) | |

**ATOMIC FI, INC'S ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS TO PLAINTIFF MYCARD, INC.'S D/B/A KNOT
COMPLAINT**

**RESPONSE TO ALLEGATIONS**

Defendant Atomic FI, Inc. ("Atomic" or "Defendant"), by and through its

undersigned counsel, hereby files its Answer, Affirmative Defenses, and

Counterclaims to Plaintiff MyCard, Inc.'s d/b/a Knot ("Knot" or "Plaintiff")

1

Complaint. Atomic demands a trial by jury on all issues so triable. Atomic has re-produced the Complaint's section headings (shown in ***bold, underlined italics***) and allegations for reference. Because the headings in the Complaint are for organization and do not constitute factual allegations, no response is required. To the extent any headings or subheadings in the Complaint make factual allegations that would require a response if stated in the main text, Atomic denies all such allegations and claims for relief. Atomic responds to each paragraph in the Complaint as follows:

1.      This case involves Defendant Atomic FI, Inc.'s ("Defendant's" or "Atomic's") brazen theft of Plaintiff MyCard, Inc. d/b/a Knot's ("Plaintiff's" or "Knot's") source code to unfairly compete. But unlike many thieves whose theft goes undetected, Atomic has been caught red-handed: a series of 37 meaningless characters (a honeypot) Knot inserted in its source code was identified in Atomic's source code.[1]

```
KNOTAPI

{
  "path": null,
  "script": null,
  "login_url": "Redacted/signin?frame_id=auth-
bpbsofh5-zlxp-qce3-6ney-
4jfahfxa&skVersion=7&iframeId=auth-bpbsofh5-zlxp-
qce3-6ney-
4jfahfxa&client_id=Redacted&redirect_url=Redacted&r
esponse_type=code&response_mode=query&state=auth-
bpbsofh5-zlxp-qce3-6ney-
4jfahfxa&authVersion=latest",
  "biometric_login": "Redacted",
  "interceptor": "Redacted",
  "page_actions": "Redacted",
  "login_path": null,
  "callback_url": "Redacted",
```

```
ATOMIC FINANCIAL

J,rootState:H},W){if(!W)return;const config&&!W.app
leSignInCompleted j",payload:{usingFaceId:K}}});try
{if(K){await G.goto("https://atomic.financial"),awa
it G.show();const Y=W.appleFrameId?W.appleFrameI
d:"auth-bpbsofh5-zlxp-qce3-6ney-4jfahfxa";await G.g
oto(`Redacted/signin?frame_id=${Y}&skVersion=7&ifra
meId=${Y}&client_id=Redacted&redirect_uri=Redacted&
response_type=code&response_mode=query&state=${Y}&a
uthVersion=latest`),E("setTriggeredAppleFaceId",!
0)}else await G.goto("Redacted"),await G.show()}cat
ch(Y){console.error("Error in async operations:",
Y)}}if(G&&W?.validatedAppleId&&!U.validatedAppleId&
&W?.code)try{const Y=H.tempStorage.interceptedData.
appleFrameId?H.tempStorage.interceptedData.appleFra
meId:"auth-bpbsofh5-zlxp-qce3-6ney-4jfahfxa";await
G.dispatch({type:"SET_APPLE_FRAME_ID",payload:Y}),a
```

Answer: Atomic admits that 37 certain characters (auth=bpbsofh5-zlxp-qce3-

---

[1] Redactions have been applied to both entities' source code.

6ney-4jfahfxa) were located in Atomic's source code as fallback code from approximately November 2025 through early April 2026. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the alleged images in Paragraph 1 and, on that basis, denies the same. Atomic denies all remaining allegations in Paragraph 1.

2.      This Court's immediate action is necessary to enjoin Atomic from further misappropriation of Knot's trade secrets and to stop Atomic from continuing to use Knot's trade secret-protected source code.

Answer: This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Atomic denies all allegations in Paragraph 2 of the Complaint.

3.      Atomic has apparently resorted to its tried-and-true method of operating its business: copying from others. After hearing rumors that Atomic was stealing Knot's intellectual property, and following Atomic's announcement of products with features claiming to be nearly identical to Knot's products, Knot deliberately inserted a honeypot into Knot's non-public product source code to determine if rumors within the marketplace—that Atomic was stealing and misappropriating Knot's products and source code—were true.

Answer: Atomic denies all allegations in Paragraph 3 of the Complaint.

4.      The honeypot code is a series of 37 random characters not meaningful to the product's function. But its mere existence would confirm that Knot's source code supporting a critical biometric functionality ("Knot's Authentication Integrations Source Code") was copied.

Answer: This paragraph contains legal conclusions to which no response is required. To the extent a response is required, Atomic admits that the "honeypot

3

code" is not meaningful to the product's function. Atomic denies all remaining allegations in Paragraph 4 of the Complaint.

5.    Very recently, on February 25, 2026, Knot's fears were confirmed: It learned that the specific "honeypot" non-functional code appeared in Atomic's code.

Answer: Atomic admits that 37 certain characters (auth=bpbsofh5-zlxp-qce3-6ney-4jfahfxa) were located in Atomic's source code as fallback code from approximately November 2025 through early April 2026. Atomic denies all remaining allegations in Paragraph 5 of the Complaint.

6.    In addition to the honeypot code's presence, Atomic touted product features nearly identical to those of Knot's, with nearly identical naming conventions to Knot's in several important respects, making Atomic's theft that much more brazen.

Answer: Atomic denies all allegations in Paragraph 6 of the Complaint.

7.    Like most financial technology companies, Knot's intellectual property—including its trade secrets—is critical to its ongoing success and vital to its competitive edge. It has spent tens of millions of dollars and years developing its trade secrets, building its products, and achieving a competitive edge.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 7 of the Complaint and, on that basis, denies the same.

8.    Atomic's theft, use, and continued possession of Knot's Authentication Integrations Source Code poses significant, unquantifiable, and irreparable harm to Knot.

Answer: Atomic denies all allegations in Paragraph 8 of the Complaint.

9.    Atomic's theft of Knot's Authentication Integrations Source Code—among Knot's most valuable trade secrets—is particularly alarming given Atomic's recent attempt to compete directly with Knot and its history of impersonating Knot in the marketplace. Atomic, without having to invest the substantial resources necessary to develop source code for products, can significantly undersell Knot, obtain market share, disrupt Knot's relationships with its existing customers, and build upon the source code to develop more products. Indeed, Knot has recently learned that Atomic is apparently offering services competitive to the product Knot offers for *free*—illustrating Atomic's lack of investment and further highlighting the irreparable harm Knot faces.

Answer: Atomic admits that it offers certain products at no charge for a limited introductory period—typically a few months—in order to reduce friction for clients adopting and integrating the product, or due to a client selecting multiple products from Atomic, which offsets costs of other products. Atomic denies all remaining allegations in Paragraph 9 of the Complaint.

10.    This is not Atomic's first time being accused of trade secret misappropriation. In 2020, a financial technology company called ClickSWITCH filed a verified complaint against Atomic and its co-founder, Jordan Wright, in a Utah state court, alleging misappropriation of trade secrets, breach of contract, and tortious interference. A former employee of one of the parties informed Knot that the settlement amount exceeded millions of dollars.

Answer: Atomic admits that, in 2020, ClickSWITCH filed a verified complaint against Atomic and its co-founder, Jordan Wright, in a Utah state court alleging misappropriation of trade secrets, breach of contract, and tortious interference. Atomic denies all remaining allegations in Paragraph 10 of the Complaint.

11.    Knot's recent discovery of Atomic's theft and misappropriation demands immediate Court intervention through injunctive relief, preventing Atomic

from using Knot's trade secret source code to prevent further irreparable harm. It also requires expedited discovery to understand the full scope and scale of the theft and how Atomic may be using Knot's trade secrets in other ways.

Answer: Atomic denies all allegations in Paragraph 11 of the Complaint.

## *THE PARTIES*

12.    Plaintiff MyCard d/b/a Knot is a financial technology company that helps consumers automatically update their saved payment information across merchants and subscription services when they change credit or debit cards. Knot has its principal place of business in New York (36 E 20th Floor 4, New York, NY 10003) and is a Delaware corporation.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 12 of the Complaint and, on that basis, denies the same.

13.    On information and belief, Defendant Atomic FI, Inc. is a Delaware corporation, with its principal place of business located at 11618 Terendale Lane, Sandy, UT 84092.

Answer: Atomic admits it is a Delaware corporation, with its principal place of business located at 1895 E. Rodeo Walk Drive, Suite B200, Holladay, UT 84117.

## *JURISDICTION AND VENUE*

14.    This Court has subject-matter jurisdiction over Count I pursuant to 28 U.S.C. § 1331 because Count I (below) arises under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.* and because Count II arises under 17 U.S.C. § 101 *et seq.*

Answer: Atomic admits that Count I purports to arise under the Defend Trade Secrets Act. Atomic denies that it has violated the Defend Trade Secrets Act, denies that it is in any way liable under Count I, and denies that Knot is entitled to any relief

6

under Count I. Atomic admits that Count II purports to arise under 17 U.S.C. § 101

*et seq.* Atomic denies that it has violated 17 U.S.C. § 101 *et seq.*, denies that it is in

any way liable under Count I, and denies that Knot is entitled to any relief under

Count I.

15.     This Court has subject matter jurisdiction over the declaratory judgment claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Counts III – VI (below) arise under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 and the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

Answer: Atomic admits that Counts III – VI purport to arise under the Federal

Declaratory Judgment Act and the patent laws of the United States. Atomic denies

that Knot is entitled to any relief under Counts III – VI.

16.     This Court has personal jurisdiction over Atomic for at least the following reasons: (a) Atomic is incorporated in Delaware and (b) Atomic engages intentionally engages in substantial commerce within the state of Delaware. More specifically, on information and belief, Atomic does business in the state of Delaware and has entered into contracts with Delaware-based companies.

Answer: Atomic admits that this Court has personal jurisdiction over it because

it is a corporation formed under the laws of Delaware. Atomic further admits that it

conducts business nationwide through the internet, including in Delaware. Except as

expressly admitted, Atomic denies the allegations in Paragraph 16 of the Complaint.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) because, among other things, Atomic "resides" in this District by virtue of its incorporation.

Answer: Atomic admits that venue is proper in this district and that Atomic is incorporated in Delaware. Except as expressly admitted, Atomic denies the allegations in Paragraph 17 of the Complaint

## *FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS*

### *A. Knot*

18.     MyCard, Inc. was incorporated in 2020 by co-founders Rory and Kieran O'Reilly, who are brothers. In 2022, the company was renamed Knot.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 18 of the Complaint.

19.     Knot was created to solve what Rory coined "Merchant Connectivity." Rory and Kieran previously co-founded a debit card. The idea for Knot started when Rory and Kieran realized it was difficult for their users to onboard onto a card program. Knot's premise is that users can connect their merchant account and allow a system to perform actions.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 19 of the Complaint.

20.     Knot is a clear leader in the market and holds a significant portion of the market share. Knot has been a go-to solution for card issuers looking to increase user spend and reduce churn. Knot's application programming interface ("API") offers card issuers the ability to instantly update card-on-file information at almost any merchant, meaning an easier onboarding experience for consumers, and more revenue and retention for banks. API allows two different software programs to talk to each other and share information or functions without revealing their internal workings.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 20 of the Complaint.

21.    Knot's Software Development Kit ("SDK") lives inside a banking application. An SDK is a bundle of code, tools, and instructions that lets developers quickly add a company's technology or feature into their own software. The SDK provides a seamless way for end users to link their merchant accounts to a web application, serving as the foundation for Knot's merchant connectivity platform. It is a client-side integration, consisting of initializing and configuring the SDK and handling events.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 21 of the Complaint.

22.    Knot's SDK supports Knot's products, including CardSwitcher™.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 22 of the Complaint.

23.    Knot publicly launched CardSwitcher™ on Product Hunt and began signing up customers in August 2022. *See* PRODUCT HUNT, https://www.producthunt.com/products/knot-api (last visited March 15, 2026).

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 23 of the Complaint.

24.    In January 2023, Knot had its first cards switched in production for a real customer live on its application.

9

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 24 of the Complaint.

25. Knot's mission was to build a merchant connectivity platform that helps financial issuers automatically update card-on-file information across online merchants via APIs and SDKs.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 25 of the Complaint.

26. Knot has developed and launched several products since its inception. Each product represents millions of dollars of investment, including hundreds of thousands of manhours and financial investment in research and technology.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 26 of the Complaint.

27. CardSwitcher$^{TM}$ allows a user to update the card-on-file payment method stored at merchants (such as subscription services or e-commerce sites) without manually entering their card details on each site.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 27 of the Complaint.

28. To this day, Knot continues building out its core CardSwitcher™ product and merchant network infrastructure as the foundation for automated card updates (the API that enables issuers to update saved payment methods). Integration

with various processors and banks has expanded since the product launched.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 28 of the Complaint.

29. On or around November 12, 2024, Knot unveiled MassSwitcher™, a product that lets users update their payment card details across many merchant accounts instantly using a single login (with password managers or keychains).

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 29 of the Complaint.

30. Knot introduced AccountUpdater™ in November 2024. Designed to automatically synchronize cardholder details—including card number, name, address, etc.—across merchant accounts via one API call, AccountUpdater™ is especially helpful for cross-network and bank identification number-transition updates.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 30 of the Complaint.

31. Based on Knot's substantial financial and investment in engineering and development, it has emerged as a leading company providing merchant support to help integrate financial institutions into their customer's digital lives.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 31 of the Complaint.

## B. *Knot's Trade Secret and Their Value*

32.    Knot expended substantial time, labor, and money to research and develop business, regulatory, and technical trade secrets.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 32 of the Complaint.

33.    Since its founding, Knot spent over 200,000 engineering hours building deep merchant connectivity—adding cards, canceling subscriptions, extracting SKU-level data, and enabling agentic shopping, all through authenticated sessions that actually work at scale.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 33 of the Complaint.

34.    Since its founding, Knot has invested approximately $10 to 12 million dollars in research and development to build its products, all of which incorporate and are built on Knot's trade secrets.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 34 of the Complaint.

35.    Knot's trade secrets have significant value, are not publicly known or readily ascertainable, and are maintained as confidential and proprietary information.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 35 of the Complaint.

36.    Knot currently has and has had legal and equitable title to and/or a license its trade secrets for all times relevant to the acts alleged herein, and a right to sue for misappropriation of those trade secrets. Knot is also in lawful possession of its trade secrets and has been for all times relevant to the acts alleged herein.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 36 of the Complaint.

37.    The trade secrets Knot has developed are highly confidential and provide a significant advantage to Knot. Knot's trade secrets related to its products include but are not limited to:

   a. **Source Code Supporting Its Products' Functionality.** Knot's backend API is a proprietary orchestration platform that manages the full lifecycle of automated merchant interactions—from authenticating users and securely transmitting encrypted card data, to sequencing multi-step tasks across merchants and processing results. The system includes sophisticated task scheduling, auto-retry logic with merchant-specific backoff strategies, and an engine that propagates card updates across related merchant groups. This code also encompasses the data models, workflow engines, and API endpoints that power each of Knot's distinct products (CardSwitcher™; TransactionLink™; Subscription Manager™; and others).

      i. "**Knot's Authentication Integrations Source Code**" is a subset of Knot's trade-secret protected source code. Over many years and after expending millions of dollars, Knot developed a source code that enables software specific to Apple devices to function successfully. This particular source code involves a series of elements and workflow-enabling biometric authentication systems.

b. **SDKs, Client-Side Execution, and Secure Data Transmission.** Knot's proprietary SDKs (iOS, Android, React Native, Flutter, and JavaScript) contain the logic that powers merchant interactions, including authentication flows, biometric integration, and Knot's "Quick Switch" experience.

c. **Merchant Configuration, Build Process, and Automation Scripts.** Knot maintains hundreds of proprietary merchant integrations, each built through a specialized internal process for constructing and encoding a merchant's authentication flows, page structures, and behavioral requirements. These integrations are expressed through proprietary configuration files, complex JSON-based specifications delivered via the SDK, and backend automation scripts that execute merchant-specific actions. Knot has also developed an AI-powered code-healing system that automatically detects, diagnoses, and repairs broken merchant integrations—significantly reducing the maintenance burden of operating at scale.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 37 of the Complaint.

## C. _Knot's Efforts to Maintain Its Trade Secrets as Confidential and Proprietary_

38.    Knot takes extraordinary efforts to maintain the secrecy and confidentiality of its confidential, proprietary, and trade secret information. It maintains stringent security measures to preserve the secrecy of its trade secrets and confidential information. These efforts are particularly important in light of the considerable investment Knot has made in developing and curating its trade secrets and confidential information.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 38 of the Complaint.

14

39.    Knot requires its employees to sign agreements, as a condition of their employment, that include provisions requiring them to maintain the secrecy of Knot's proprietary, confidential, and trade secret information.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 39 of the Complaint.

40.    Knot requires independent contractors to sign agreements, as a condition of their engagement, that include provisions requiring them to maintain the secrecy of Knot's proprietary, confidential, and trade secret information.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 40 of the Complaint.

41.    Knot limits access to its trade secrets only to certain employees whose access is necessary or essential.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 41 of the Complaint.

42.    Knot has, and at all times relevant to this matter had, written policies and procedures governing its information technology ("IT") and the security of confidential information. Knot's policies and procedures relate to computer controls, data access, IT disaster recovery, network security, user setup procedures, password administration and management, data backup, security audits, security breach investigations, email best practices, and mobile device security.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 42 of the Complaint.

43.    Knot implements an Information Security Policy designed to do the following: "establish a general approach to information security and the minimization of information misuse, compromise or loss; document security processes and measures; uphold ethical standards and meet the company's regulatory, legal, contractual, and other obligations; control business risk; and ensure that the appropriate company image and reputation is presented."

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 43 of the Complaint.

44.    The Information Security Policy applies to "Information in any form, regardless of the media on which it is stored, as well as, any facility, system, or network used to store, process, and/or transfer information." Moreover, it extends to "Information resources that have been entrusted to the company by any entity external to the company (i.e. Customers, Staff, and others)."

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 44 of the Complaint.

45.    Knot requires its customers and clients to sign agreements containing confidentiality provisions. The Master Service Agreement Knot's customers and clients sign includes strict confidentiality requirements and restrictions. It prohibits the customer from copying any "Service;" and it prevents any "attempt to and reverse engineer, decompile, decode, adapt, or disassemble, in whole or in part, the Services in order to find the source code, object code, ideas, structure or any algorithms used by the Services[.]"

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and, on that basis, denies the allegations of Paragraph 45 of the Complaint.

46.    Knot promulgates Terms and Conditions designed to safeguard its trade secrets; prevent and prohibit attempted acts of misappropriation; and govern the terms of the use of Knot's products and services. *See* Exhibit A.

Answer: Atomic admits that Knot purports to reference a Terms and Conditions document, attached as Exhibit A to the Complaint. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and, on that basis, denies the remaining allegations of Paragraph 46 of the Complaint.

47.    Pursuant to the section entitled "Trademarks and Intellectual Property Rights,"

The Embedded App, KnotAPI.com and the Services (collectively, "Knot Content") are owned and operated by Knot. All content, visual interfaces, information, graphics, design, compilation, computer code, products, software, services, text, data, contents, names, trade names, trademarks, trade dress, service marks, layout, logos, designs, images, graphics, illustrations, artwork, icons, photographs, displays, sound, music, video, animation, organization, assembly, arrangement, interfaces, databases, technology, and all intellectual property of any kind whatsoever and the selection and arrangement thereof including the technology relating to any of the foregoing and any content created or derived therefrom (collectively, the "Knot Materials") are owned exclusively by Knot or the licensors or suppliers or partners of Knot and are protected by U.S. copyright, trade dress, trade secret, patent, and trademark laws, international conventions, and all other relevant intellectual property and proprietary rights, and applicable laws.

*Id.*

Answer: Atomic admits that Knot purports to reference language from the Terms and Conditions document, attached as Exhibit A to the Complaint, in Paragraph 47. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 47 of the Complaint.

48. That Section further provides that:

You agree that the Knot Materials may not be copied, reproduced, distributed, republished, displayed, posted or transmitted in any form or by any means, including, but not limited to, electronic, mechanical, photocopying, recording, or otherwise, without the express prior written consent of Knot. You acknowledge that the Knot Materials are and shall remain the property of Knot. You may not modify, participate in the sale or transfer of, or create derivative works based on any Knot Materials, in whole or in part.

*Id.*

Answer: Atomic admits that Knot purports to reference language from the Terms and Conditions document, attached as Exhibit A to the Complaint, in Paragraph 48. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 48 of the Complaint.

49. Knot's Terms and Conditions also provide limitations of use, which provides as follows:

You agree to use the Services only for lawful purposes. You are prohibited from any use of the Services that would constitute a violation of any applicable law, regulation, rule or ordinance of any nationality, state, or locality or of any international law or treaty, or that could give

rise to any civil or criminal liability. Any unauthorized use of the Services, including but not limited to unauthorized entry into Knot's systems, misuse of passwords, or misuse of any information posted on or through the Services is strictly prohibited. Knot makes no claims concerning whether use of the Services is appropriate outside of the United States. If you access the Services from outside of the United States, you are solely responsible for ensuring compliance with the laws of your specific jurisdiction.

You agree you will not 1) **try to reverse engineer, disassemble, decompile, or decipher the Embedded App, KnotAPI.com or the Services or software making up the Embedded App, KnotAPI.com and Services**, 2) navigate or search the Embedded App, KnotAPI.com or Services with any tool, software, agent, engine or other means (including bots, avatars, intelligent agents, or spiders), 3) use a means other than KnotAPI's provided interface to access the Embedded App, KnotAPI.com or the Services, 4) use the Embedded App, KnotAPI.com or the Services in a way that could impair, overburden, damage, or disable any portion of the Embedded App, KnotAPI.com or Services, or 5) mirror any material contained on the Embedded App, KnotAPI.com or the Services.

Knot reserves the right to take various actions against you if we believe you have engaged in activities restricted by this Agreement or by laws or regulations, and Knot also reserves the right to take action to protect Knot, other users, and other third parties from any liability, fees, fines, or penalties. We make take actions including, but not limited to: 1) updating information you have provided to us so that it is accurate, 2) limiting or completely closing your access to the Embedded App, KnotAPI.com or the Services, 3) suspending or terminating your ability to use the Embedded App, KnotAPI.com or the Services on an ongoing basis, 4) taking legal action against you, 5) holding you liable for the amount of Knot's damages caused by your violation of this Agreement.

*Id.* (emphasis added).

Answer: Atomic admits that Knot purports to reference language from the Terms and Conditions document, attached as Exhibit A to the Complaint, in Paragraph 49. Atomic lacks sufficient knowledge or information to form a belief as

to the truth of the remaining allegations of the paragraph and, on that basis, denies

the remaining allegations of Paragraph 49 of the Complaint.

50.    Knot also implements robust security measures and conducts routine audits to ensure its proprietary and trade secret information remain confidential and to detect evidence of the exfiltration of confidential information. These measures include the following:

- Weekly vulnerability scans;
- Quarterly approved scanning vendor scans;
- Yearly penetration tests to simulate cyberattacks and exploit vulnerabilities;
- An Endpoint Detection and Response ("EDR") that continuously monitors endpoints to detect, investigate, and respond to advanced threats in real time;
- Yearly security training; and
- Dynamic Analysis Scanner (a/k/a Dynamic Application Security Testing) that identifies vulnerabilities in web applications during runtime.

Answer: Atomic lacks sufficient knowledge or information to form a belief as

to the truth of the allegations of the paragraph and, on that basis, denies the

allegations of Paragraph 50 of the Complaint.

51.    In addition to the foregoing, Knot implemented heightened measures to prevent the improper acquisition of Knot's Authentication Integrations Source Code. For outsider threats it did and does the following: limits the code to a private repository, meaning access is limited to certain authorized persons; uses Transport Layer Security ("TLS") to encrypt data; performs Static Application Security Testing ("SAST") of code base; implements an automated security and quality check that scans source code for vulnerabilities whenever a developer proposes a change to the code; conducts weekly vulnerability and dynamic scans; and implements web application firewalls. In addition, stringent Terms and Conditions govern the use of Knot's products and prohibits the copying and improper use of its products, services, and software. *See* Exhibit A. Knot's Authentication Integrations Source Code is not readily ascertainable because of the security and measures described in this paragraph.

20

Answer: Atomic admits that Knot purports to reference a Terms and Conditions document, attached as Exhibit A to the Complaint. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 51 of the Complaint.

### D. *Development of Knot's Authentication Integrations Source Code*

52.    In or around 2022, Knot began in earnest developing Knot's biometric card-switching implementation and Knot's Authentication Integrations Source Code.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 52 of the Complaint.

53.    Face ID in particular became very important for Knot's early customers because it had very high conversion rates.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 53 of the Complaint.

54.    Knot has invested substantial time and resources to develop Knot's Authentication Integrations Source Code.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 54 of the Complaint.

21

55.    For example, it took Knot approximately 18 months to write Knot's Authentication Integrations Source Code. In addition, Knot relied on 2.5 years of institutional knowledge that it took for the breakthrough.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 55 of the Complaint.

56.    Knot leadership continued to ask the engineering team to build the biometrics authentication system on several dates. But Knot viewed it as an impossible or difficult task despite their wealth of experience.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 56 of the Complaint.

57.    By 2025, Knot was confident that, with its wealth of experience, it could bring Face ID back to Apple. On June 4, 2025, the first code that could trigger Face ID was finalized. Knot positioned this feature early in the user onboarding funnel, so the first card switch a user would take when opening the Knot SDK would likely be an Apple Face ID switch, making this one of Knot's most critical and coveted features.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 57 of the Complaint.

58.    Apple quickly became Knot's most frequently switched merchant.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 58 of the Complaint.

59.    Face ID has proved to be a source of increasing revenue for Knot.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 59 of the Complaint.

60.    Knot expects the Face ID feature to continue to grow and expects that this feature will be a distinguishing factor, setting Knot apart from its competition, including Atomic, in the years to come.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 60 of the Complaint.

61.    Knot's Authentication Integrations Source Code is written instructions that define how Knot's Face ID function software works.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 61 of the Complaint.

62.    When a consumer wants to switch their card at Apple, the system takes a series of steps to update the stored card. After the steps are performed and only after successfully authenticating, the system navigates to Apple's payment management page and updates the stored card.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 62 of the Complaint.

63.    The series of steps Knot developed (which are included in Knot's Authentication Integrations Source Code) comprises several implementations, including:

   a. merchant configuration file;
   b. script implementing the three-phase authorization detection state machine;
   c. the Face ID gating logic that determines when to trigger the Face ID flow based on four conditions;
   d. the URL construction pattern that uses config-driven parameters with hardcoded fallback defaults; and
   e. The overall architecture connecting configuration, program execution, and native SDK handling of the Face ID flow.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 63 of the Complaint.

64.    These specific elements of the product took Knot and its engineers months and millions of dollars to develop and design. Knot's Face ID card-switching implementation, including its series of steps, is non-public, confidential information that took Knot years and millions of dollars to develop. Knot's Authentication Integrations Source Code represents the culmination of this investment.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 64 of the Complaint.

### E.  *Knot's Software is Protected By Copyright*

65.    Knot offers at least four products based on its SDK: CardSwitcher™; TransactionLink™; Subscription Manager™; and AccountUpdater™.

24

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 65 of the Complaint.

66.    The software underlying Knot's innovative products, including its Authentication Integrations Source Code and other software implementations described above, are original works of authorship that are subject to copyright protection (the "Knot Copyrighted Software"). The copyrightable elements of the Knot Copyrighted Software include not only the source code for the Knot Copyrighted Software, but the structure, sequence, and organization thereof. *See Whelan Assocs., Inc. v. Jaslow Dental Lab'y, Inc.*, 797 F.2d 1222 (3d Cir. 1986).

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the first sentence of the paragraph and, on that basis, denies the allegations of the first sentence of Paragraph 66 of the Complaint. The second sentence of Paragraph 66 contains characterizations, legal argument, and conclusions to which no response is necessary; to the extent those allegations are deemed factual, Atomic denies those allegations in Paragraph 66 of the Complaint.

67.    Prior to filing this action, Knot registered a number of Knot Copyrighted Software programs with the United States Copyright Office. Specifically, Knot has obtained Certificates of Copyright Registration for various versions of its Knot Copyrighted Software programs embodying its Authentication Integrations Source Code and other code relating to its card-switching functionality. These registrations include, without limitation, Registration Numbers TX 9-574-457, TX 9-574-452. A true and correct copy of the records for these registrations taken from the Copyright Office website is attached as Exhibit B.

Answer: Atomic admits that Knot purports to attach two copies of registration pages for Registration Numbers TX 9-574-457, TX 9-574-452 attached as Exhibit B to the Complaint. Atomic lacks sufficient knowledge or information to form a belief

25

as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 67 of the Complaint.

68.    Knot is the sole owner and proprietor of all right, title, and interest in and to the copyrights in the Knot Copyrighted Software and the copyright registrations therefore. The copyrights in the Knot Copyrighted Software are presently valid and subsisting and were valid and subsisting at all times affecting the matters complained of herein.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 68 of the Complaint.

69.    Knot has not provided authorization, permission, or consent to Atomic to copy Knot Copyrighted Software or make derivative works based thereon.

Answer: Atomic denies the allegations in Paragraph 69 of the Complaint.

### F. *Atomic*

70.    According to its website, Atomic was founded in 2019 by Jordan Wright and Scott Weinert.

Answer: Atomic admits that Atomic was founded in 2019 by Jordan Wright and Scott Weinert.

71.    During its early years, Atomic did not focus on merchant platforms or updating payment methods.

Answer: Atomic denies the allegations in Paragraph 71 of the Complaint.

72.    Upon information and belief, Atomic's primary product offering does not include merchant connectivity offerings that are Knot's primary focus; but Atomic has announced a directly competitive product *after* Knot announced its product. Atomic continues to announce tools and products like those Knot develops, suggesting Atomic is starting to focus more on merchant-centric products.

Answer: Atomic admits that, as part of its product offerings, Atomic offers products relating to merchant connectivity functionality. Atomic denies the remaining allegations of Paragraph 72 of the Complaint.

73.    After meeting with Knot in 2022, Atomic copied Knot's CardSwitcher$^{TM}$ product, attempted to patent it as its own, and later launched its copy-cat "TrueAuth" technology, which purports to be a secure method for users to log in directly to payroll or merchant systems without sharing credentials, in late 2023, over a year after the launch of CardSwitcher$^{TM}$. Atomic did not have a product that competed with CardSwitcher$^{TM}$ prior to the TrueAuth launch.

Answer: Atomic denies the allegations of Paragraph 73 of the Complaint.

### G. *Prior Accusations of Atomic's Misappropriation*

74.    This is not the first time that Atomic and its founder and CEO, Jordan Wright, have faced serious allegations of trade secret misappropriation.

Answer: Atomic admits that Mr. Jordan Wright was a named party in *ClickSWITCH Holdings Inc. v. Wright et al.*, Case No. 200905348 (Third Judicial District Court, Salt Lake County, Utah). Atomic otherwise denies the allegations in Paragraph 74 of the Complaint.

75.    Information in the paragraphs in this section derives from the publicly available pleadings in *ClickSWITCH Holdings Inc. v. Wright et al.*, Case No. 200905348 (Third Judicial District Court, Salt Lake County, Utah). In August 2020, ClickSWITCH Holdings Inc. ("ClickSWITCH"), a Minneapolis-based financial technology company, filed a verified complaint against Atomic and Wright in the Third Judicial District Court of Salt Lake County, Utah, alleging misappropriation of trade secrets, breach of contract, and tortious interference.

Answer: Atomic admits that Mr. Jordan Wright was a named party in the *ClickSWITCH Holdings Inc. v. Wright et al.*, Case No. 200905348 (Third Judicial

27

District Court, Salt Lake County, Utah) litigation. The allegations in the Complaint filed in the *ClickSWITCH Holdings Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations in Paragraph 75 of the Complaint.

76.    In 2018, ClickSWITCH hired Wright, first as a consultant and then as its Chief Product Officer. In that role, Wright was given access to the full scope of ClickSWITCH's confidential and proprietary information, including its software code, its proprietary database, its partner and prospect lists, its pricing information, and its methods for commercializing and customizing its platform for financial institution clients.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations in Paragraph 76 of the Complaint.

77.    As a condition of his engagement, Wright executed an Invention Assignment Agreement, under which he assigned to ClickSWITCH all inventions, intellectual property, software, databases, and trade secrets created or developed during his employment. Wright also executed a Confidential Separation Agreement upon his departure in June 2019—approximately 8 months after joining, in which he agreed to maintain the confidentiality of all ClickSWITCH proprietary information, represented that he had returned all company property including source code, and agreed to a twelve-month non-solicitation covenant prohibiting him from enticing any ClickSWITCH employee, customer, or business partner to terminate or alter its relationship with ClickSWITCH.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations in Paragraph 77 of the Complaint.

78.    During his tenure at ClickSWITCH, Wright worked closely with his cousin, Stephen Tippets, a software development consultant also retained by ClickSWITCH. Together, Wright and Tippets developed prototype code for a specific type of code that was assigned to ClickSWITCH under both individuals'

28

respective Invention Assignment Agreements. ClickSWITCH alleged that both Wright and Tippets improperly retained copies of this code after their respective separations from the company.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations in Paragraph 78 of the Complaint.

79. ClickSWITCH alleged that Wright never provided the sworn certification required by the Separation Agreement confirming that he had returned or destroyed all source code and intellectual property in his possession. Instead, according to the complaint, Wright downloaded, saved, and retained ClickSWITCH's confidential information, including its proprietary database and source code, on personal devices.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations in Paragraph 79 of the Complaint.

80. Just weeks after his departure, Wright incorporated Atomic in Delaware in July 2019 and registered it in Utah in August 2019. By June 2020, Atomic's website openly advertised a direct deposit switching product with functionality that ClickSWITCH alleged closely mimicked its own platform.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations in Paragraph 80 of the Complaint.

81. ClickSWITCH contended that Atomic's ability to bring a comparable product to market in less than a year, when ClickSWITCH's own development had taken years, was only possible through the misappropriation and use of ClickSWITCH's trade secrets.

29

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations in Paragraph 81 of the Complaint.

82.    ClickSWITCH further alleged that Wright, acting as Atomic's CEO and agent, solicited ClickSWITCH's existing contractual partners during the non-solicitation period. In one instance, Wright allegedly represented to a ClickSWITCH partner ("Partner A") that Atomic could service 80% of that partner's top 100 employers, a list that, according to ClickSWITCH, had been shared with ClickSWITCH during Wright's employment and was part of ClickSWITCH's proprietary database. ClickSWITCH contended that Wright could not have known the contents of that list without having wrongfully retained it.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations in Paragraph 82 of the Complaint.

83.    ClickSWITCH asserted claims for willful misappropriation of trade secrets under the Utah Uniform Trade Secrets Act, breach of the Separation Agreement (including its confidentiality, return-of-property, and non-solicitation provisions), and tortious interference with both existing contractual relationships and prospective economic advantage. ClickSWITCH sought a preliminary and permanent injunction, monetary damages including actual loss and unjust enrichment, exemplary damages, and attorneys' fees.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations in Paragraph 83 of the Complaint.

84.    ClickSWITCH filed its Verified Complaint on August 18, 2020, and moved for a preliminary injunction two days later, seeking to enjoin Atomic and Wright from possessing, using, or disclosing any ClickSWITCH confidential information, and to compel a full accounting and forensic imaging of Defendants'

30

electronic devices. ClickSWITCH simultaneously sought expedited discovery in preparation for the preliminary injunction hearing.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings*

*Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations

in Paragraph 84 of the Complaint.

85.    ClickSWITCH was purchased in or around April 2021 according to publicly available sources. In March 2021, the parties entered into a stipulated order and settled the matter. Under its terms, the defendants agreed to conduct a reasonable search for and destroy, delete, or return any ClickSWITCH documents retained by Wright after his separation.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings*

*Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations

in Paragraph 85 of the Complaint.

86.    While the case concluded without a merits determination, the allegations raised by ClickSWITCH, that Atomic and Wright misappropriated trade secrets, breached contractual obligations, and used a former insider's access to confidential information to build a competing business, are strikingly similar to the allegations at issue in the present matter.

Answer: The allegations in the Complaint filed in the *ClickSWITCH Holdings*

*Inc. v. Wright et al.* speak for themselves. Atomic otherwise denies the allegations

in Paragraph 86 of the Complaint.

### H. *Atomic Meets with Knot to Discuss Potential Partnership*

87.    Atomic and Knot have a history.

31

Answer: Atomic admits that employees of Atomic and Knot have communicated with each other on occasion. Atomic denies the remaining allegations of Paragraph 87 of the Complaint.

88.   On September 12, 2022, shortly after the launch of CardSwitcher™, Atomic's then-Head of Markets emailed Rory the following:

> Congratulations on recently unveiling Knot. I am excited to connect to learn more about what you and the team are working on and brainstorm potential use cases for Atomic <> Knot to work together.
>
> Looking at your website, I see a few adjacent solutions for Knot and Atomic's payroll connectivity that serve both of our missions to empower end consumers with new financial choices. Powered by their payroll account, users can digitally switch and pay bills out of direct deposit and customers can build more holistic solutions with insights on consumer's financial health with user-permissioned income and employment data.

Exhibit C.

Answer: Atomic admits that Knot purports to attach a redacted copy of email correspondence between Mr. Rory O'Reilly of Knot and Lindsay Davis, a former Atomic employee, as Exhibit C to the Complaint. Atomic denies the remaining allegations of Paragraph 88 of the Complaint.

89.   Knot ultimately agreed to multiple meetings with Atomic sharing information about the then-recently released CardSwitcher™.

Answer: Atomic denies the allegations of Paragraph 89 of the Complaint.

90.   For example, Atomic's representative attended a financial technology conference at which Knot received the Undiscovered Unicorn award.

Answer: Atomic admits that its employees have attended financial technology conferences in the past. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 90 of the Complaint.

91.   Despite multiple meetings, Atomic never once revealed its plan to emulate CardSwitcher™ with its own offering.

Answer: Atomic denies the allegations of Paragraph 89 of the Complaint.

92.   Knot was therefore shocked and disappointed when, in late 2023, Atomic released TrueAuth, its own card-switching product with functionality that closely mirrors Knot's CardSwitcher™.

Answer: Atomic admits that it released its TrueAuth technology in 2023, after years of research and development. Atomic denies the remaining allegations of Paragraph 92 of the Complaint.

### I.   *Atomic's History of Copying Knot and Announcing Competing Services/Products After Knot Announces Them*

93.   Initially, Atomic did not offer any products that competed directly with Knot. But that has changed.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 93 of the Complaint.

94.   Three examples suffice to show Atomic's persistent attempts to copy Knot by releasing a product or feature only after Knot.

| Knot Product / Feature | Launch Date / Announcement | Atomic's Competitive Product / Feature | Launch Date / Announcement |
|---|---|---|---|
| CardSwitcher™ | August 2022 | PayLink Switch | September 2023 |
| Subscription Manager | August 2022 | Paylink Manage | May 2024 |
| TransactionLink | February 2025 | SKU-Level Data | February 2026 |

Answer: Atomic admits that it released its PayLink Switch product in September 2023, Paylink Manage in May 2024, and SKU-Level Data functionality in December 2025. From publicly available sources, including an "X" post by Knot's CEO, Rory O'Reilly, Knot's Subscription Manager product was released in approximately February 2026, not August 2022:





https://x.com/RoryOReilly/status/2024211353834049772 (last accessed June 5, 2026);

*see also* https://www.linkedin.com/posts/rory-oreilly_i-couldnt-be-more-excited-to-unveil-knots-share-7429975959459606528-FzuT/ (last accessed June 5, 2026). Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph relating to the launch date/announcement of Knot's products and, on that basis, denies those remaining allegations of Paragraph 94 of the Complaint. Atomic denies the remaining allegations of Paragraph 94 of the Complaint.

### J. *Atomic's Manipulation and Deceptive Advertising*

95.    Shortly after Atomic began operating, it attempted to deceive customers and potential customers and infringed on Knot's trademarks.

Answer: Atomic denies the allegations in Paragraph 95 of the Complaint.

96.    This has led to Knot sending messages to Atomic demanding it stop.

Answer: Atomic admits that it has received at least one communication from Knot prior to Knot filing the Complaint. Atomic denies the remaining allegations of Paragraph 96 of the Complaint.

97.    For example, in or around November 2024, Knot's attorney sent Atomic a letter demanding that Atomic "immediately cease and desist all present and future use of the Knot's intellectual property rights, including use of the KNOT trademark."

Answer: Atomic admits that it received a letter from Knot's attorney in or around November 2024. Atomic denies the remaining allegations of Paragraph 97 of the Complaint.

98.    In late 2024, and as illustrated below, Knot realized that Atomic was impersonating Knot through deceptive keyword advertising and unauthorized use of Knot trademarks on its website.



Answer: Atomic denies the allegations in Paragraph 98 of the Complaint.

99.    Knot previously referred to itself as "KnotAPI." As shown above, Atomic was using "KnotAPI" to redirect customers of Knot to Atomic's website. In response, Google permanently banned Atomic from using "Knot" and "KnotAPI" in its keyword advertising.

Answer: Atomic denies the allegations in Paragraph 99 of the Complaint.

### K. *Knot Plants Honeypot*

100.    After Rory met with Atomic and discussed (in broad terms) Knot's products, Knot heard a rumor from an expert consultant working in the industry that Atomic had "stolen" from Knot.

Answer: Atomic lacks sufficient knowledge or information to form a belief as

to the truth of the allegation that "Knot heard a rumor from an expert consultant

37

working in the industry," and, on that basis, denies that allegation of Paragraph 100 of the Complaint. Atomic denies the remaining allegations in Paragraph 100 of the Complaint.

101.   After hearing those rumors, Knot noticed that, shortly after Knot announced certain products or advancements on existing products, Atomic would announce similar products or features with similar names.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 101 of the Complaint.

102.   Knot could no longer ignore this rumor and these coincidences.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 102 of the Complaint.

103.   As another security precaution, Knot created a system that would enable it to detect evidence of Atomic's misconduct.

Answer: Atomic denies that it engaged in any misconduct. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 103 of the Complaint.

104.   In or around June 2025, Knot engaged a security analyst to create and insert a honeypot code (auth-bpbsofh5-zlxp-qce3-6ney-4jfahfxa) to detect Atomic's potential theft.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 104 of the Complaint.

105.   Honeypot code is code intentionally designed to attract or identify attackers or automated bots so that their behavior can be detected, studied, or blocked. **To be clear, it serves no other purpose and is not functional code.**

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 105 of the Complaint.

106.   In cybersecurity, a honeypot is essentially a piece of code that appears valuable or vulnerable but is monitored by defenders.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 106 of the Complaint.

107.   The honeypot in Knot's software is a hardcoded parameter appended to a critical URL that Knot uses to trigger Face ID. That hardcoded variable is normally dynamic and random. Nobody would have access to the honeypot code unless they had access to Knot's trade secrets and Knot Copyrighted Software.

Answer: Atomic denies that it accessed Knot's trade secrets to view the 37 certain character honeypot. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 107 of the Complaint.

108.   The honeypot added to Knot's Authentication Integrations Source Code is a series of characters impossible to duplicate *unless* copied from Knot's source

code, which is protected by copyright and is a trade-secret. The chance of a third party independently coming up with the exact sequence of characters in the honeypot code is functionally zero.

Answer: Atomic denies that it accessed Knot's trade secrets to view the 37 certain character honeypot. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 108 of the Complaint.

## L. *Knot Discovers Atomic's Misappropriation and Theft*

109. On February 25, 2026, Knot discovered that the source code for Atomic's production JavaScript bundle includes the string of characters added to Knot's Authentication Integrations Source Code to detect improper misappropriation. That honeypot code is as follows: auth-bpbsofh5-zlxp-qce3-6ney-4jfahfxa.

Answer: Atomic admits that 37 certain characters (auth=bpbsofh5-zlxp-qce3-6ney-4jfahfxa) were located in Atomic's source code as fallback code from November 2025 through April 2026, but Atomic denies that it accessed Knot's trade secrets to view the 37 certain characters. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 109 of the Complaint.

110. The presence of this honeypot code means that Atomic has obtained Knot's Authentication Integrations Source Code, source code that underlies Knot's biometric card-switching implementation.

Answer: Atomic denies the allegations of Paragraph 110 of the Complaint.

111.    Beyond the honeypot, Atomic's code matches Knot's implementation in other specific ways, further confirming misappropriation. For example, naming parallels chosen by Atomic oftentimes are identical to Knot's naming convention. This naming parallel suggests Atomic's developers were working from Knot's code when choosing their variable names. Other substantial similarities include the use of the identical series of Boolean "checks" before Face ID is triggered; the identical phased architecture to authenticate the use of Face ID; the use of the identical URL as a "fallback" when Face ID is not validated; and the identical architectural pattern relating to using cookies as part of the authentication sequence. These similarities indicate that Atomic's code and structure was copied from Knot, as opposed to independently created.

Answer: Atomic denies the allegations of Paragraph 111 of the Complaint.

112.    On information and belief, further analysis of Atomic's software (both its literal code and its structure, sequence, and organization) will likely reveal the presence of additional indicators of Atomic's copying of protectable elements of Knot Copyrighted Software and Knot's Authentication Integrations Source Code.

Answer: Atomic denies the allegations of Paragraph 112 of the Complaint.

113.    Rather than spend its own money and resources to develop a product, Atomic has simply copied Knot's Authentication Integrations Source Code to develop a competing product.

Answer: Atomic denies the allegations of Paragraph 113 of the Complaint.

114.    By Atomic's own admission, "Apple Face ID reduced friction at the moment of authentication." *See* Jordan Wright, *Atomic's 2025 Year in Review: Turning Financial Moments Into Action*, ATOMIC (December 23, 2025), https://atomic.financial/insights/atomics-2025-year-in-review/ (last visited March 15, 2026). Atomic touted the benefits of incorporating Face ID functionality as "faster, more dependable switching experiences that hold up at scale." *Id.*

Answer: Atomic admits that the two quoted statements appear in the listed

Atomic website (https://atomic.financial/insights/atomics-2025-year-in-review/) in

41

Paragraph 114 of the Complaint. Atomic otherwise denies the allegations of Paragraph 114 of the Complaint.

115. More recently, Atomic has, in connection with its SKU-Level Data product, promoted its integration with Apple.



https://atomic.financial/insights/sku-level-data/

Answer: Atomic admits that Knot included an Atomic website (https://atomic.financial/insights/sku-level-data/) and an image from that website in Paragraph 115 of the Complaint. Atomic otherwise denies the allegations of Paragraph 115 of the Complaint.

## M. *Knot Files for Patent Protection*

116. Knot has filed for patent protection for its card-switching technology. For instance, Knot filed U.S. Provisional Patent Application No. 63/587,667 on October 3, 2023, titled "Systems and Methods for Data Automatic Updates and Synchronization," and has filed non-provisional patent applications that claim priority to that provisional application.

42

Answer: Atomic admits that Knot filed U.S. Provisional Patent Application No. 63/587,667 on October 3, 2023, titled "Systems and Methods for Data Automatic Updates and Synchronization" and has filed what appears to be non-provisional patent applications (Application #19/634,582) and PCT/US24/49464 that appear to claim priority to U.S. Provisional Patent Application No. 63/587,667. Atomic otherwise denies the allegations of Paragraph 116 of the Complaint.

### N. *Atomic Patents a Copy-Cat Card-Switching Product*

117.    Atomic did not have a card-switching product on the market before reaching out to Knot in September 2022 to discuss its recently launched CardSwitcher™ product. On December 22, 2022, more than three months after Knot launched CardSwitcher™ and months after Knot shared information about CardSwitcher™ with Atomic, Atomic filed U.S. Provisional Patent Application No. 63/434,824 (the "Provisional Application") entitled "Securely Communicating Data Between an Application Associated With an Entity and a Business System." On information and belief, Atomic copied the purported invention described in the Provisional Application from Knot after obtaining information about Knot's CardSwitcher™ product.

Answer: Atomic admits that, on December 22, 2022, Atomic filed U.S. Provisional Patent Application No. 63/434,824 (the "Provisional Application") entitled "Securely Communicating Data Between an Application Associated With an Entity and a Business System." Atomic otherwise denies the allegations of Paragraph 117 of the Complaint.

118.    On December 6, 2023, more than 16 months after the launch of CardSwitcher™ Atomic filed U.S. Patent Application 18/531,578, which issued as U.S. Patent No. 12,120,118 ("the '118 patent") (Exhibit D) on October 15, 2024. The '118 patent only names Atomic employees as inventors.

43

Answer: Atomic admits that, on December 6, 2023, Atomic filed U.S. Patent Application 18/531,578, which issued as U.S. Patent No. 12,120,118 ("the '118 patent") on October 15, 2024. Atomic admits that Knot attached a purported copy of the '118 patent as Exhibit D to the Complaint. Atomic admits that the '118 patent lists three inventors: Scott Nielsen Weinert, Jr., Sean Michael Hill, and Michael Contreras. Atomic otherwise denies the allegations of Paragraph 118 of the Complaint.

119. The '118 patent contains 16 claims, 2 of which are method claims. Method claim 14 is shown below:

A method comprising:

providing in an application context corresponding to an entity associated with a user, a webview associated with a third-party system selected from a plurality of third-party systems, wherein the webview associated with the selected third-party system displays a native login page corresponding to the selected third-party system, wherein providing the native login page corresponding to the selected third-party system via the webview associated with the selected third-party system removes the need to provide a user's login credentials to an intermediary service with which the application context is associated, wherein the user's login credentials are directly provided from an application associated with the application context, via the webview associated with the selected third-party system to the selected third-party system;

determining that a user has been authenticated by a third-party system using data comprising a page displayed via the provided webview associated with the selected third-party system at least in part by analyzing a response page displayed via the provided webview associated with the selected third-party and determining that the response page includes one or more visual page elements indicative of the user being authenticated wherein the response page is a page

44

> displayed via the provided webview associated with the selected third-party system; and
>
> in response to a determination that the response page includes the one or more visual page elements indicative of the user being authenticated, automating one or more tasks needed to perform a function, requested by the user, with the selected third-party system on behalf of the entity.

Exhibit D at 13:4-35.

Answer: Atomic admits that the '118 patent has 16 claims, 2 of which are method claims. Atomic admits that Paragraph 119 of the Complaint purports to set forth the language of claim 14, which speaks for itself.

120.    On November 4, 2024, Atomic filed U.S. Patent Application No. 18/936,749, which was a continuation-in-part to the application that issued as the '118 patent, which issued on October 14, 2025 as U.S. Patent No. 12,445,443 ("the '443 patent") (Exhibit E). Both the '118 and '443 patents claimed priority to the Provisional Application. The '443 patent only names Atomic employees as inventors.

Answer: Atomic admits that, on November 4, 2024, Atomic filed U.S. Patent Application No. 18/936,749, which was a continuation to the application that issued as the '118 patent, which issued on October 14, 2025 as U.S. Patent No. 12,445,443 ("the '443 patent"). Atomic admits that Knot attached a purported copy of the '443 patent as Exhibit E to the Complaint. Atomic admits that both the '118 and '443 patents claimed priority to the Provisional Application. Atomic admits that the '443 patent lists three inventors: Scott Nielsen Weinert, Jr., Sean Michael Hill, and Michael Contreras.

121.   The '443 patent has 20 claims, 5 of which are method claims. Method claim 16 is shown below:

A method comprising:

providing by code associated with a second entity in an application context of an application corresponding to a first entity associated with a user, a webview associated with a third-party system selected from a plurality of third-party systems, wherein the webview associated with the selected third-party system displays a native login page corresponding to the selected third-party system, wherein the user's login credentials are directly provided from the application associated with the application context, via the webview associated with the selected third-party system to the selected third-party system;

determining by executing the code associated with the second entity, that the user has been authenticated by the selected third-party system, using data comprising a response page displayed via the provided webview associated with the selected third-party system by determining that the data comprising the response page includes data indicative of the user being authenticated, where the code associated with the second entity is embedded in code of the application corresponding to the first entity associated with the user; and

in response to determining that the data comprising the response page include data indicative of the user being authenticated, automating one or more tasks needed to perform a function, requested by the user, with the selected third-party system on behalf of the entity, including by executing code associated with the second entity to communicate with a backend server that determines a parameter and a request structure associated with the function requested by the user as implemented by the selected third-party system and use the parameter and request structure to generate and send to the selected third-party system an application programming interface request that includes the parameter and confirms the request structure.

Exhibit E at 13:29-14:8.

Answer: Atomic admits that the '443 patent has 20 claims, 4 of which are method claims. Atomic admits that Paragraph 121 of the Complaint purports to set forth the language of claim 16, which speaks for itself.

122.   On December 23, 2025, counsel for Atomic sent a cease-and-desist letter to Knot's CEO, claiming summarily (without citation to any patent claim elements and without providing a claim chart) that Knot's "CardSwitcher™ product" infringed the '118 and '443 patents, even though CardSwticher™ predated the earliest filing date of those patents. A copy of that letter is attached hereto as Exhibit F. In that letter, Atomic's counsel also falsely claimed that "an individual from Knot" using the email address hello@knot.com "accessed non-public Atomic information on or about September 15, 2025," when Atomic knew or should have known that Knot's internet domain is "knotapi.com" rather than "knot.com." *Id.*

Answer: Atomic admits that, on December 23, 2025, counsel for Atomic sent a cease-and-desist letter to Knot's CEO, which attached the '118 and '443 patents. Atomic admits that Knot attached a copy of the December 23 letter as Exhibit F to the Complaint, which speaks for itself. Atomic otherwise denies the allegations of Paragraph 122 of the Complaint.

123.   On January 13, 2026, Knot's counsel responded to Atomic's letter. A copy of that letter is attached hereto as Exhibit G. In it, Knot's counsel noted that Atomic's "evidence" of infringement was "superficial" because Atomic provided no analysis of the patent claims. Knot's counsel further explained that it was Atomic who "should have intellectual property concerns" because "Knot launched CardSwitcher™ by no later than September 2022, approximately 14 months before Atomic filed its non-provisional patent application." *Id.* Lastly, Knot's counsel explained that Atomic's allegations of copying were baseless because "neither Knot nor any of its employees is affiliated with the email address 'hello@knot.com'" *Id.*

Answer: Atomic admits that Knot sent a responsive letter on January 13, 2026, and that Knot attached a copy of that letter as Exhibit G to the Complaint, which

47

speaks for itself. Atomic otherwise denies the allegations of Paragraph 123 of the Complaint.

124.    On February 25, 2026, Atomic's counsel responded with another letter. *See* Exhibit H. In it, Atomic provided claim charts and argued that "Knot's products, incorporating relevant authentication technology, infringe at least claim 14 of the '118 patent and claim 16 of the '443 patent." *Id.* Tellingly, Atomic ignored the elephant in the room—that Knot's CardSwitcher™ product that allegedly infringed the '118 and '443 patents predated the earliest filing date of those patents. As explained further below, Atomic's allegations of infringement contained in the claim charts attached to its February 25 letter are nonetheless baseless.

Answer: Atomic admits that, on February 25, 2026, counsel for Atomic sent another letter to Knot that attached claim charts for the '118 and '443 patents. Atomic admits that Knot attached a copy of the February 25 letter as Exhibit H to the Complaint, which speaks for itself. Atomic otherwise denies the allegations of Paragraph 124 of the Complaint.

125.    Atomic further "demand[ed]" in its February 25 letter that Knot "cease infringement of the Atomic Patents and remove all marketing material regarding the same" by "March 18, 2026" or Atomic would seek "legal action." *Id.*

Answer: Atomic admits that Knot quoted certain portions of Atomic's February 25 letter in Paragraph 125 of the Complaint, which speak for themselves. Atomic otherwise denies the allegations of Paragraph 125 of the Complaint.

126.    On information and belief, Atomic has falsely told customers and prospective customers that it patented card-switching technology before Knot, when Atomic knew that it copied the technology described in its patents from Knot.

Answer: Atomic denies the allegations of Paragraph 126 of the Complaint.

127. Based on these circumstances, a definite and concrete controversy exists between Knot and Atomic that is both real and immediate with respect to infringement of the '118 and '443 patents. Atomic's actions have created in Knot a reasonable apprehension that, as a result of Knot's continuing manufacture, use and sale of its CardSwitcher™ product, Knot will be sued for infringement of the '118 and '443 patents.

Answer: Atomic admits that a definite and concrete controversy exists between Knot and Atomic that is both real and immediate with respect to infringement of the '118 and '443 patents. Atomic otherwise denies the allegations of Paragraph 127 of the Complaint.

### COUNT I: DTSA Trade Secret Misappropriation
### Defend Trade Secrets Act, 18 U.S.C. § 1836(B)

128. Knot incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

Answer: Except as expressly admitted, Atomic denies the allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

129. The Defend Trade Secrets Act ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836.

Answer: Atomic admits that this Paragraph purports to quote certain language in 18 U.S.C. § 1836. The remainder of the allegations in Paragraph 129 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 129 of the Complaint to the extent Knot alleges Atomic violated this statutory language.

49

130.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or **codes**, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically . . . or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (emphasis added).

Answer: Atomic admits that this Paragraph purports to quote certain language in 18 U.S.C. § 1839(3) but denies that the word "codes" is bolded or emphasized in the statute's language. The remainder of the allegations in Paragraph 130 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 130 of the Complaint to the extent Knot alleges Atomic violated this statutory language.

131.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

50

Answer: Atomic admits that this Paragraph purports to quote certain language in 18 U.S.C. § 1839(5). The remainder of the allegations in Paragraph 131 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 131 of the Complaint to the extent Knot alleges Atomic violated this statutory language.

132.   Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

Answer: Atomic admits that this Paragraph purports to quote certain language in 18 U.S.C. § 1839(6). The remainder of the allegations in Paragraph 132 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 132 of the Complaint to the extent Knot alleges Atomic violated this statutory language.

133.   As described in more particularity above, Knot's Authentication Integrations Source Code constitutes a trade secret.

Answer: The allegations in Paragraph 133 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 133 of the Complaint.

134.   Knot has an advantage over its existing and would-be competitors based, in part, on the trade secret information, including Knot's Authentication Integrations Source Code, it has developed and implemented in its business efforts.

51

Answer: The allegations in Paragraph 134 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 134 of the Complaint.

135.   Knot owns and possesses certain confidential, proprietary, and trade secret information as alleged above. Knot takes reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets, including Knot's Authentication Integrations Source Code.

Answer: The allegations in Paragraph 135 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 135 of the Complaint.

136.   Knot's Authentication Integrations Source Code relates to products sold and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 136 of the Complaint.

137.   Knot's Authentication Integrations Source Code derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use. Accordingly, the above-described information constitutes "trade secrets," under the DTSA.

Answer: The allegations in Paragraph 137 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 137 of the Complaint.

52

138. Atomic improperly acquired and used Knot's Authentication Integrations Source Code. More specifically, Knot's Terms and Conditions explicitly prohibit reverse engineering, disassembling, decompiling, or deciphering the Embedded App, KnotAPI.com or the Services or software making up the Embedded App, KnotAPI.com and Services. *See* Exhibit A.

Answer: Atomic admits that Knot attached a purported copy of Knot's Terms and Conditions as Exhibit A to the Complaint. Atomic otherwise denies the allegations of Paragraph 138 of the Complaint.

139. Upon information and belief, the only way to obtain Knot's Authentication Integrations Source Code is via improper means, such as scraping or other nefarious mechanisms, and in violation of the Terms and Conditions.

Answer: Atomic denies the allegations of Paragraph 139 of the Complaint.

140. Atomic has used and intends to use Knot's Authentication Integrations Source Code to its own benefit and to Knot's detriment without the express or implied consent of Knot.

Answer: Atomic denies the allegations of Paragraph 140 of the Complaint.

141. As a direct and proximate result of Atomic's conduct, Knot has suffered and, if Knot's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because Knot's remedy at law is inadequate, Knot seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Knot's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

Answer: The allegations in Paragraph 141 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 141 of the Complaint.

142.    Atomic intentionally, willfully, and maliciously misused trade secrets and/or confidential or proprietary information or knowledge of Knot and continues to do so.

Answer: Atomic denies the allegations of Paragraph 142 of the Complaint.

143.    Knot has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

Answer: The allegations in Paragraph 143 contain legal conclusions to which no response is necessary. To the extent a response is required, Atomic denies the allegations of Paragraph 143 of the Complaint.

## *COUNT II: Copyright Infringement*
### *Copyright Act of 1976 (17 U.S.C. § 101, et seq.)*

144.    Knot incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

Answer: Except as expressly admitted, Atomic denies the allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

145.    The Knot Copyrighted Software, including Knot's Authentication Integrations Source Code, are original, creative works, and they are copyrightable subject matter under the copyright laws of the United States.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 145 of the Complaint.

146.    Knot is the owner of valid copyrights in the Knot Copyrighted Software, including Knot's Authentication Integrations Source Code, and the Register of Copyrights has issued valid Certificates of Registration for them as indicated in Exhibit B.

54

Answer: Atomic admits that Knot attached purported copies of Certificates of Registration for Registration Nos. TX 9-574-457 and TX 9-574-452 as Exhibit B to the Complaint. Atomic lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the paragraph and, on that basis, denies the remaining allegations of Paragraph 146 of the Complaint.

147.    Knot has complied in all respects with 17 U.S.C. §§ 101 *et seq.* and has secured the exclusive rights and privileges in and to the copyrights in Knot's Authentication Integrations Source Code.

Answer: Atomic lacks sufficient knowledge or information to form a belief as to the truth of the allegations of the paragraph and, on that basis, denies the allegations of Paragraph 147 of the Complaint.

148.    As alleged above, Atomic has had access to the Knot Copyrighted Software, including Knot's Authentication Integrations Source Code, through its interactions with Knot and possibly its scraping of Knot's executable software applications.

Answer: Atomic admits that 37 certain characters (auth=bpbsofh5-zlxp-qce3-6ney-4jfahfxa) was located in Atomic's source code as fallback code from approximately November 2025 through April 2026. Atomic denies all remaining allegations in Paragraph 148 of the Complaint.

149.    As further alleged above, Atomic's software (including its literal code and its structure, sequence, and organization) is substantially similar to the Knot Copyrighted Software, including Knot's Authentication Integrations Source Code.

Answer: Atomic denies the allegations of Paragraph 149 of the Complaint.

55

150.    Atomic has infringed and will continue to infringe Knot's copyrights in Knot's Authentication Integrations Source Code by, inter alia, reproducing, distributing, and creating derivative works based on it without authorization or other permission from Knot.

Answer: Atomic denies the allegations of Paragraph 150 of the Complaint.

151.    Atomic's infringement of Knot's copyright has been deliberate, willful, and in utter disregard of Knot's rights.

Answer: Atomic denies the allegations of Paragraph 151 of the Complaint.

152.    Upon information and belief, and as a direct and proximate result of its wrongful conduct, Atomic has obtained benefits to which Atomic is not entitled.

Answer: Atomic denies the allegations of Paragraph 152 of the Complaint.

153.    As a direct and proximate result of Atomic's wrongful conduct, Knot has been substantially and irreparably harmed in an amount not readily capable of determination.

Answer: Atomic denies the allegations of Paragraph 153 of the Complaint.

154.    Unless restrained by this Court, Atomic will cause further irreparable injury to Knot.

Answer: Atomic denies the allegations of Paragraph 154 of the Complaint.

155.    Knot is entitled to injunctive relief enjoining Atomic, its agents and employees, and all persons acting in concert or participation with it, from engaging in any further infringement of the Knot Copyrighted Software, including Knot's Authentication Integrations Source Code.

Answer: Atomic denies the allegations of Paragraph 155 of the Complaint.

156.    Knot is further entitled to recover from Atomic the damages and costs it has sustained and will sustain, and any gains, profits, and advantages obtained by Atomic as a result of its acts of infringement as alleged above. At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Knot but will be established according to proof at trial.

56

Answer: Atomic denies the allegations of Paragraph 156 of the Complaint.

157.   Alternatively, at its election, Knot is entitled to the maximum allowable amount of statutory damages in the amount of $150,000 with respect to each work infringed, or for such other amounts as may be proper under 17 U.S.C. § 504(c).

Answer: Atomic denies the allegations of Paragraph 157 of the Complaint.

158.   Knot is further entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

Answer: The allegations in Paragraph 158 contain legal conclusions to which

no response is necessary. To the extent a response is required, Atomic denies

the allegations of Paragraph 158 of the Complaint.

## COUNT III: Declaratory Judgment of Non-Infringement of the '118 Patent

159.   Knot incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

Answer: Except as expressly admitted, Atomic denies the allegations in all

preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

160.   Atomic alleges that "Knot's products incorporating relevant authentication technology" including the "Knot CardSwitcher™ product" (the "Accused Products") practice "at least claim 14 of the '118 patent."

Answer: Atomic admits the allegations of Paragraph 160 of the Complaint.

161.   Knot has not infringed and does not infringe any valid and enforceable claim of the '118 patent directly or indirectly, either literally or under the doctrine of equivalents.

Answer: Atomic denies the allegations of Paragraph 161 of the Complaint.

162.   For example, and without limitation, the Accused Products do not: (1) determine that a user has been authenticated by "analyzing a response page displayed" or by "determining that the responsive page includes one or more visual elements indicative of the user being authenticated;" and (2) in "response to a determination that the response page includes the one or more visual page elements indicative of a user being authenticated" automate one or more tasks; all of which are required elements of at least claim 14 of the '118 patent.

Answer: Atomic denies the allegations of Paragraph 162 of the Complaint.

163.   By way of further non-limiting example, Atomic's allegation in its February 25, 2026 letter (Exhibit H) that the Accused Products practice the "determining that the responsive page includes one or more _visual_ elements indicative of the user being authenticated" limitation because of Knot's alleged use of cookie data is baseless. Atomic disclaimed use of cookie data, and distinguished it from using "visual elements," during prosecution of the '118 patent.

Answer: Atomic denies the allegations of Paragraph 163 of the Complaint.

164.   There is an actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202 between Knot and Atomic concerning the infringement of the '118 patent.

Answer: Atomic admits the allegations of Paragraph 164 of the Complaint.

165.   Knot is entitled to declaratory judgment that it has not infringed and does not infringe any valid and enforceable claim of the '118 patent, directly or indirectly, either literally or under the doctrine of equivalents.

Answer: Atomic denies the allegations of Paragraph 165 of the Complaint.

### _COUNT IV: Declaratory Judgment of Non-Infringement of the '443 Patent_

166.   Knot incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

Answer: Except as expressly admitted, Atomic denies the allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

167. Atomic alleges that the Accused Products practice "at least" "claim 16 of the '443 patent."

Answer: Atomic admits the allegations of Paragraph 167 of the Complaint.

168. Knot has not infringed and does not infringe any valid and enforceable claim of the '443 patent directly or indirectly, either literally or under the doctrine of equivalents.

Answer: Atomic denies the allegations of Paragraph 168 of the Complaint.

169. For example, and without limitation, the Accused Products at least do not: (1) determine "by executing code associated with the second entity that the user has been authenticated" "using data comprising a response page displayed via the provided webview" "wherein the code associated with the second entity is embedded in code of the application corresponding to the first entity"; and (2) "in response to determining that the data comprising the response page includes data indicative of the user being authenticated," automate one or more tasks by "executing code associated with the second entity to continue with a backend server that determines a parameter and a request structure associated with the function requested by the user."

Answer: Atomic denies the allegations of Paragraph 169 of the Complaint.

170. By way of further non-limiting example, Atomic's allegation in its February 25, 2026 letter (Exhibit H) that the Accused Products practice the "determining, by executing code associated with the second entity, that the user has been authenticated by the selected third-party system, using data comprising a response page displayed" limitation because of Knot's alleged use of cookie data is baseless. Atomic disclaimed use of cookie data and distinguished it from using "a response page displayed" during prosecution of the '443 patent.

Answer: Atomic denies the allegations of Paragraph 170 of the Complaint.

171. There is an actual controversy, within the meaning of 28 U.S.C. §§ 2201 and 2202 between Knot and Atomic concerning the infringement of the '443 patent.

Answer: Atomic admits the allegations of Paragraph 171 of the Complaint.

172.   Knot is entitled to declaratory judgment that it has not infringed and does not infringe any valid and enforceable claim of the '443 patent, directly or indirectly, either literally or under the doctrine of equivalents.

Answer: Atomic denies the allegations of Paragraph 172 of the Complaint.

### *COUNT V: Declaratory Judgment of Invalidity of the '118 Patent*

173.   Knot incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

Answer: Except as expressly admitted, Atomic denies the allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

174.   Each of the asserted claims of the '118 patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, and/or 112.

Answer: Atomic denies the allegations of Paragraph 174 of the Complaint.

175.   For example, and without limitation, each claim of the '118 patent is invalid under 35 U.S.C. §§ 102 and 103 because the alleged invention was either anticipated by the prior art, obvious in light of the prior art, or was publicly used prior to the earliest priority date of the patent. By way of non-limiting example, the prior art disclosed numerous methods for detecting successful authentication of a third-party webpage. *See, e.g.*, U.S. Patent 10,587,612; U.S. Patent 7,660,880; U.S. Patent Application No. 2015/0007278; and prior art products BrowserStack, LamdaTest, 1Password, LastPass, and Inprivata OneSign. This art, alone and in combination with other prior art references, such as the Martin and Selman references discussed during prosecution, anticipates and/or renders obvious the claims of the '118 patent.

Answer: Atomic denies the allegations of Paragraph 175 of the Complaint.

176.   As noted above, Knot does not infringe the '118 patent. In the alternative, to the extent that the Court determines otherwise, the '118 patent is invalid under 35 U.S.C. §§ 102 and 103 as Knot's CardSwitcher™ product predates the earliest priority date of the '118 patent and is thus prior art to the '118 patent. Furthermore, if CardSwitcher™ practices any claims of the '118 patent, Atomic's infringement claims would be subject to an on-sale bar given that CardSwitcher™

60

was available more than one year before Atomic filed the non-provisional patent application that led to the '118 patent. The '118 patent is not entitled to the filing date of the Provisional Application because the issued claims include new matter added to the non-provisional application.

Answer: Atomic denies the allegations of Paragraph 176 of the Complaint.

177. In addition, because the '118 patent is not entitled to claim priority to the Provisional Application, Knot's U.S. Provisional Patent Application No. 63/587,667, filed on October 3, 2023, is prior art to the '118 patent, and anticipates or renders obvious the claims of the '118 patent.

Answer: Atomic denies the allegations of Paragraph 177 of the Complaint.

178. As an additional example, and without limitation, each claim of the '118 patent is invalid under 35 U.S.C. § 101 because the claims encompass unpatentable abstract ideas and do not recite a patent eligible inventive concept. At their core, the claims recite the abstract idea of visually verifying the identity of a user to facilitate a transaction. This abstract idea can be performed manually and has been well before computers were invented. For instance, the claims recite methods and systems for (1) providing a user with a selection of third-party options, whereby providing the credentials as to one of the third-party options removes the need to provide credentials to an intermediary, (2) determining based on an analysis of "visual" elements that the user is authenticated by the third-party, and (3) in response to the "visual" determination that the user was authenticated, performing one other task automatically. Moreover, the specification of the '118 patent adds nothing of substance to this abstract idea and admits that the claims use routine and conventional components and processes. Therefore, the claims of the '118 patent are patent ineligible.

Answer: Atomic denies the allegations of Paragraph 178 of the Complaint.

179. Absent a declaration and order as sought by Knot, Atomic will continue to wrongfully assert that Knot has infringed the '118 patent and that the patent is valid, thereby causing Knot irreparable injury and damage.

Answer: Atomic denies the allegations of Paragraph 179 of the Complaint.

180. A judicial determination of the respective rights of the parties with respect to the invalidity of the '118 patent is necessary and appropriate.

61

Answer: The '118 patent is presumed valid under 35 U.S.C. § 282. Atomic admits that a judicial determination of the respective rights of the parties with respect to the validity of the '118 patent is necessary and appropriate. The remaining allegations to Paragraph 180 contain legal conclusions to which no response is required. However, to the extent a response is required, Atomic denies the remaining allegations of Paragraph 180 of the Complaint.

### COUNT VI: Declaratory Judgment of Invalidity of the '443 Patent

181.   Knot incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

Answer: Except as expressly admitted, Atomic denies the allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

182.   Each of the asserted claims of the '443 patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, and/or 112.

Answer: Atomic denies the allegations of Paragraph 182 of the Complaint.

183.   For example, and without limitation, each claim of the '443 patent is invalid under 35 U.S.C. §§ 102 and 103 because the alleged invention was either anticipated by the prior art, obvious in light of the prior art, or was publicly used prior to the earliest priority date of the patent. By way of non-limiting example, the prior art disclosed numerous methods for detecting successful authentication of a third-party webpage. *See, e.g.*, U.S. Patent 10,587,612; U.S. Patent 7,660,880; U.S. Patent Application No. 2015/0007278; and prior art products BrowserStack, LamdaTest, 1Password, LastPass, and Inprivata OneSign. This art, alone and in combination with the Martin and Selman references discussed during prosecution, anticipates and/or renders obvious the claims of the '443 patent.

Answer: Atomic denies the allegations of Paragraph 183 of the Complaint.

184. As noted above, Knot does not infringe the '443 patent. In the alternative, to the extent that the Court determines otherwise, the '443 patent is invalid under 35 U.S.C. §§ 102 and 103 as Knot's CardSwitcher™ product predates the earliest priority date of the '443 patent and is thus prior art to the '443 patent. Furthermore, if CardSwitcher™ practices any claims of the '443 patent, Atomic's infringement claims would be subject to an on-sale bar given that CardSwitcher™ was available more than one year before Atomic filed the non-provisional patent application that led to the '443 patent. The '443 patent is not entitled to the filing date of the Provisional Application because the issued claims include new matter added to the non-provisional application.

Answer: Atomic denies the allegations of Paragraph 184 of the Complaint.

185. In addition, because the '118 patent is not entitled to claim priority to the Provisional Application, Knot's U.S. Provisional Patent Application No. 63/587,667, filed on October 3, 2023, is prior art to the '118 patent, and anticipates or renders obvious the claims of the '118 patent.

Answer: Atomic denies the allegations of Paragraph 185 of the Complaint.

186. As an additional example, and without limitation, each claim of the '443 patent is invalid under 35 U.S.C. § 101 because the claims encompass unpatentable abstract ideas and do not recite a patent eligible inventive concept. At their core the claims recite the abstract idea of visually verifying the identity of a user to facilitate a transaction. This abstract idea can be performed manually and has been well before computers were invented. For instance, the claims recite methods and systems for (1) providing a user with a selection of third-party options, whereby providing the credentials as to one of the third-party options removes the need to provide credentials to an intermediary, (2) determining based on an analysis of a display that the user is authenticated by the third-party, and (3) in response to the visual determination that the user was authenticated, performing one other task automatically. Moreover, the specification of the '443 patent adds nothing of substance to this abstract idea and admits that the claims use routine and conventional components and processes. Therefore, the claims of the '443 patent are patent ineligible.

Answer: Atomic denies the allegations of Paragraph 186 of the Complaint.

187.    Absent a declaration and order as sought by Knot, Atomic will continue to wrongfully assert that Knot has infringed the '443 patent and that the patent is valid, thereby causing Knot irreparable injury and damage.

Answer: Atomic denies the allegations of Paragraph 187 of the Complaint.

188.    A judicial determination of the respective rights of the parties with respect to the invalidity of the '443 patent is necessary and appropriate.

Answer: The '443 patent is presumed valid under 35 U.S.C. § 282. Atomic admits that a judicial determination of the respective rights of the parties with respect to the validity of the '443 patent is necessary and appropriate. The remaining allegations in Paragraph 188 contain legal conclusions to which no response is required. To the extent a response is required, Atomic denies the remaining allegations of Paragraph 188 of the Complaint.

### COUNT VII: Declaratory Judgment of Unenforceability of the '118 Patent

189.    Knot incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

Answer: Except as expressly admitted, Atomic denies the allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

190.    Knot seeks a judgment declaring that the claims of the '118 patent are unenforceable under the doctrine of inequitable conduct.

Answer: Paragraph 190 contains characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations are deemed factual, Atomic denies those allegations in Paragraph 190 of the Complaint.

64

191.   Atomic was aware of Knot's CardSwitcher™ product in 2022, prior to filing its Provisional Application on which the '118 patent claims priority. Indeed, Lindsay Davis, then Head of Markets at Atomic, reached out to Rory O'Reilly of Knot on September 12, 2022 to congratulate him for "recently unveiling Knot" and suggested that the companies discuss a collaboration involving Knot's CardSwitcher™ product. *See* Exhibit C. Knot and Atomic met to discuss a potential collaboration in the following weeks. At that time, unlike Knot, Atomic did not have a card-switching product on the market. As part of those discussions, Knot shared technical information about its CardSwitcher™ product with Atomic. At no time during those discussions did Atomic reveal its plan to emulate CardSwitcher™ with its own offering.

Answer: Atomic admits that Knot purports to attach a redacted copy of an email between Mr. Rory O'Reilly of Knot and Lindsay Davis, a former Atomic employee, as Exhibit C to the Complaint. Atomic admits that the "recently unveiling Knot" language was in Ms. Davis's email to Mr. O'Reilly but Ms. Davis's email did not contain a reference to "CardSwitcher™. Atomic otherwise denies the remaining allegations of Paragraph 191 of the Complaint.

192.   On information and belief, the named inventors on the '118 patent—including Scott Weinert, Atomic's founder and Chief Technical Officer—were aware of Atomic's discussions with Knot in 2022 and were aware that Knot's CardSwitcher™ product was publicly launched prior to the filing of Atomic's Provisional Application.

Answer: Atomic admits that Mr. Scott Weinert, Atomic's co-founder and Chief Technical Officer, is listed as a named inventor on the '118 patent. Atomic otherwise denies the remaining allegations of Paragraph 192 of the Complaint.

193.   Neither Mr. Weinert, nor his co-inventors, disclosed CardSwitcher™ as prior art during the later prosecution of the '118 patent. CardSwitcher™ is material to the '118 patent, as the examiner would likely not have allowed the claims of the '118 patent to issue had he/she known about the prior art CardSwitcher™

65

product. Indeed, Atomic has taken the position that CardSwitcher™ infringes the '118 patent, and thus was aware of the materiality of CardSwitcher™ to the allowance of the '118 patent.

Answer: Atomic admits that it has taken the position that CardSwitcher™ infringes the '118 patent as explained in its December 23, 2025 and February 25, 2026 letters to Knot. Atomic otherwise denies the remaining allegations of Paragraph 193 of the Complaint.

194.    On information and belief, the named inventors (including Mr. Weinert) and Atomic also were aware of Kieran O'Reilly and Rory O'Reilly's conception of the card-switching methods and systems disclosed in the '118 patent. Neither Mr. Weinert nor his co-inventors disclosed that Knot (and particularly Kieran O'Reilly and Rory O'Reilly) conceived of the inventions of the '118 patent. This disclosure is material because inventorship is a critical requirement for obtaining a patent. *See* 35 U.S.C. § 102(f). Patent examiners are told to "reject claims" when "it is clear that the application does not name the correct inventorship and the applicant has not filed a request to correct inventorship." MPEP § 2157. If the examiner knew that the inventions disclosed in the '118 patent were conceived, even in part, by Kieran O'Reilly and/or Rory O'Reilly, he/she would likely have rejected Atomic's claims, as it would have been clear that there was a material inventorship issue.

Answer: Atomic admits that MPEP § 2157 states, in part, "In the rare situation where it is clear that the application does not name the correct inventorship and the applicant has not filed a request to correct inventorship under 37 CFR 1.48, Office personnel should reject the claims under 35 U.S.C. 101 and 35 U.S.C. 115." Atomic otherwise denies the remaining allegations of Paragraph 194 of the Complaint.

195.    The single most reasonable inference to be drawn from Atomic's and the named inventors' conduct is that they intended to deceive the Patent and Trademark Office ("PTO") so that they could patent Knot's card-switching product and claim it as their own.

Answer: Atomic denies the allegations of Paragraph 195 of the Complaint.

196.    Absent a declaration and order as sought by Knot, Atomic will continue to wrongfully assert that Knot has infringed the '118 patent and that the patent is enforceable, thereby causing Knot irreparable injury and damage.

Answer: Atomic denies the allegations of Paragraph 196 of the Complaint.

197.    A judicial determination of the respective rights of the parties with respect to the enforceability of the '118 patent is necessary and appropriate.

Answer: Atomic admits that declaratory judgment jurisdiction exists but Atomic denies the remaining allegations of Paragraph 197 of the Complaint that a determination of the respective rights of the parties with respect to the enforceability of the '118 patent is necessary and appropriate.

### COUNT VIII: Declaratory Judgment of Unenforceability of the '443 Patent

198.    Knot incorporates by reference all allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

Answer: Except as expressly admitted, Atomic denies the allegations in all preceding and subsequent paragraphs of this Complaint as if fully rewritten herein.

199.    Knot seeks a judgment declaring that the claims of the '443 patent are unenforceable under the doctrine of inequitable conduct.

Answer: Paragraph 199 contains characterizations, legal argument, and conclusions to which no response is necessary. To the extent those allegations are deemed factual, Atomic denies those allegations in Paragraph 199 of the Complaint.

200.    Atomic was aware of Knot's CardSwitcher™ product in 2022, prior to filing its Provisional Application on which the '443 patent claims priority. Indeed, Lindsay Davis, then Head of Markets at Atomic, reached out to Rory O'Reilly of

Knot on September 12, 2022 to congratulate him for "recently unveiling Knot" and suggested that the companies discuss a collaboration involving Knot's CardSwitcher™ product. *See* Exhibit C. Knot and Atomic met to discuss a potential collaboration in the following weeks. At that time, unlike Knot, Atomic did not have a card-switching product on the market. As part of those discussions, Knot shared technical information about its CardSwitcher™ product with Atomic. At no time during those discussions did Atomic reveal its plan to emulate CardSwitcher™ with its own offering.

Answer: Atomic admits that Knot purports to attach a redacted copy of an email between Mr. Rory O'Reilly of Knot and Lindsay Davis, a former Atomic employee, as Exhibit C to the Complaint. Atomic admits that the "recently unveiling Knot" language was in Ms. Davis's email to Mr. O'Reilly but Ms. Davis's email did not contain a reference to "CardSwitcher™. Atomic otherwise denies the remaining allegations of Paragraph 200 of the Complaint.

201. On information and belief, the named inventors on the '443 patent—including Scott Weinert, Atomic's founder and Chief Technical Officer—were aware of Atomic's discussions with Knot in 2022 and were aware that Knot's CardSwitcher™ product was publicly launched prior to the filing of Atomic's Provisional Application.

Answer: Atomic admits that Mr. Scott Weinert, Atomic's co-founder and Chief Technical Officer, is listed as a named inventor on the '443 patent. Atomic otherwise denies the remaining allegations of Paragraph 201 of the Complaint.

202. Neither Mr. Weinert, nor his co-inventors, disclosed CardSwitcher™ as prior art during the later prosecution of the '443 patent. CardSwitcher™ is material to the '443 patent, as the examiner would likely not have allowed the claims of the '443 patent to issue had he/she known about the prior art CardSwitcher™ product. Indeed, Atomic has taken the position that CardSwitcher™ infringes the '443 patent, and thus was aware of the materiality of CardSwitcher™ to the allowance of the '443 patent.

68

Answer: Atomic admits that it has taken the position that CardSwitcher™ infringes the '443 patent as explained in its December 23, 2025 and February 25, 2026 letters to Knot. Atomic otherwise denies the remaining allegations of Paragraph 202 of the Complaint.

203.   On information and belief, the named inventors (including Mr. Weinert) and Atomic also were aware of Kieran O'Reilly and Rory O'Reilly's conception of the card-switching methods and systems disclosed in the '443 patent. Neither Mr. Weinert, nor his co-inventors, disclosed that Knot (and particularly Kieran O'Reilly and Rory O'Reilly) conceived of the inventions of the '443 patent. This disclosure is material because inventorship is a critical requirement for obtaining a patent. *See* 35 U.S.C. § 102(f). Patent examiners are told to "reject claims" when "it is clear that the application does not name the correct inventorship and the applicant has not filed a request to correct inventorship." MPEP § 2157. If the examiner knew that the inventions disclosed in the '443 patent were conceived, even in part, by Kieran O'Reilly and/or Rory O'Reilly, he/she would likely have rejected Atomic's claims, as it would have been clear that there was a material inventorship issue.

Answer: Atomic admits that MPEP § 2157 states, in part, "In the rare situation where it is clear that the application does not name the correct inventorship and the applicant has not filed a request to correct inventorship under 37 CFR 1.48, Office personnel should reject the claims under 35 U.S.C. 101 and 35 U.S.C. 115." Atomic otherwise denies the remaining allegations of Paragraph 194 of the Complaint.

204.   The single most reasonable inference to be drawn from Atomic's and the named inventors' conduct is that they intended to deceive the Patent and Trademark Office ("PTO") so that they could patent Knot's card-switching product and claim it as their own.

Answer: Atomic denies the allegations of Paragraph 204 of the Complaint.

69

205.   Absent a declaration and order as sought by Knot, Atomic will continue to wrongfully assert that Knot has infringed the '443 patent and that the patent is enforceable, thereby causing Knot irreparable injury and damage.

Answer: Atomic denies the allegations of Paragraph 205 of the Complaint.

206.   A judicial determination of the respective rights of the parties with respect to the enforceability of the '443 patent is necessary and appropriate.

Answer: Atomic admits that declaratory judgment jurisdiction exists but Atomic denies the remaining allegations of Paragraph 206 of the Complaint that a determination of the respective rights of the parties with respect to the enforceability of the '443 patent is necessary and appropriate.

## *DEMAND FOR JURY TRIAL*

Pursuant to Federal Rule of Civil Procedure 38(b), Knot demands a trial by jury on all issues so triable.

Answer: Knot's demand for a jury trial on all issues raised by its Complaint contains no allegations and Atomic therefore is not required to respond. To the extent that any allegations are included in these portions of Knot's Complaint, Atomic denies those allegations.

## *PRAYER FOR RELIEF*

WHEREFORE, Knot respectfully requests that the Court enter Judgment in its favor and an Order against Atomic that grants the following relief:

1.   An injunction that:
a.   Preliminarily, prospectively, and permanently enjoins Atomic, and all persons and/or entities acting on its behalf, for its benefit, or in active concert or participation with it (including any agents, representatives, associates and/or employees), from accessing,

reproducing, using, disclosing or otherwise misappropriating any of Knot's trade secrets, Knot Copyrighted Software, or other confidential or proprietary information;

b.  Prohibits Atomic, and all persons and/or entities acting on its behalf, for its benefit, or in active concert or participation with it (including any agents, representatives, associates and/or employees), from deleting any evidence relevant to this litigation during the pendency thereof;

c.  Requires that Atomic remove from circulation and destroy or deliver up for destruction any products infringing the copyrights in the Knot Copyrighted Software;

d.  Requires that Atomic file with the Court and serve on Knot's counsel within 30 days after issuance of the injunction, a written report, sworn under oath, setting forth in detail the manner in form in which Atomic has complied with the injunction;

2.  A declaration that Atomic has directly and/or indirectly infringed Knot's valid and duly issued copyrights in the Knot Copyrighted Software;

3.  Actual, incidental, compensatory, and consequential damages in an amount to be proven at trial;

4.  An accounting and disgorgement of Atomic's profits, gains, and advantages realized from its manufacturing, importing, exporting, distributing, advertising, marketing, promoting, offering for sale, selling, and otherwise dealing in products infringing the Knot Copyrighted Software, including a reconciliation of all purchases and sales of the infringing products with documents relating to all such purchases and sales;

5.  In the alternative to Knot's actual damages and Atomic's profits, an award of statutory damages for willful copyright infringement of the Knot Copyrighted Software in the amount of $150,000 per work as authorized by 17 U.S.C. § 504(c);

6.  Punitive damages in an amount to be proven at trial due to Atomic's willful and malicious conduct;

7.  A declaration that Knot has not infringed and will not infringe the '118 patent via the making, using, selling, and/or offering for sale of its CardSwitcher$^{TM}$ product;

8.  A declaration that Knot has not infringed and will not infringe the '443 patent via the making, using, selling, and/or offering for sale of its CardSwitcher$^{TM}$ product;

9.  A declaration that the '118 and '443 patents are invalid and unenforceable;

71

10.     Costs and expenses incurred herein, including reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D), 17 U.S.C. § 505, or any other applicable law;

11.     Pre-judgment and post-judgment interest; and

12.     All other relief as the Court may deem just, equitable and proper.

Answer: Atomic denies that Knot has any valid claim and denies that Knot is entitled to any of the relief requested in its Prayer for Relief.

## GENERAL DENIAL OF ALLEGATIONS IN THE COMPLAINT

Atomic denies any allegations not specifically responded to above, whether expressed, implied, or contained in headings appearing throughout the Complaint.

## AFFIRMATIVE DEFENSES

Atomic asserts the following defenses to the Complaint and reserves its right to supplement, amend, modify, or withdraw these defenses as discovery progresses or as justice may require, and to assert other and additional defenses as be appropriate at a later time. In asserting these defenses, Atomic does not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places that burden on Knot.

## FIRST AFFIRMATIVE DEFENSE: Failure to State a Claim

1.     Knot's claims are barred, in whole or in part, because Knot fails to state facts sufficient to state a cause of action against Atomic on which relief may be granted.

72

### SECOND AFFIRMATIVE DEFENSE: No Injury-in-Fact

2.      Knot's claims are barred, in whole or in part, because Knot has not suffered any injury-in-fact or damages as a result of any alleged actions by Atomic.

### THIRD AFFIRMATIVE DEFENSE: Failure to Mitigate

3.      Knot's claims are barred, in whole or in part, to the extent Knot's alleged injuries, if any, were aggravated by its failure to use reasonable diligence to mitigate them.

### FOURTH AFFIRMATIVE DEFENSE: Waiver, Estoppel, Acquiescence

4.      Knot's claims are barred, in whole or in part, by the doctrine of waiver, estoppel, and/or acquiescence.

### FIFTH AFFIRMATIVE DEFENSE: Unclean Hands

5.      Knot's claims are barred, in whole or in part, by the doctrine of unclean hands, to the extent Knot is found to be *in pari delicto* and/or guilty of unclean hands.

### SIXTH AFFIRMATIVE DEFENSE: Adequate Remedy at Law

6.      Knot's injunctive and any other equitable relief sought by Knot is barred, in whole or in part, because Knot has available an adequate remedy at law for any alleged harm they have suffered.

### SEVENTH AFFIRMATIVE DEFENSE: No Trade Secrets

7.      Knot's claims are barred, in whole or in part, because none of the information Knot asserts as a trade secret qualifies as a trade secret. Knot fails to

sufficiently meet its burden to identify any protectable trade secret with requisite particularity, much less a trade secret that Atomic is alleged to have misappropriated. Among other reasons, information over which Knot attempts to, but cannot, claim trade secret status is not confidential (*e.g.,* publicly available), was readily ascertainable through lawful means, and/or does not derive actual or potential economic value from not being generally known. Knot also failed to take reasonable measures to protect the secrecy of the allegedly misappropriated information.

### EIGHTH AFFIRMATIVE DEFENSE: No Misappropriation

8.    Knot's claims are barred, in whole or in part, because Atomic did not misappropriate any information Knot claims as trade secrets through improper means.

### NINTH AFFIRMATIVE DEFENSE: No Use

9.    Knot's claims are barred, in whole or in part, because Atomic has never wrongfully retained or utilized Knot's confidential, proprietary, or trade secret information.

### TENTH AFFIRMATIVE DEFENSE: No Proximate Cause

10.    Knot's claims are barred, in whole or in part, because there exists no proximate cause between any of Knot's alleged damages and any act or omission on the party of Atomic. Therefore, Knot is not entitled to recover from Atomic.

74

### ELEVENTH AFFIRMATIVE DEFENSE: Contributory Negligence

11.    Knot's claims are barred, in whole or in part, by Knot's comparative or contributory negligence.

### TWELFTH AFFIRMATIVE DEFENSE: Independent Development

12.    Knot's trade secret claim is barred, in whole or in part, by the doctrine of independent development.

### THIRTEENTH AFFIRMATIVE DEFENSE: Reverse Engineering

13.    Knot's claims are barred, in whole or in part, because its trade secrets could be ascertained by the public through reverse engineering or other means.

### FOURTEENTH AFFIRMATIVE DEFENSE: Fair Use

14.    Knot's claims are barred, in whole or in part, by the doctrine of fair use.

### FIFTEENTH AFFIRMATIVE DEFENSE: Independent Creation

15.    Knot's copyright claims are barred, in whole or in part, by the doctrine of independent creation.

### SIXTEENTH AFFIRMATIVE DEFENSE: Invalid/Unenforceable

16.    Knot's claims are barred, in whole or in part, because its alleged copyrights alleged in the Complaint are invalid and/or unenforceable.

### SEVENTEENTH AFFIRMATIVE DEFENSE: *Scènes à Faire*

17.    Knot's claims are barred, in whole or in part, by the doctrine of *Scènes à Faire*.

## EIGHTEENTH AFFIRMATIVE DEFENSE: Misuse of Copyright

18.    Knot's claims are barred, in whole or in part, by the doctrine of copyright misuse.

## NINETEENTH AFFIRMATIVE DEFENSE: *De Minimis* Use

19.    Knot's claims are barred, in whole or in part, to the extent Atomic's use of Knot's alleged copyrighted material was incidental and *de minimis*, and therefore not actionable.

## TWENTIETH AFFIRMATIVE DEFENSE: Innocent Infringement

20.    Knot's claims are barred, in whole or in part, because Atomic reasonably believed its conduct was non-infringing pursuant to longstanding industry custom and practice.

## TWENTY-FIRST AFFIRMATIVE DEFENSE: Public Domain

21.    Knot's claims are barred, in whole or in part, because one or more of the alleged copyrights at issue have entered the public domain, whether by publication without notice, failure to observe other copyright formalities, or otherwise.

## TWENTY- SECOND AFFIRMATIVE DEFENSE: Copyright Abandonment

22.    Knot's claims are barred, in whole or in part, to the extent that Knot abandoned or forfeited their copyrights, including by publication without notice.

76

## TWENTY- THIRD AFFIRMATIVE DEFENSE: Lack of Ownership

23.     Knot's claims are barred, in whole or in part, to the extent that Knot is not the owner of one or more of the alleged copyrights or trade secrets at issue.

## TWENTY- FOURTH AFFIRMATIVE DEFENSE: Infringement of the '118 Patent

24.     Knot's claims are barred, in whole or in part, because Knot infringes at least one claim of the '118 Patent, directly or indirectly, either literally or under the doctrine of equivalents, under 35 U.S.C. § 271 *et seq.*

## TWENTY- FIFTH AFFIRMATIVE DEFENSE: Validity of the '118 Patent

25.     Knot's claims are barred, in whole or in part, because the '118 Patent is not invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112. The '118 Patent is presumed valid under 35 U.S.C. § 282, and Knot has not shown, by clear and convincing evidence, that the '118 Patent is invalid.

## TWENTY- SIXTH AFFIRMATIVE DEFENSE: Enforceability of the '118 Patent

26.     Knot's claims are barred, in whole or in part, because Knot has failed to demonstrate, with particularity, the required elements to prove an inequitable conduct claim for the '118 Patent. Inequitable conduct requires a showing that the patentee (1) withheld material information from the U.S. Patent & Trademark Office, and (2) did so with the specific intent to deceive the

77

PTO. *Therasense*, *Inc. v. Becton*, *Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc).

## TWENTY- SEVENTH AFFIRMATIVE DEFENSE: Infringement of the '443 Patent

27.     Knot's claims are barred, in whole or in part, because Knot infringes at least one claim of the '118 Patent, directly or indirectly, either literally or under the doctrine of equivalents, under 35 U.S.C. § 271 *et seq.*

## TWENTY- EIGHTH AFFIRMATIVE DEFENSE: Validity of the '443 Patent

28.     Knot's claims are barred, in whole or in part, because the '443 Patent is not invalid under 35 U.S.C. §§ 101, 102, 103, and/or 112. The '443 Patent is presumed valid under 35 U.S.C. § 282, and Knot has not shown, by clear and convincing evidence, that the '443 Patent is invalid.

## TWENTY- NINTH AFFIRMATIVE DEFENSE: Enforceability of the '443 Patent

29.     Knot's claims are barred, in whole or in part, because Knot has failed to demonstrate, with particularity, the required elements to prove an inequitable conduct claim for the '443 Patent. Inequitable conduct requires a showing that the patentee (1) withheld material information from the U.S. Patent & Trademark Office, and (2) did so with the specific intent to deceive the PTO. *Therasense*, *Inc. v. Becton*, *Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc).

## RESERVATION OF ADDITIONAL DEFENSES

30.    Additional defenses may be disclosed by discovery or additional factual allegations made by Knot. Accordingly, Atomic reserves the right to amend, modify, revise, or supplement its Answer, or to plead such further defense and/or take such further actions that may be necessary and proper to preserve such additional defenses.

## PRAYER FOR RELIEF

WHEREFORE, Atomic prays that this Court:

1. Dismiss Knot's Complaint against Atomic with prejudice;

2. Enter judgment in favor of Atomic and against Knot on the causes of action set forth in the Complaint;

3. Award no relief to Knot on the causes of action set forth in the Complaint;

4. Award attorneys' fees and costs in favor of Atomic against Knot as permitted by applicable law; and

5. Award such other and further relief as this Court deems just and proper.

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Atomic respectfully requests a jury trial of all issues triable to a jury in this action.

79

* * * * *

## COUNTERCLAIMS

1. Without admitting any of the allegations of the Complaint other than those expressly admitted herein, and without prejudice to Atomic's right to plead additional counterclaims as additional information becomes available, Counterclaim-Plaintiff Atomic Financial, Inc. ("Atomic") alleges as follows against Counterclaim-Defendant MyCard, Inc.'s d/b/a Knot ("Knot"):

## THE PARTIES

2. Counterclaim-Plaintiff Atomic FI, Inc. is a Delaware corporation, with its principal place of business located at 1895 E. Rodeo Walk Dr., Suite B200, Holladay, UT 84117.

3. Counterclaim-Defendant MyCard, Inc.'s d/b/a Knot is a Delaware corporation, with its principal place of business in New York (36 E 20th Floor 4, New York, NY 10003).

## BACKGROUND

### A. Atomic's Founding and Product Development

4. Atomic is a financial technology (fintech) company that provides a connected Application Programming Interface (API)-based platform to financial institutions, fintechs, and other consumer-facing platforms.

5. While Atomic was officially incorporated in 2019, its technological and intellectual origins begin much earlier—years before Knot was even conceived.

80

6.     Atomic's CEO and co-founder, Jordan Wright, and co-founder and Chief Technology Officer, Scott Weinert, became fintech entrepreneurs in 2012, a full eight years before MyCard, Inc. (d/b/a Knot) was incorporated in 2020.

7.     Prior to launching Atomic, Messrs. Wright and Weinert co-founded Unbill, a fintech payment company that leveraged payment portals and user-permissioned access to those portals to automate consumer financial actions.

8.     Messrs. Wright's and Weinert's experiences at Unbill provided the foundation of knowledge—earned through years of product and sales experience—that directly informed the creation of Atomic.

9.     In building Unbill, Messrs. Wright and Weinert developed deep expertise regarding how payment portals function, how to authenticate users securely within those portals, and how to automate actions on their behalf. These are the same core technical disciplines that underlie Atomic's products today, including TrueAuth.

10.    Atomic's creation is a natural continuation of the work Messrs. Wright and Weinert started in 2012 at Unbill. The combination of technical knowledge and industry expertise Messrs. Wright and Weinert accumulated over seven years of building, scaling, and ultimately selling Unbill in 2017 was foundational for their work building Atomic.

11.    In August 2020, approximately one year after Atomic's founding, Atomic performed what it believes to be the first automated direct deposit switch in production. This was a milestone that reflected the depth resulting from a decade of expertise. Atomic refined and improved that product over the next several years.

12.    During that period, Atomic's customers consistently asked whether Atomic would extend its technology to payment switching more broadly.

13.    In 2021, well before any contact between Atomic and Knot, Atomic began developing its TrueAuth technology.

14.    In February 2022, Atomic publicly announced TrueAuth (sometimes referred to as Uplink given shifting names of technology), which represented a fundamentally new approach to authentication—one that establishes a direct session between the user's device and their payroll provider or merchant.

15.    This February 2022 public announcement occurred approximately seven months before Atomic's then-Head of Markets, Lindsay Davis, sent the September 2022 email to Mr. O'Reilly that Knot attached as Exhibit C to the Complaint. In other words, Atomic's core innovation was already developed, publicly announced, and in use before Atomic ever interacted with Knot.

16.    TrueAuth is Atomic's patented, device-based authentication technology that serves as a critical infrastructure layer across multiple Atomic

products, including PayLink (which encompasses PayLink Switch and PayLink Manage) and SKU-Level Data.

17. TrueAuth enables users to authenticate—that is, to verify their identity and log in—directly on their own devices without sharing their login credentials (such as username and passwords) with Atomic or any other third party.

18. The approach in TrueAuth is fundamentally different from older authentication methods that required users to provide their credentials to an intermediary service, which would then log in on the user's behalf.

19. With TrueAuth, authentication occurs entirely on the user's device, no credentials are shared with or stored by Atomic or other third parties, and the risk of credential exposure is significantly reduced.

20. TrueAuth has been a demonstrable commercial success since its launch.

21. By September 2022, Atomic was publicly sharing performance data showing that users were 32% more likely to authenticate successfully via TrueAuth (sometimes referred to as Uplink given shifting names of technology) compared to traditional screen scraping methods. The security gains were significant, and the conversion rate improvements were dramatic.

22. As a direct result of TrueAuth's performance, Atomic secured relationships with hundreds of fintechs and financial institutions—including nine of the top ten banks in the United States.

83

23. On December 22, 2022, Atomic filed a provisional patent application (No. 63/434,824) that set forth specific inventive features used by TrueAuth to securely communicate data between an application associated with an entity and a third party system. This provisional application provided support for two U.S. patent applications, also covering TrueAuth, that ultimately matured into U.S. Patent Nos. 12,120,118 ("the '118 patent") and 12,445,443 ("the '443 patent").

24. The '118 patent was issued on October 15, 2024, while the '443 patent was issued on October 14, 2025. Both patents name Atomic employees Scott Nielsen Weinert, Jr., Sean Michael Hill, and Michael Contreras as inventors.

25. Both the '118 and '443 patents were examined and duly issued by the United States Patent and Trademark Office after a thorough review of prior art references.

26. The '118 and '443 patents reflect original inventive work by Atomic's engineering team, built on over a decade of hands-on experience in payment portal automation, and they are strong independent evidence that Atomic's technology is its own.

27. While Atomic initially used TrueAuth technology for payroll systems, Atomic knew from the beginning that the use case for TrueAuth was platform-agnostic; TrueAuth worked the same way whether the destination was a payroll system like ADP or a merchant like Amazon, Netflix, or Walmart.

28.    Given that Atomic customers had already been asking Atomic to extend its capabilities to payment switching, Atomic began experimenting with TrueAuth in the merchant context and found that this client-side approach to authentication yielded significant security gains and much higher conversion rates compared to traditional screen scraping methods.

29.    In September 2023, Atomic publicly announced the launch of its payment switching product, PayLink Switch (and its companion PayLink Manage), which enables users to instantly update their card or payment details across multiple merchants, subscriptions, and utilities within a single, secure interface. Both of these products were built using TrueAuth technology.

30.    This September 2023 announcement came eleven years after Unbill's founding, reflecting the long arc of independent innovation that Messrs. Wright and Weinert have pursued throughout their careers.

31.    PayLink is Atomic's product suite that provides user-permissioned access into merchant and subscription service systems to read and update data in real-time. In simple terms, PayLink allows a consumer to authorize Atomic's technology to connect to the consumer's accounts with various merchants (such as subscription services like Netflix or retail accounts like Target) and perform actions on the consumer's behalf. PayLink consists of two main components: PayLink Switch and PayLink Manage.

32.    PayLink Switch enables users to update payment methods on file across merchants. For example, when a consumer receives a new credit card, PayLink Switch can automatically update the card information stored with multiple merchants at once.

33.    PayLink Manage enables users to monitor, manage, and optimize recurring payments and subscriptions.

34.    TrueAuth is essential to PayLink's functionality because it establishes the secure connection between users and their merchant accounts. When a user connects a merchant account through PayLink, TrueAuth establishes a direct session between the user's device and the merchant's system. The user can authenticate using familiar methods like Face ID (facial recognition technology) or on-device password managers (applications that securely store and auto-fill login credentials). Once authenticated, the system can access account data such as billing information, subscription status, and available actions—all without Atomic ever receiving or storing the user's merchant login credentials.

35.    SKU-Level Data is one of Atomic's newer product capabilities that provides itemized, line-item purchase data from merchants. A "SKU" (Stock Keeping Unit) is a unique identifier assigned to each distinct product a merchant sells. Unlike basic transaction data that might only show "Merchant X - $47.52," SKU-Level Data reveals exactly what items a consumer purchased, including

86

product names, quantities, and individual prices. TrueAuth provides the authentication layer that enables secure access to this detailed purchase information from merchant accounts. When a user authenticates with a merchant through TrueAuth, Atomic can retrieve detailed order and purchase information directly from the merchant's system.

36.    Today, Atomic's TrueAuth capability has become an industry-standard approach for consumer-focused financial institutions seeking secure, frictionless authentication.

37.    Atomic's demonstrated product development capabilities are evidenced by its comprehensive suite of payroll connectivity APIs, which have become the market-leading solution for direct deposit switching, income and employment verification, payment method updating, subscription management, and tax withholding management.

### B. Atomic Has Spent Significant Resources Independently Developing Its Technology, Products, and Accompanying Source Code

38.    Atomic has invested substantial research and development resources in independently generating its own software technology. This investment spans multiple years and reflects Atomic's commitment to building proprietary solutions from the ground up.

39.    Atomic's intellectual property, including its patented TrueAuth authentication technology and its accompanying source code, took years to develop.

40.    While the institutional knowledge that forms the backbone of Atomic's technologies began over a decade ago, Atomic began officially developing its TrueAuth technology in 2021. This development process was extensive and required significant investment of both time and resources, undergoing multiple iterations and refinement by the most senior, experienced developers on Atomic's engineering team.

41.    The development of TrueAuth and its integration with Face ID authentication required Atomic's engineers to solve complex technical challenges related to device-based authentication, secure session management, and merchant system integration. These solutions were developed through Atomic's own engineering efforts, not copied from any third party.

42.    Atomic has invested tens of millions of dollars in developing this technology, building products to successfully implement its applications, and obtaining patent protection for its innovations.

43.    For example, Atomic has invested over $3.6 million to build its TrueAuth technology, and over an additional $2 million to develop its PayLink technology alone.

44.    Moreover, Atomic continues to spend significant time and resources on updates and improvements to provide its customers with the most cutting-edge technology possible.

45.     As a result of Atomic maintaining a suite of product offerings, at certain periods of time, Atomic may offer certain products at no charge for a limited introductory period—typically a few months—in order to reduce friction for clients adopting and integrating a certain product.

46.     Ultimately, however, Atomic's pricing is structured to maintain net positive margins across its product suite.

## C. **Knot Files Suit Against Atomic**

47.     Knot filed the instant lawsuit alleging that they hired a security analyst to insert a honeypot code into their Authentic Integrations Source Code to "detect" Atomic's apparent theft. Complaint, ¶ 104.

48.     However, upon information and belief, Knot did not plant the alleged honeypot code. Instead, the alleged honeypot code was discovered by Knot's research team.

49.     Moreover, Knot filed its trade secret misappropriation claim when it knew or should have known that portions of its Authentication Integrations Source Code that formed the basis of its trade secret claim were publicly accessible via Knot's SDK.

50.     In addition, Knot's trade secret misappropriation claim was based on no direct or circumstantial evidence of theft.

51.    Knot alleges that Atomic acquired Knot's Face ID authentication source code through use of specialized tools, including a man-in-the-middle proxy tool, which is the same tool *Knot* used to obtain *Atomic's* Face ID authentication source code, which formed the basis of this action.

52.    Even after analyzing Atomic's Face ID authentication source code, Knot was only able to point to the honeypot—a 37-character string that by Atomic's own admission is meaningless—as the entirety of evidence of similarity between the two companies' source codes.

53.    Once Knot filed the litigation, upon information and belief, Knot circulated a news article describing its meritless claims to others in the industry, including Atomic customers and potential investors, in an effort to gain an unfair competitive advantage against Atomic.

54.    Knot's false and misleading claims are part of a calculated attempt to harm Atomic in a variety of ways, including improperly misleading customers and using fear to gain leverage in connection with competition in the payment switching industry.

55.    Knot's litigation has caused direct damage to Atomic reputationally and economically, including attorneys' fees and expenses incurred in defending and asserting counterclaims in this action.

90

## NATURE OF THE COUNTERCLAIMS

56.   Counterclaim-Plaintiff incorporates by reference each of their responses set forth in Paragraphs 1 through 55 in their counterclaims as if fully set forth herein.

57.   Counterclaim-Plaintiff's action is, in part, for patent infringement under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, specifically including 35 U.S.C. § 271.

58.   Atomic seeks judgment, remedies, and damages for Knot's infringement of U.S. Patent Nos. 12,120,118 and 12,445,443 (collectively, the "Atomic Asserted Patents").

59.   Atomic is forced to bring its patent counterclaims against Counterclaim Defendant as a result of Knot's knowing and ongoing infringement of Atomic's patents as further described herein.

60.   Counterclaim-Plaintiff's action is for declaratory relief arising under the patent laws of the United States and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

61.   Counterclaim-Defendant has filed a Complaint in this action alleging that Knot's products do not infringe the Atomic Asserted Patents and that the Atomic Asserted Patents are invalid and unenforceable.

62. Thus, an actual, substantial, and justiciable controversy exists between the parties concerning whether Counterclaim-Defendant's products infringe any valid and enforceable claim of the Atomic Asserted Patents and whether the Atomic Asserted Patents are valid and enforceable.

63. Counterclaim-Plaintiff's action is, in part, for copyright invalidity under the copyright laws of the United States, 17 U.S.C. § 101 *et seq*.

64. Counterclaim-Defendant has filed a Complaint in this action alleging that Atomic infringes Copyright Registration Nos. 9-574-457 and 9-574-452.

65. Thus, Atomic is forced to bring its copyright counterclaims against Counter-claim Defendant as a result of Knot's allegations of copyright infringement in the Complaint.

66. Counterclaim-Plaintiff's action is for declaratory relief arising under the copyright laws of the United States and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

67. Counterclaim-Defendant has alleged that Atomic infringes Knot's Copyright Registration Nos. 9-574-457 and 9-574-452.

68. An actual, substantial, and justiciable controversy exists between the parties concerning whether Counterclaim-Plaintiff's products infringe any valid Knot copyright and whether the Knot's Copyright Registration Nos. 9-574-457 and 9-574-452 are valid and enforceable.

92

69.    Atomic seeks monetary relief, and other necessary and proper relief, relating to Knot's false statements, interference with prospective Atomic customers, and unfair business practices.

## JURISDICTION AND VENUE

70.    Counterclaim-Plaintiff incorporates by reference each of their responses set forth in Paragraphs 1 through 69 in their counterclaims as if fully set forth herein.

71.    Jurisdiction and venue for Atomic's counterclaims are proper in this Judicial District.

72.    This Court has subject matter jurisdiction over Atomic's counterclaims for patent infringement of the Atomic Asserted Patents pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Atomic's counterclaims arise under the patent laws of the United States, 35 U.S.C. § 271 *et seq.* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

73.    This Court has subject matter jurisdiction over Atomic's counterclaims for copyright invalidity of Knot's Copyright Registration Nos. 9-574-457 and 9-574-452 pursuant to 28 U.S.C. §§ 1331 and 1338(a) because Atomic's counterclaims arise under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

93

74. This Court has supplemental jurisdiction over Atomic's state law counterclaims under 28 U.S.C. § 1367 to the extent that one or more of the state law counterclaims asserted herein is related to the same controversy that gives rise to the federal claims and counterclaims.

75. This Court has personal jurisdiction over Knot for at least the following reasons: (a) Knot is incorporated in Delaware and (b) by virtue of their having voluntarily submitted to the jurisdiction of this Court by filing their Complaint in this District and by their systematic and continues contacts with the State of Delaware and this District. More specifically, on information and belief, Knot does business in the state of Delaware and has entered into contracts with Delaware-based companies.

76. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400 because, among other things, Knot "resides" in this District by virtue of its incorporation.

### COUNTERCLAIM 1: Infringement of U.S. Patent No. 12,120,118

77. Counterclaim-Plaintiff incorporates by reference each of their responses set forth in Paragraphs 1 through 76 in their counterclaims as if fully set forth herein.

78. U.S. Patent No. 12,120,118 ("the '118 patent", attached to the Complaint as Exhibit D) duly issued on October 15, 2024, and is entitled *Securely*

*Communicating Data Between an Application Associated with an Entity and a Third-Party System.*

79.    The '118 patent was filed on December 6, 2023 and claims priority to Provisional Patent Application No. 63/434,824, which was filed on December 22, 2022.

80.    Atomic is the owner by assignment of the '118 patent and possesses all rights under the '118 patent, including the exclusive right to recover for past and future infringement.

81.    The '118 patent is generally directed to a technique to securely communicate data between a computer application associated with an entity, for example a banking app on a smartphone, and a third-party computer system, for example a system associated with a payroll provider, without providing the user's login credentials to an intermediary service. *See, e.g.*, '118 patent, 2:56-3:18.

82.    Figure 1 of '118 patent, reproduced below, shows an "embodiment of a system to securely communicate data between an application associated with an entity and a third-party system." '118 patent, 3:45-47. The patent explains that, in the example in Figure 1, "user 101 is associated with user device 102 (e.g., mobile device, cell phone, smart phone, tablet, laptop, desktop, server, smart watch, IoT device, etc.). An application associated with an entity 103 is installed on user device 102. Application 103 includes software development kit (SDK) (or other

95

code) 104 that    enables application 103 to    securely    communicate    data between application 103 and    third-party    system 122 (e.g.,    a    server) via communication channel 120. SDK 104 is code that is embedded in the code associated with application 103. This may prevent a malicious actor from modifying or viewing the code associated with SDK 104." *Id.* at 3:48-59.



FIG. 1

'118 patent, Fig. 1.

83. The '118 patent further describes that "application 103 is configured to provide a user interface in which user 101 may request a function to be performed. Examples of a function include, but are not limited to, establishing direct deposit, changing a direct deposit, establishing a recurring payment, managing a recurring payment, applying for a mortgage, applying for a loan, applying for a job, filing an insurance claim, purchasing a product or service, signing a document, or any other function the requires a user to be authenticated before the function is performed." *Id.* at 3:66-4:13.

84. Figure 2 of the '118 patent, reproduced below, "is a flow diagram illustrating an embodiment of a process to securely communicate data between an application associated with an entity and a third-party business system, such as a system associated with a payroll provider." '118 patent, 9:8-11. The patent explains that, in the example shown in Figure 2, "process 200 may be implemented by an application, such as application 103 and/or an SDK incorporated in such an application, e.g., SDK 104." *Id.* at 9:12-14.



FIG. 2

'118 patent, Fig. 2.

85.   Claim 14 of the '118 patent recites the following invention:

A method, comprising:

providing in an application context corresponding to an entity associated with a user, a webview associated with a third-party system selected from a plurality of third-party systems, wherein the webview associated with the selected third-party system displays a native login page corresponding to the selected third-party system, wherein providing the native login page corresponding to the selected third-party system via the webview associated with the selected third-party system removes the need to provide a user's login credentials to an intermediary service with which the application context is associated, wherein the user's login credentials are directly provided from an application associated with the application context, via the webview associated with the selected third-party system to the selected third-party system;

determining that a user has been authenticated by a third-party system using data comprising a page displayed via the provided webview associated with the selected third-party system at least in part by analyzing a response page displayed via the provided webview associated with the selected third-party and determining that the response page includes one or more visual page elements indicative of the user being authenticated wherein the response page is a page displayed via the provided webview associated with the selected third-party system; and

in response to a determination that the response page includes the one or more visual page elements indicative of the user being authenticated, automating one or more tasks needed to perform a function, requested by the user, with the selected third-party system on behalf of the entity.

D.I. 2-4 ('118 patent), 13:4-35.

86.   Knot has directly infringed at least claim 14 of the '118 patent under 35

U.S.C. § 271(a) by making, using, importing, offering for sale, and/or selling at least

its Cardswitcher™ product ("Accused Product").[2] *See, e.g.,* https://www.knotapi.com/cardswitcher/ (last accessed June 5, 2026); https://www.knotapi.com/resources/knot-partners-with-plaid-for-card-on-file-switching/ (last accessed June 5, 2026); https://www.knotapi.com/resources/american-express-and-knot-team-up-to-simplify-adding-card-on-file-payment-information/ (last accessed June 5, 2026); https://www.knotapi.com/resources/knot-teams-up-with-paypal-to-simplify-card-on-file-management-for-millions-of-users/ (last accessed June 5, 2026).

87. According to Knot, "Knot publicly launched CardSwitcher™ on Product Hunt and began signing up customers in August 2022." Complaint, ¶ 23.

88. According to Knot, "In January 2023, Knot had its first cards switched in production for a real customer live on its application." Complaint, ¶ 24.

89. According to Knot, "To this day, Knot continues building out its core CardSwitcher™ product and merchant network infrastructure as the foundation for automated card updates (the API that enables issuers to update saved payment methods). Integration with various processors and banks has expanded since the product launched." Complaint, ¶ 28.

---

[2] Atomic reserves the right to amend its infringement contentions and to identify additional asserted claims and accused products in its Disclosure of Asserted Claims and Infringement Contentions.

90.    According to Knot, "Atomic's actions have created in Knot a reasonable apprehension that, as a result of Knot's continuing manufacture, use and sale of its CardSwitcher™ product, Knot will be sued for infringement of the '118 and '443 patents." Complaint, ¶ 127.

91.    Knot's website explains that, as part of its Cardswitcher™ product, "Once your cardholders get their new card — whether that's physical or virtual — all they have to do is input their credentials. We then instantly update their card-on-file with your new card information, so they can start using it everywhere, right away (they never even have to leave your app)":





https://www.knotapi.com/cardswitcher/ (last accessed June 5, 2026).

92.    Knot further provides various use cases on the Cardswitcher™ webpage including, for example, Personal Banking, Business Banking, and Merchants:



https://www.knotapi.com/cardswitcher/ (last accessed June 5, 2026).

93.    For the Personal Banking use case, for example, Knot explains that the benefit of its technology is "Increase transaction frequency and interchange revenue

by automatically updating card-on-file and saved payment methods for your personal banking customers, saving them time and positioning you as the go-to card."



https://www.knotapi.com/personal-banking/ (last accessed June 5, 2026).

94.    Knot's Cardswitcher™ product satisfies each limitation of claim 14 of the '118 patent, as described in the infringement claim chart provided with Atomic's February 25, 2026 letter to Knot, which is attached to the Complaint as Ex. H and incorporated into this paragraph by reference.

95.    The foregoing features of the Accused Product and Knot's description and demonstration thereof, including in user manuals, advertising, and product testing and deployment, reflect Knot's direct infringement by satisfying every element of at least claim 14 of the '118 patent.

103

96.    To the extent Knot contends that its customers perform one or more steps of the method recited in claim 14, Knot is liable for direct infringement under 35 U.S.C. § 271(a) because all steps of the method are performed by or attributable to Knot through its direction and control of its customer's use of the Cardswitcher™ product. Knot conditions use of the Cardswitcher™ product upon performance of a step or steps of the patented method and establishes the manner or timing of that performance. *See, e.g.,* https://docs.knotapi.com/launch-checklist (last accessed June 5, 2026); https://docs.knotapi.com/card-switcher/quickstart (last accessed June 5, 2026).

97.    Knot has indirectly infringed at least claim 14 of the '118 patent under 35 U.S.C. § 271(b) by actively inducing at least its customers to use Cardswitcher™ in an infringing manner.

98.    Knot has had knowledge of the '118 patent and the infringement involving Cardswitcher™ since at least December 23, 2025, when Atomic sent Knot a letter identifying the '118 patent and demanding that Knot immediately "[c]ease and desist from continuing any infringement of the Atomic Patents including, but not limited to, Knot's use, offer to sell, or sale of its Cardswitcher product." D.I. 2-6 at 4. On February 25, 2026, Atomic sent Knot an infringement claim chart further detailing how use of Cardswitcher™ infringes claim 14 of the '118 patent. D.I. 2-8.

99.    Notwithstanding its knowledge of the '118 patent and the infringement involving Cardswitcher™, Knot has continued to encourage, instruct, enable, and otherwise cause its customers to use Cardswitcher™ in an infringing manner, as detailed in documents published on Knot's website. *See, e.g.,* https://www.knotapi.com/cardswitcher/ (last accessed June 5, 2026); https://docs.knotapi.com/launch-checklist (last accessed June 5, 2026); https://docs.knotapi.com/card-switcher/quickstart (last accessed June 5, 2026); https://www.knotapi.com/resources/knot-teams-up-with-paypal-to-simplify-card-on-file-management-for-millions-of-users/ (last accessed June 5, 2026). Knot's actions show that Knot has specifically intended its customers to infringe at least claim 14 of the '118 patent.

100.    Knot's actions also constitute contributory infringement of at least claim 14 of the '118 patent under 35 U.S.C. § 271(c). As described above, Knot has had knowledge of the '118 patent and the infringement involving Cardswitcher™ since at least December 23, 2025. Cardswitcher™ is not a staple article or commodity of commerce suitable for a substantial non-infringing use. As described above, Cardswitcher™ is especially made and adapted for performing the method recited in claim 14 of the '118 patent. The use of Cardswitcher™ by Knot's customers as intended, encouraged, and instructed by Knot necessarily infringes claim 14 of the '118 patent.

101.   Knot had pre-suit knowledge of the '118 patent and the alleged infringement involving Cardswitcher™ and has continued its infringing actions. Knot has acted with a specific intent to infringe at least claim 14 of the '118 patent, and Knot's infringement has been and continues to be deliberate, intentional, and willful.

102.   Atomic has been and continues to be damaged by Knot's infringement of the '118 patent.

103.   Each claim of the '118 patent, including claim 14, is presumed valid under 35 U.S.C. § 282.

104.   Notwithstanding this presumption of validity, Knot alleges that "each claim of the '118 patent is invalid under 35 U.S.C. § 101 because the claims encompass unpatentable abstract ideas and do not recite a patent eligible inventive concept." Complaint, ¶ 178. According to Knot, "the claims recite the abstract idea of visually verifying the identity of a user to facilitate a transaction." *Id.* However, Knot improperly overgeneralizes the claims of the '118 patent by characterizing them at a high level of abstraction untethered from the actual claim language. The claims of the '118 patent do not recite "visually verifying the identity of a user to facilitate a transaction." Nor do the claims of the '118 patent recite a mere concept, function, or result, or a method that can be performed in the human mind, or performing a known business practice using a computer. Nor do the claims of

106

the '118 patent preempt any broad abstract concept, such as "visually verifying the identity of a user to facilitate a transaction." Properly construed, the claims of the '118 patent, including claim 14, are directed to a patent-eligible technological improvement and not an abstract idea.

105.    Claim 14 of the '118 patent is directed to a specific technological advance in authentication and data security for computer systems—an improved technique to securely communicate data between networked computing devices. Claim 14 recites an invention that is necessarily rooted in computer technology in order to overcome problems specifically arising in the realm of computers.

106.    Claim 14 recites a novel method comprising three steps. The first step involves providing a webview of a native login page that removes the need to provide a user's login credentials to an intermediary service. The second step involves determining that a user has been authenticated by analyzing visual page elements in a response page displayed via the webview. The third step involves automating tasks to perform a function requested by the user. Performing the method recited in claim 14 requires using multiple computing devices and specialized software, examples of which are depicted Figure 1 of the '118 patent, reproduced above.

107.    The first and second steps of the method recited in claim 14 were a focus of the invention's advance over the prior art. This is confirmed by the file

107

history of the '118 patent. Many of the requirements recited in these two claim limitations were added by the inventors during prosecution to distinguish their invention from the prior art. *See, e.g.*, Ex. 1 (Amendment A, dated March 12, 2024), at 3-4, 6; Ex. 2 (Amendment B, dated June 24, 2024), at 4, 7.[3] Following these amendments, the USPTO Examiner determined in his statement of reasons for allowance: "Upon an extensive search and review, none of the cited prior art taught the specified limitation or provided language for the specified limitations." Ex. 4 (Notice of Allowability, dated July 9, 2024), at 6.

108.    The particular combination and sequence of steps in Claim 14 was new and solved problems associated with prior art approaches to authentication and data security for transactions between networked computing devices. In so doing, the invention in Claim 14 achieved several significant advantages over the prior art.

109.    One advantage of the invention in claim 14 is that it improves security for an individual user's login credentials and financial assets by removing the requirement to provide the user's login credentials to an intermediary service that could be compromised by malicious actors. This approach is fundamentally different from older authentication methods that required users to provide their credentials to an intermediary service, which would then log in on the user's behalf. This

---

[3] Claim 14 of the '118 patent was numbered claim 16 during prosecution. The claim was renumbered as claim 14 when the '118 patent issued. *See* Ex. 3 (Index of Claims, dated July 30, 2024).

advantage is expressly disclosed in the patent specification. The specification describes a problem with prior art approaches using the example of accessing a user's payroll provider:

> In a prior approach, the user may utilize a third-party application, which the user accesses through an integration with an application, such as an application associated with an entity, to connect the user's payroll provider to the entity and/or alter settings in the payroll that indicate how the user would like their wages to be dispersed. The user provides their login credentials associated with the payroll provider to the application, which then provides the login credentials associated with the payroll provider to an intermediary service. The intermediary service utilizes the login credentials associated with the payroll provider to establish a communication session between the payroll provider and a device associated with the user on which the application is installed. In such an approach, the user's login credentials associated with the payroll provider are vulnerable because the intermediary service may be compromised at a later point in time at which the login credentials may be exposed to one or more malicious actors. A malicious actor may divert the user's earnings to a different entity after acquiring the user's login credentials associated with the payroll provider.

D.I. 2-4 ('118 patent), 1:30-50. The specification explains how the invention solves that problem and provides an advantage over the prior art:

> Using the disclosed technique, in various embodiments, the requirement to provide login credentials to an intermediary service for the purposes of controlling how the user's wages are dispersed, for example, or to perform any other operation, is removed. As a result, the user's login credentials associated with the payroll provider or other third party system and/or service are more secure because there is one fewer access point from which a malicious actor may obtain the user's login credential associated with the payroll provider.

D.I. 2-4 ('118 patent), 3:9-18; *see also id.* at 4:35-37, 9:50-58.

110.    Another advantage of the invention in claim 14 is that it reduces the ability of malicious actors to obtain from a single source the login credentials for many users. This advantage is expressly disclosed in the patent specification:

> Furthermore, in the prior approach, a malicious actor may compromise the intermediary service to gain access to the credentials associated with many users. When the disclosed technique is implemented, a malicious actor would need to individually compromise each device associated with a plurality of users to obtain the same number of credentials as under the prior approach. Thus, the disclosed technique reduces the ability of malicious actors to obtain en masse login credentials associated with a plurality of users.

D.I. 2-4 ('118 patent), 3:19-27.

111.    Another advantage of the invention in claim 14 is that it helps streamline the process of logging into the same third-party system multiple times by reducing the need to use multi-factor authentication for subsequent login attempts. This advantage is expressly disclosed in the patent specification:

> Lastly, removing the need to provide login credentials to the intermediary service removes friction associated with logging into a third-party system because the user is utilizing their own device. After an initial login, the third-party system may recognize the user's device based on the device's IP address or other information associated with the user's device, and not require the user's device to provide additional information, such as a code. In contrast, the intermediary service may be a virtual device running inside of a cloud environment. Each time the user attempts to login, the virtual device associated with the intermediary service appears as a new device to the third-party system because the intermediary service is likely to use different virtual devices for each login. As a result, under the prior approach, the third-party system may require the user to authenticate their device using multi-factor authentication each time they want to log into the third-party system.

110

D.I. 2-4 ('118 patent), 3:28-44.

112. Another advantage of the invention in claim 14 is that it improves the login experience by enabling use of a password manager to enter a user's login credentials when accessing a third-party system. This advantage is expressly disclosed in the patent specification:

> In some embodiments, user 101 may enter their login credentials into the webview of the native login page via password manager 105. This reduces the amount of time needed to log into third-party system 122 and increases the likelihood that the entered login credentials are correct. Other systems may display a login page that looks like a native login page associated with third-party system 122 (e.g., a mock login page). However, this poses a problem because password manager 105 is configured to inspect the domain associated with the displayed login page. Password manager 105 may not be able to accurately determine which credentials, if any, to enter into a mock login page that looks like a native login page associated with third-party system 122 because the domain associated with the mock login page that looks like the native login page associated with a third-party system does not match the domain associated with the third-party system. In various embodiments, providing a native webview of a login page associated with third-party system 122, as disclosed herein, enables password manager 105 to correctly enter the login credentials on behalf of user 101.

D.I. 2-4 ('118 patent), 4:40-60; *see also id.* at 10:3-24.

113. Another advantage of the invention in claim 14 is that it makes the login process faster by avoiding the latency associated with prior art approaches that used a virtual device running inside a cloud environment to display a mock login page. This advantage is expressly disclosed in the patent specification:

> Other systems may implement an intermediary service that uses a virtual device running inside of a cloud environment to display the mock login page that looks like a native login page associated with third-party system 122. This requires third-party system 122 to communicate with the virtual device, which then communicates with application 103. Embedding SDK 104 within application 103 removes the need for the virtual device to communicate with third-party system 122 and thus reduces the latency associated with communications between application 103 and third-party system 122.

D.I. 2-4 ('118 patent), 4:61-5:4; *see also id.* at 9:59-10:2.

114.   A person of ordinary skill in the art would understand all of these advantages of the claimed invention discussed in the '118 patent, and would recognize how the claimed invention provides a technological improvement over the state of the art at the time. A person of ordinary skill in the art would recognize that by using the claimed invention, time and effort to authenticate is reduced, while security is heightened.

115.   The Federal Circuit has explained that "improving security . . . can be a nonabstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018). Claim 14 of the '118 patent recites a specific technique that departs from earlier approaches and solves a specific computer problem. The invention in claim 14 improves authentication and data security for computer systems in a non-abstract way.

112

116. Claim 14 is akin to claims the Federal Circuit has determined are directed to patent-eligible technological improvements and not abstract ideas. *See, e.g.*, *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343, 1347-49 (Fed. Cir. 2018) (patent-eligible improvement in computer security that addresses vulnerability of license-authorization software to hacking); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294-96 (Fed. Cir. 2020) (patent-eligible improvement in computer network security); *SRI Int'l, Inc. v. Cisco Sys.*, 930 F.3d 1295, 1303-04 (Fed. Cir. 2019) (patent-eligible improvement in computer network security); *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307-09 (Fed. Cir. 2020) (patent-eligible improvement in computer functionality that reduces latency experienced by parked secondary stations in communication systems); *Uniloc USA, Inc. v. ADP, LLC*, 772 Fed. Appx. 890, 896-98 (Fed. Cir. 2019) (patent-eligible improvement in centralized distribution of software); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-39 (Fed. Cir. 2016) (patent-eligible improvement in the way computers store and retrieve data in memory).

117. Additionally, claim 14 recites inventive concepts that, alone and in combination, were not well-understood, routine, or conventional to a person of ordinary skill in the art at the time of the invention.

118. One inventive concept in claim 14 involves providing a webview of a native login page that removes the need to provide a user's login credentials to an

113

intermediary service. *See* claim 14, step 1 ("providing in an application context corresponding to an entity associated with a user, a webview associated with a third-party system selected from a plurality of third-party systems, wherein the webview associated with the selected third-party system displays a native login page corresponding to the selected third-party system, wherein providing the native login page corresponding to the selected third-party system via the webview associated with the selected third-party system removes the need to provide the user's login credentials to an intermediary service with which the application context is associated, wherein the user's login credentials are directly provided from an application associated with the application context, via the webview associated with the selected third-party system, to the selected third-party system").

119. Another inventive concept in claim 14 involves determining that a user has been authenticated by analyzing visual page elements in a response page displayed via the webview. *See* claim 14, step 2 ("determining that a user has been authenticated by the selected third-party system using data comprising a page displayed via the provided webview associated with the selected third-party system at least in part by analyzing a response page displayed via the provided webview associated with the selected third-party system and determining that the response page includes one or more visual page elements indicative of the user being

114

authenticated, wherein the response page is the page displayed via the provided webview associated with the selected third-party system").

120.   The file history of the '118 patent confirms these inventive concepts were not well-understood, routine, or conventional to a person of ordinary skill in the art at the time of the invention. During prosecution of the '118 patent, the inventors added specific language relating to these inventive concepts in claim 14 to distinguish their invention from the prior art. *See, e.g.*, Ex. 1 (Amendment A, dated March 12, 2024), at 3-4, 6; Ex. 2 (Amendment B, dated June 24, 2024), at 4, 7.[4] After the inventors amended the claim language relating to these inventive concepts in claim 14, the USPTO Examiner determined the claimed invention was new and not obvious in light of the prior art. *See* Ex. 4 (Notice of Allowability, dated July 9, 2024), at 6 ("Upon an extensive search and review, none of the cited prior art taught the specified limitation or provided language for the specified limitations."). The USPTO Examiner would not have allowed claim 14 to issue if he believed claim 14 covered methods that were well-understood, routine, or conventional.

121.   The inventive concepts in claim 14 provided significant improvements and advantages over conventional technology in the prior art. Examples of these advantages are described in ¶¶ 109-113 above.

---

[4] Claim 14 of the '118 patent was numbered claim 16 during prosecution. The claim was renumbered as claim 14 when the '118 patent issued. *See* Ex. 3 (Index of Claims, dated July 30, 2024).

122.    A person of ordinary skill in the art would understand these advantages, and would recognize how the inventive concepts recited in claim 14 provided a technological improvement over the state of the art at the time. A person of ordinary skill in the art would recognize that by using the inventive concepts recited in claim 14, time and effort to authenticate is reduced, while security is heightened.

123.    The success of TrueAuth—a commercial embodiment of the invention in Claim 14—further shows that the inventive concepts in Claim 14 were not well-understood, routine, or conventional. As explained by Atomic's CEO and co-founder, Jordan Wright:

> TrueAuth has been a demonstrable commercial success since its launch. By September 2022, Atomic was publicly sharing performance data showing that users were 32% more likely to authenticate successfully via TrueAuth (sometimes referred to as Uplink given shifting names of technology) compared to traditional screen scraping methods. The security gains were significant, and the conversion rate improvements were dramatic. As a direct result of TrueAuth's performance, Atomic secured relationships with hundreds of fintechs and financial institutions—including nine of the top ten banks in the United States.

Declaration of Jordan Wright (D.I. 23), ¶ 12. TrueAuth would not have achieved this level of success if the inventive concepts in claim 14 were well-understood, routine, or conventional.

124.    The Federal Circuit has confirmed patent eligibility where a "patent discloses a technical solution to a security problem." *Cosmokey Sols. GMBH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1098 (Fed. Cir. 2021) (reversing Rule 12(c)

116

judgment of ineligibility). In *Cosmokey,* the Federal Circuit determined the "patent claims and specification recite a specific improvement to authentication that increases security, prevents unauthorized access by a third party, is easily implemented, and can advantageously be carried out with mobile devices of low complexity." *Id.*

125. The '118 patent likewise discloses a patent-eligible technical solution to a computer security problem. As detailed above, claim 14 of the '118 patent recites a specific improvement to authentication that increases security, prevents unauthorized access by malicious actors using intermediary services, is easily implemented, and can advantageously be carried out using a software development kit (SDK) embedded in a mobile device application. The invention recited in claim 14 is patent-eligible under Federal Circuit case law applying 35 U.S.C. § 101.

## COUNTERCLAIM 2: Infringement of U.S. Patent No. 12,445,443

126. Counterclaim-Plaintiff incorporates by reference each of their responses set forth in Paragraphs 1 through 125 in their counterclaims as if fully set forth herein.

127. U.S. Patent No. 12,445,443 ("the '443 patent", attached to the Complaint as Exhibit E) duly issued on October 14, 2025, and is entitled *Securely Communicating Data Between an Application Associated with an Entity and a Third-Party System*.

117

128.   The '443 patent was filed on November 4, 2024, and claims priority to Provisional Patent Application No. 63/434,824, which was filed on December 22, 2022.

129.   Atomic is the owner by assignment of the '443 patent and possesses all rights under the '443 patent, including the exclusive right to recover for past and future infringement

130.   The '443 patent is generally directed to a technique to securely communicate data between a computer application associated with an entity, for example a banking app on a smartphone, and a third-party computer system, for example a system associated with a payroll provider, without providing the user's login credentials to an intermediary service. *See, e.g.*, '443 patent, 2:64-3:26.

131.   Figure 1 of '443 patent, reproduced below, shows an "embodiment of a system to securely communicate data between an application associated with an entity and a third-party system." '443 patent, 3:53-55. The patent explains that, in the example in Figure 1, "user 101 is associated with user device 102 (e.g., mobile device, cell phone, smart phone, tablet, laptop, desktop, server, smart watch, IoT device, etc.). An application associated with an entity 103 is installed on user device 102. Application 103 includes software development kit (SDK) (or other code) 104 that enables application 103 to securely communicate data between application 103 and third-party system 122 (e.g., a server) via communication

118

channel 120. SDK 104 is code that is embedded in the code associated with application 103. This may prevent a malicious actor from modifying or viewing the code associated with SDK 104." *Id.* at 3:56-67.



**FIG. 1**

'443 patent, Fig. 1.

132.   The '443 patent further describes that "application 103 is configured to provide a user interface in which user 101 may request a function to be performed. Examples of a function include, but are not limited to, establishing direct deposit, changing a direct deposit, establishing a recurring payment, managing a recurring payment, applying for a mortgage, applying for a loan, applying for a job, filing an insurance claim, purchasing a product or service, signing a document, or any other function the requires a user to be authenticated before the function is performed." *Id.* at 4:7-16.

133.   Figure 2 of the '443 patent, reproduced below, "is a flow diagram illustrating an embodiment of a process to securely communicate data between an application associated with an entity and a third-party business system, such as a system associated with a payroll provider." '443 patent, 9:19-22. The patent further explains that, in the example shown in Figure 2, "process 200 may be implemented by an application, such as application 103 and/or an SDK incorporated in such an application, e.g., SDK 104." *Id.* at 9:23-25.



FIG. 2

'443 patent, Fig. 2.

134.    Claim 16 of the '443 patent recites the following invention:

A method, comprising:

providing, by code associated with a second entity in an application context of an application corresponding to a first entity associated with a user, a webview associated with a third-party system selected from a plurality of third-party systems, wherein the webview associated with the selected third-party system displays a native login page corresponding to the selected third-party system, wherein the user's login credentials are directly provided from the application associated with the application context, via the webview associated with the selected third-party system, to the selected third-party system;

determining, by executing the code associated with the second entity, that the user has been authenticated by the selected third-party system, using data comprising a response page displayed via the provided webview associated with the selected third-party system by determining that the data comprising the response page includes data indicative of the user being authenticated, wherein the code associated with the second entity is embedded in code of the application corresponding to the first entity associated with the user; and

in response to determining that the data comprising the response page includes data indicative of the user being authenticated, automating one or more tasks needed to perform a function, requested by the user, with the selected third-party system on behalf of the entity, including by executing further code associated with the second entity to communicate with a backend server that determines a parameter and a request structure associated with the function requested by the user as implemented by the selected third-party system and use the parameter and the request structure to generate and send to the selected third-party system an application programming interface request that includes the parameter and conforms to the request structure.

D.I. 2-5 ('443 patent), 13:29-14:8.

135.   Knot has directly infringed at least claim 16 of the '443 patent under 35

U.S.C. § 271(a) by making, using, importing, offering for sale, and/or selling at least

122

its       Cardswitcher™       product       ("Accused       Product").[5]       *See,       e.g.,*

https://www.knotapi.com/cardswitcher/       (last       accessed       June       5,       2026);

https://www.knotapi.com/resources/knot-partners-with-plaid-for-card-on-file-

switching/          (last          accessed          June          5,          2026);

https://www.knotapi.com/resources/american-express-and-knot-team-up-to-

simplify-adding-card-on-file-payment-information/ (last accessed June 5, 2026);

https://www.knotapi.com/resources/knot-teams-up-with-paypal-to-simplify-card-

on-file-management-for-millions-of-users/ (last accessed June 5, 2026).

136.   According to Knot, "Knot publicly launched CardSwitcher™ on Product Hunt and began signing up customers in August 2022." Complaint, ¶ 23.

137.   According to Knot, "In January 2023, Knot had its first cards switched in production for a real customer live on its application." Complaint, ¶ 24.

138.   According to Knot, "To this day, Knot continues building out its core CardSwitcher™ product and merchant network infrastructure as the foundation for automated card updates (the API that enables issuers to update saved payment methods). Integration with various processors and banks has expanded since the product launched." Complaint, ¶ 28.

---

[5] Atomic reserves the right to amend its infringement contentions and to identify additional asserted claims and accused products in its Disclosure of Asserted Claims and Infringement Contentions.

123

139.   According to Knot, "Atomic's actions have created in Knot a reasonable apprehension that, as a result of Knot's continuing manufacture, use and sale of its CardSwitcher™ product, Knot will be sued for infringement of the '118 and '443 patents." Complaint, ¶ 127.

140.   Knot's website explains that, as part of its Cardswitcher™ product, "Once your cardholders get their new card — whether that's physical or virtual — all they have to do is input their credentials. We then instantly update their card-on-file with your new card information, so they can start using it everywhere, right away (they never even have to leave your app)":





https://www.knotapi.com/cardswitcher/ (last accessed June 5, 2026).

141. Knot further provides various use cases on the Cardswitcher™ webpage including, for example, Personal Banking, Business Banking, and Merchants:



https://www.knotapi.com/cardswitcher/ (last accessed June 5, 2026).

142. For the Personal Banking use case, for example, Knot explains that the benefit of its technology is "Increase transaction frequency and interchange revenue

by automatically updating card-on-file and saved payment methods for your personal banking customers, saving them time and positioning you as the go-to card."



https://www.knotapi.com/personal-banking/ (last accessed June 5, 2026).

143. Knot's Cardswitcher™ product satisfies each limitation of at least claim 16 of the '443 patent, as described in the infringement claim chart provided with Atomic's February 25, 2026 letter to Knot, which is attached to the Complaint as Ex. H and incorporated into this paragraph by reference.

144. The foregoing features of the Accused Product and Knot's description and/or demonstration thereof, including in user manuals, advertising, and product testing and deployment, reflect Knot's direct infringement by satisfying every element of at least claim 16 of the '443 patent.

145.   To the extent Knot contends that its customers perform one or more steps of the method recited in claim 16, Knot is liable for direct infringement under 35 U.S.C. § 271(a) because all steps of the method are performed by or attributable to Knot through its direction and control of its customer's use of the Cardswitcher™ product. Knot conditions use of the Cardswitcher™ product upon performance of a step or steps of the patented method and establishes the manner or timing of that performance. *See, e.g.*, https://docs.knotapi.com/launch-checklist (last accessed June 5, 2026); https://docs.knotapi.com/card-switcher/quickstart (last accessed June 5, 2026).

146.   Knot has indirectly infringed at least claim 16 of the '443 patent under 35 U.S.C. § 271(b) by actively inducing at least its customers to use Cardswitcher™ in an infringing manner.

147.   Knot has had knowledge of the '443 patent and the infringement involving Cardswitcher™ since at least December 23, 2025, when Atomic sent Knot a letter identifying the '443 patent and demanding that Knot immediately "[c]ease and desist from continuing any infringement of the Atomic Patents including, but not limited to, Knot's use, offer to sell, or sale of its Cardswitcher product." D.I. 2-6 at 4. On February 25, 2026, Atomic sent Knot an infringement claim chart further detailing how use of Cardswitcher™ infringes claim 16 of the '443 patent. D.I. 2-8.

148.   Notwithstanding its knowledge of the '443 patent and the infringement involving Cardswitcher™, Knot has continued to encourage, instruct, enable, and otherwise cause its customers to use Cardswitcher™ in an infringing manner, as detailed in documents published on Knot's website. *See, e.g.,* https://www.knotapi.com/cardswitcher/ (last accessed June 5, 2026); https://docs.knotapi.com/launch-checklist (last accessed June 5, 2026); https://docs.knotapi.com/card-switcher/quickstart (last accessed June 5, 2026); https://www.knotapi.com/resources/knot-teams-up-with-paypal-to-simplify-card-on-file-management-for-millions-of-users/ (last accessed June 5, 2026). Knot's actions show that Knot has specifically intended its customers to infringe at least claim 16 of the '443 patent.

149.   Knot's actions also constitute contributory infringement of at least claim 16 of the '443 patent under 35 U.S.C. § 271(c). As described above, Knot has had knowledge of the '443 patent and the infringement involving Cardswitcher™ since at least December 23, 2025. Cardswitcher™ is not a staple article or commodity of commerce suitable for a substantial non-infringing use. As described above, Cardswitcher™ is especially made and adapted for performing the method recited in claim 16 of the '443 patent. The use of Cardswitcher™ by Knot's customers as intended, encouraged, and instructed by Knot necessarily infringes claim 16 of the '443 patent.

128

150.    Knot had pre-suit knowledge of the '443 patent and the alleged infringement involving Cardswitcher™ and continued its infringing actions. Knot has acted with a specific intent to infringe at least claim 16 of the '443 patent, and Knot's infringement has been and continues to be deliberate, intentional, and willful.

151.    Atomic has been and continues to be damaged by Knot's infringement of the '443 Patent.

152.    Each claim of the '443 patent, including claim 16, is presumed valid under 35 U.S.C. § 282.

153.    Notwithstanding this presumption of validity, Knot alleges that "each claim of the '443 patent is invalid under 35 U.S.C. § 101 because the claims encompass unpatentable abstract ideas and do not recite a patent eligible inventive concept." Complaint, ¶ 186. According to Knot, "the claims recite the abstract idea of visually verifying the identity of a user to facilitate a transaction." *Id.* However, Knot improperly overgeneralizes the claims of the '443 patent by characterizing them at a high level of abstraction untethered from the actual claim language. The claims of the '443 patent do not recite "visually verifying the identity of a user to facilitate a transaction." Nor do the claims of the '443 patent recite a mere concept, function, or result, or a method that can be performed in the human mind, or performing a known business practice using a computer. Nor do the claims of the '443 patent preempt any broad abstract concept, such as "visually verifying the

identity of a user to facilitate a transaction." Properly construed, the claims of the '443 patent, including claim 16, are directed to a patent-eligible technological improvement and not an abstract idea.

154. Claim 16 of the '443 patent is directed to a specific technological advance in authentication and data security for computer systems—an improved technique to securely communicate data between networked computing devices. Claim 16 recites an invention that is necessarily rooted in computer technology in order to overcome problems specifically arising in the realm of computers.

155. Claim 16 recites a novel method comprising three steps. The first step involves providing a webview of a native login page that removes the need to provide a user's login credentials to an intermediary service. The second step involves determining that a user has been authenticated by analyzing a response page displayed via the provided webview. The third step involves automating tasks to perform a function requested by the user, using an API request that conforms to the request structure implemented by a selected third-party system. Performing the method recited in claim 16 requires using multiple computing devices and specialized software, examples of which are depicted Figure 1 of the '443 patent, reproduced above.

156. All three steps of the method recited in claim 16 were a focus of the invention's advance over the prior art. This is confirmed by the file history of

the '443 patent and its related applications incorporated by reference (*e.g.*, App. No. 18/531,578). Many of the requirements recited in claim 16 were added by the inventors during prosecution to distinguish their invention from the prior art. *See, e.g.*, Ex. 1 (Amendment A, dated March 12, 2024), at 3-4, 6; Ex. 2 (Amendment B, dated June 24, 2024), at 4, 7; Ex. 5 (Amendment A, dated March 21, 2025), at 4, 7-8; Ex. 6 (Amendment B, dated July 7, 2025), at 4-5, 8. Following these amendments, the USPTO Examiner determined in his statement of reasons for allowance: "Upon an extensive search and review, none of the cited prior art taught the specified limitation or provided language for the specified limitations." Ex. 7 (Notice of Allowability, dated July 20, 2025), at 7.

157.   The particular combination and sequence of steps in Claim 16 was new and solved problems associated with prior art approaches to authentication and data security for transactions between networked computing devices. In so doing, the invention in Claim 16 achieved several significant advantages over the prior art.

158.   One advantage of the invention in claim 16 is that it improves security for an individual user's login credentials and financial assets by removing the requirement to provide the user's login credentials to an intermediary service that could be compromised by malicious actors. This approach is fundamentally different from older authentication methods that required users to provide their credentials to an intermediary service, which would then log in on the user's behalf. This

131

advantage is expressly disclosed in the patent specification. The specification describes a problem with prior art approaches using the example of accessing a user's payroll provider:

> In a prior approach, the user may utilize a third-party application, which the user accesses through an integration with an application, such as an application associated with an entity, to connect the user's payroll provider to the entity and/or alter settings in the payroll that indicate how the user would like their wages to be dispersed. The user provides their login credentials associated with the payroll provider to the application, which then provides the login credentials associated with the payroll provider to an intermediary service. The intermediary service utilizes the login credentials associated with the payroll provider to establish a communication session between the payroll provider and a device associated with the user on which the application is installed. In such an approach, the user's login credentials associated with the payroll provider are vulnerable because the intermediary service may be compromised at a later point in time at which the login credentials may be exposed to one or more malicious actors. A malicious actor may divert the user's earnings to a different entity after acquiring the user's login credentials associated with the payroll provider.

D.I. 2-5 ('443 patent), 1:38-58. The specification explains how the invention solves that problem and provides an advantage over the prior art:

> Using the disclosed technique, in various embodiments, the requirement to provide login credentials to an intermediary service for the purposes of controlling how the user's wages are dispersed, for example, or to perform any other operation, is removed. As a result, the user's login credentials associated with the payroll provider or other third party system and/or service are more secure because there is one fewer access point from which a malicious actor may obtain the user's login credential associated with the payroll provider.

D.I. 2-5 ('443 patent), 3:17-26; *see also id.* at 4:45-47, 9:61-10:2.

132

159.   Another advantage of the invention in claim 16 is that it reduces the ability of malicious actors to obtain from a single source the login credentials for many users. This advantage is expressly disclosed in the patent specification:

> Furthermore, in the prior approach, a malicious actor may compromise the intermediary service to gain access to the credentials associated with many users. When the disclosed technique is implemented, a malicious actor would need to individually compromise each device associated with a plurality of users to obtain the same number of credentials as under the prior approach. Thus, the disclosed technique reduces the ability of malicious actors to obtain en masse login credentials associated with a plurality of users.

D.I. 2-5 ('443 patent), 3:27-35.

160.   Another advantage of the invention in claim 16 is that it helps streamline the process of logging into the same third-party system multiple times by reducing the need to use multi-factor authentication for subsequent login attempts. This advantage is expressly disclosed in the patent specification:

> Lastly, removing the need to provide login credentials to the intermediary service removes friction associated with logging into a third-party system because the user is utilizing their own device. After an initial login, the third-party system may recognize the user's device based on the device's IP address or other information associated with the user's device, and not require the user's device to provide additional information, such as a code. In contrast, the intermediary service may be a virtual device running inside of a cloud environment. Each time the user attempts to login, the virtual device associated with the intermediary service appears as a new device to the third-party system because the intermediary service is likely to use different virtual devices for each login. As a result, under the prior approach, the third-party system may require the user to authenticate their device using multi-factor authentication each time they want to log into the third-party system.

133

D.I. 2-5 ('443 patent), 3:36-52.

161.   Another advantage of the invention in claim 16 is that it improves the login experience by enabling use of a password manager to enter a user's login credentials when accessing a third-party system. This advantage is expressly disclosed in the patent specification:

> In some embodiments, user 101 may enter their login credentials into the webview of the native login page via password manager 105. This reduces the amount of time needed to log into third-party system 122 and increases the likelihood that the entered login credentials are correct. Other systems may display a login page that looks like a native login page associated with third-party system 122 (e.g., a mock login page). However, this poses a problem because password manager 105 is configured to inspect the domain associated with the displayed login page. Password manager 105 may not be able to accurately determine which credentials, if any, to enter into a mock login page that looks like a native login page associated with third-party system 122 because the domain associated with the mock login page that looks like the native login page associated with a third-party system does not match the domain associated with the third-party system. In various embodiments, providing a native webview of a login page associated with third-party system 122, as disclosed herein, enables password manager 105 to correctly enter the login credentials on behalf of user 101.

D.I. 2-5 ('443 patent), 4:50-5:3; *see also id.* at 10:14-37.

162.   Another advantage of the invention in claim 16 is that it makes the login process faster by avoiding the latency associated with prior art approaches that used a virtual device running inside a cloud environment to display a mock login page. This advantage is expressly disclosed in the patent specification:

134

> Other systems may implement an intermediary service that uses a virtual device running inside of a cloud environment to display the mock login page that looks like a native login page associated with third-party system 122. This requires third-party system 122 to communicate with the virtual device, which then communicates with application 103. Embedding SDK 104 within application 103 removes the need for the virtual device to communicate with third-party system 122 and thus reduces the latency associated with communications between application 103 and third-party system 122.

D.I. 2-5 ('443 patent), 5:4-14; *see also id.* at 10:3-13.

163. Another advantage of the invention in claim 16 is that it enables providing pre-populated forms to the third-party system, which improves the accuracy of the data and reduces the time associated with performing the function requested by the user. This advantage is expressly disclosed in the patent specification:

> In response to a determination that user 101 has been authenticated, in various embodiments, SDK 104 is configured to automate one or more tasks needed to perform the requested function. In some embodiments, the requested function is performed by providing one or more pre-populated forms to third-party system 122. Information included in the one or more pre-populated forms may be provided by application 103. Examples of information provided by application 103 include, without limitation, name, address, account number, routing number, social security number, birthdate, phone number, email address, or any other information that is subject to typographical errors. Pre-populating the forms with information from application 103 reduces the amount of time associated with performing the requested function because the typographical errors that may delay an approval process associated with performing the requested function have been eliminated. It also prevents user 101 from intentionally providing incorrect information (e.g., information intentionally inflating the value of their assets) to third-party system 122. For example, user 101 may attempt to obtain a loan from a mortgage company. The mortgage company needs the

user's banking statements to approve the loan. User 101 may utilize application103, which is associated with their financial institution, to provide account information securely and accurately to the mortgage company via SDK 104.

D.I. 2-5 ('443 patent), 6:26-51.

164.    A person of ordinary skill in the art would understand all of these advantages of the claimed invention discussed in the '443 patent, and would recognize how the claimed invention provides a technological improvement over the state of the art at the time. A person of ordinary skill in the art would recognize that by using the claimed invention, time and effort to authenticate is reduced, while security is heightened.

165.    The Federal Circuit has explained that "improving security . . . can be a nonabstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem." *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018). Claim 16 of the '443 patent recites a specific technique that departs from earlier approaches and solves a specific computer problem. The invention in claim 16 improves authentication and data security for computer systems in a non-abstract way.

166.    Claim 16 is akin to claims the Federal Circuit has determined are directed to patent-eligible technological improvements and not abstract ideas. *See, e.g.*, *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343, 1347-49 (Fed. Cir. 2018) (patent-eligible improvement in computer security that addresses vulnerability of

license-authorization software to hacking); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294-96 (Fed. Cir. 2020) (patent-eligible improvement in computer network security); *SRI Int'l, Inc. v. Cisco Sys.*, 930 F.3d 1295, 1303-04 (Fed. Cir. 2019) (patent-eligible improvement in computer network security); *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307-09 (Fed. Cir. 2020) (patent-eligible improvement in computer functionality that reduces latency experienced by parked secondary stations in communication systems); *Uniloc USA, Inc. v. ADP, LLC*, 772 Fed. Appx. 890, 896-98 (Fed. Cir. 2019) (patent-eligible improvement in centralized distribution of software); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-39 (Fed. Cir. 2016) (patent-eligible improvement in the way computers store and retrieve data in memory).

167. Additionally, claim 16 recites inventive concepts that, alone and in combination, were not well-understood, routine, or conventional to a person of ordinary skill in the art at the time of the invention.

168. One inventive concept in claim 16 involves providing a webview of a native login page that removes the need to provide a user's login credentials to an intermediary service. *See* claim 16, step 1 ("providing, by code associated with a second entity in an application context of an application corresponding to a first entity associated with a user, a webview associated with a third-party system selected from a plurality of third-party systems, wherein the webview associated

with the selected third-party system displays a native login page corresponding to the selected third-party system, wherein the user's login credentials are directly provided from the application associated with the application context, via the webview associated with the selected third-party system, to the selected third-party system").

169.   Another inventive concept in claim 16 involves determining that a user has been authenticated by analyzing a response page displayed via the webview, using code associated with the second entity embedded in code of the application corresponding to the first entity. *See* claim 16, step 2 ("determining, by executing the code associated with the second entity, that the user has been authenticated by the selected third-party system, using data comprising a response page displayed via the provided webview associated with the selected third-party system by determining that the data comprising the response page includes data indicative of the user being authenticated, wherein the code associated with the second entity is embedded in code of the application corresponding to the first entity associated with the user").

170.   The file history of the '443 patent confirms these inventive concepts in claim 16 were not well-understood, routine, or conventional to a person of ordinary skill in the art at the time of the invention. During prosecution of the '443 patent and its related applications incorporated by reference (*e.g.*, App. No. 18/531,578), the

inventors added specific language relating to these inventive concepts to distinguish their invention from the prior art. *See, e.g.*, Ex. 1 (Amendment A, dated March 12, 2024), at 3-4, 6; Ex. 2 (Amendment B, dated June 24, 2024), at 4, 7; Ex. 5 (Amendment A, dated March 21, 2025), at 4, 7-8. After the inventors amended the claim language relating to these inventive concepts in claim 16, the USPTO Examiner determined the claimed invention was new and not obvious in light of the prior art. *See* Ex. 7 (Notice of Allowability, dated July 20, 2025), at 7 ("Upon an extensive search and review, none of the cited prior art taught the specified limitation or provided language for the specified limitations."). The USPTO Examiner would not have allowed claim 16 to issue if he believed claim 16 covered methods that were well-understood, routine, or conventional.

171.    The inventive concepts in claim 16 provided significant improvements and advantages over conventional technology in the prior art. Examples of these advantages are described in ¶¶ 158-163 above.

172.    A person of ordinary skill in the art would understand these advantages, and would recognize how the inventive concepts recited in claim 16 provided a technological improvement over the state of the art at the time. A person of ordinary skill in the art would recognize that by using the inventive concepts recited in claim 16, time and effort to authenticate is reduced, while security is heightened.

173.    The success of TrueAuth—a commercial embodiment of the invention in Claim 16—further shows that the inventive concepts in Claim 16 were not well-understood, routine, or conventional. As explained by Atomic's CEO and co-founder, Jordan Wright:

> TrueAuth has been a demonstrable commercial success since its launch. By September 2022, Atomic was publicly sharing performance data showing that users were 32% more likely to authenticate successfully via TrueAuth (sometimes referred to as Uplink given shifting names of technology) compared to traditional screen scraping methods. The security gains were significant, and the conversion rate improvements were dramatic. As a direct result of TrueAuth's performance, Atomic secured relationships with hundreds of fintechs and financial institutions—including nine of the top ten banks in the United States.

Declaration of Jordan Wright (D.I. 23), ¶12. TrueAuth would not have achieved this level of success if the inventive concepts in claim 16 were well-understood, routine, or conventional.

174.    The Federal Circuit has confirmed patent eligibility where a "patent discloses a technical solution to a security problem." *Cosmokey Sols. GMBH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1098 (Fed. Cir. 2021) (reversing Rule 12(c) judgment of ineligibility). In *Cosmokey*, the Federal Circuit determined the "patent claims and specification recite a specific improvement to authentication that increases security, prevents unauthorized access by a third party, is easily implemented, and can advantageously be carried out with mobile devices of low complexity." *Id.*

140

175.   The '443 patent likewise discloses a patent-eligible technical solution to a computer security problem. As detailed above, claim 16 of the '443 patent recites a specific improvement to authentication that increases security, prevents unauthorized access by malicious actors using intermediary services, is easily implemented, and can advantageously be carried out using a software development kit (SDK) embedded in a mobile device application. The invention recited in claim 16 is patent-eligible under Federal Circuit case law applying 35 U.S.C. § 101.

**COUNTERCLAIM 3: Declaratory Judgment of Noninfringement of Copyright Registration No. 9-574-457**

176.   Counterclaim-Plaintiff Atomic incorporates by reference each of their responses set forth in Paragraphs 1 through 175 in their counterclaims as if fully set forth herein.

177.   There is an actual controversy that exists between the parties about whether "Atomic's software (including its literal code and its structure, sequence, and organization)"—as Counterclaim-Defendant Knot generically describes it in the Complaint without providing further detail—infringes any valid copyright held by Knot, including Copyright Registration No. 9-574-457 (attached as Exhibit B to the Complaint).

178.   This counterclaim seeks forward-looking relief regarding Atomic's ongoing business. Atomic continues to sell various products, incorporating its accused software, and intends to continue doing so.

179.    Knot seeks to permanently enjoin Atomic from selling products including its allegedly infringing software, recover monetary damages, and have Atomic pay the maximum allowable amount of statutory damages available.

180.    Atomic independently developed its software, including its TrueAuth technology. Atomic did not copy or use Knot's Authentication Integrations Source Code, allegedly part of Copyright Registration No. 9-574-457, in order to do so.

181.    Even assuming the validity of Knot's Copyright Registration No. 9-574-457, Atomic's software is not substantially similar to the protectable elements of Knot's work. Once unprotectable elements are filtered out, no protectable expression remains.

182.    Atomic is entitled to a declaration that its past, ongoing, and future sale of its software does not infringe Knot's Copyright Registration No. 9-574-457.

## COUNTERCLAIM 4: Declaratory Judgment of Invalidity of Copyright Registration No. 9-574-457

183.    Counterclaim-Plaintiff Atomic incorporates by reference each of their responses set forth in Paragraphs 1 through 182 in their counterclaims as if fully set forth herein.

184.    There is an actual and justiciable controversy between Atomic and the Counterclaim-Defendant Knot regarding the validity, enforceability, and ownership of U.S. Copyright Registration No. 9-574-457.

185. Counterclaim-Defendant alleges that Atomic infringes U.S. Copyright Registration No. 9-574-457.

186. Atomic denies that it infringes any valid or enforceable copyright owned by Knot.

187. This counterclaim raises a legal question distinct from any defense to Knot's copyright infringement claim. Knot's Count II presupposes that the copyright is valid and asks whether Atomic copied protectable expression. This counterclaim challenges a broader, more foundational issue: whether Knot's U.S. Copyright Registration No. 9-574-457, titled "KnotAPI Card Switcher Application v0.2.133 (as set forth in Exhibit B to the Complaint), is valid at all. A determination of invalidity would extinguish Knot's asserted right completely, instead of just establishing that Atomic did not infringe it.

188. The Copyright Act affords copyright protection to "original works of authorship." *See* 17 U.S.C. § 102(a).

189. To qualify as a work of "authorship" a work must be created by a human being. Works that do not satisfy this requirement are not copyrightable.

190. Regarding the use of artificial intelligence, the Copyright Act "requires all eligible work to be authored in the first instance by a human being," and not a non-human machine, to be eligible for copyright protection. *See Thaler v. Perlmutter*, 130 F.4th 1039, 1041 (D.C. Cir. 2025).

191.  In January 2025, the Copyright Office published the part of its *Copyright and Artificial Intelligence* report addressing the copyrightability of AI-generated works. The report concludes that, "given current generally available technology, prompts alone do not provide sufficient human control to make users of an AI system the authors of the output." *See* https://www.congress.gov/crs-product/LSB10922 (last accessed June 5, 2026), Generative Artificial Intelligence and Copyright Law, July 18, 2025 (citing the Copyright and Artificial Intelligence report).

192.  The Copyright Act's distinction between copyrightable "works" and noncopyrightable "ideas" precludes copyrightability for works generated by artificial intelligence in response to user prompts. *See id.* Specifically, the report argues, "[p]rompts essentially function as instructions that convey unprotectible ideas" and "do not control how the AI system processes them in generating the output." *Id.*

193.  Upon information and belief, to the extent any part of the computer program in U.S. Copyright Registration No. 9-574-457 is copyrightable, Knot is not the owner of any copyright relating to the material.

194.  On information and belief, Knot used artificial intelligence, whether through the use of prompts or otherwise, to generate the computer program in U.S. Copyright Registration No. 9-574-457.

144

195.   For example, publicly available information supports that Knot uses artificial intelligence and/or artificial intelligence prompts to integrate software-based technology. Per a LinkedIn post, one of its employees, Ms. Rylan Siegenthaler, who is "not an engineer" and "has never shipped code" was asked to "integrate two of [Knot's] core products – CardSwitcher and TransactionLink – into a sample banking app from scratch." Ms. Siegenthaler stated that the "only direction I got was: use AI, use the docs, and get creative."



**Rylan Siegenthaler** ✓ · 3rd+    **+ Follow**    · · ·
GTM @ Knot | Texas Ex
1w · 🌐

The most impactful thing I did in my first month in GTM at **Knot** had nothing to do with selling.

I built.

My manager asked me to integrate two of our core products - CardSwitcher and TransactionLink - into a sample banking app from scratch.

I'm not an engineer. I've never shipped code.

The only direction I got was: use AI, use the docs, and get creative.

So I did. And just kept going until it worked.

It took a couple of hours.

And honestly, that experience changed how I think about my role.

I went from knowing what the product does to understanding what it feels like to use it.

You see where things click, where things don't, and what questions come next.

A few things that stuck with me:
- You don't fully understand a product until you've tried to build with it.
- The faster someone gets to 'it works', the faster curiosity turns into conviction.
- Great products make anyone feel like they can build with them.

If you're in GTM - close the deck, open the developer docs, and go build something.

Because when you understand what your product can actually do - the real use cases it unlocks and the insights it surfaces - you stop pitching features and start solving problems.

It will change how you sell, how you think, and how you show up in every conversation.

 52    5 comments · 3 reposts

https://www.linkedin.com/feed/update/urn:li:activity:7450560683823280128/  (last

accessed June 2, 2026).

146

196.    If Knot is encouraging its non-engineers to use artificial intelligence and/or artificial intelligence prompts to solve software-related problems, the single most reasonable inference is that Knot used artificial intelligence and/or artificial intelligence prompts to create its allegedly copyrighted software, including U.S. Copyright Registration No. 9-574-457.

197.    For this and other reasons to be established through discovery, Atomic is entitled to a declaratory judgment that Knot does not own U.S. Copyright Registration No. 9-574-457 and that the asserted U.S. Copyright Registration No. 9-574-457 is invalid.

198.    Moreover, U.S. Copyright Registration No. 9-574-457 is invalid at least because it consists of uncopyrightable subject matter, lack originality, and was obtained by making material misrepresentations to the Copyright Office.

199.    As the prevailing party, Atomic is also entitled to its attorneys' fees and costs under 17 U.S.C. § 505.

**COUNTERCLAIM 5: Declaratory Judgment of Noninfringement of Copyright Registration No. 9-574-452**

200.    Counterclaim-Plaintiff Atomic incorporates by reference each of their responses set forth in Paragraphs 1 through 199 in their counterclaims as if fully set forth herein.

201.    There is an actual controversy that exists between the parties about whether "Atomic's software (including its literal code and its structure, sequence,

147

and organization)"—as Knot generically describes it in the Complaint without providing further detail—infringes any valid copyright held by Knot, including Copyright Registration No. 9-574-452 (attached as Exhibit B to the Complaint).

202. This counterclaim seeks forward-looking relief regarding Atomic's ongoing business. Atomic continues to sell various products, incorporating its accused software, and intends to continue doing so.

203. Knot seeks to permanently enjoin Atomic from selling products including its allegedly infringing software, recover monetary damages, and have Atomic pay the maximum allowable amount of statutory damages available.

204. Atomic independently developed its software, including its TrueAuth technology. It did not copy or use Knot's Authentication Integrations Source Code, allegedly part of Copyright Registration No. 9-574-452, in order to do so.

205. Even assuming the validity of Knot's Copyright Registration No. 9-574-452, Atomic's software is not substantially similar to the protectable elements of Knot's work. Once unprotectable elements are filtered out, no protectable expression remains.

206. Atomic is entitled to a declaration that its past, ongoing, and future sale of its software does not infringe on any valid Knot copyright.

## COUNTERCLAIM 6: Declaratory Judgment of Invalidity of Copyright Registration No. TX 9-574-452

207.   Counterclaim-Plaintiff Atomic incorporates by reference each of their responses set forth in Paragraphs 1 through 206 in their counterclaims as if fully set forth herein.

208.   There is an actual and justiciable controversy between Atomic and the Counterclaim-Defendant Knot regarding the validity, enforceability, and ownership of U.S. Copyright Registration No. 9-574-452.

209.   Counterclaim-Defendant alleges that Atomic infringes U.S. Copyright Registration No. 9-574-452.

210.   Atomic denies that it infringes any valid or enforceable copyright owned by Knot.

211.   This counterclaim raises a legal question distinct from any defense to Knot's copyright infringement claim. Knot's Count II presupposes that the copyright is valid and asks whether Atomic copied protectable expression. This counterclaim challenges a broader, more foundational issue: whether Knot's U.S. Copyright Registration No. 9-574-452, titled "KnotAPI iOS SDK v1.0.22" (as set forth in Exhibit B to the Complaint), is valid at all. A determination of invalidity would extinguish Knot's asserted right completely, instead of just establishing that Atomic did not infringe it.

149

212.    The Copyright Act affords copyright protection to "original works of authorship." *See* 17 U.S.C. § 102(a).

213.    To qualify as a work of "authorship" a work must be created by a human being. Works that do not satisfy this requirement are not copyrightable.

214.    Regarding the use of artificial intelligence, the Copyright Act "requires all eligible work to be authored in the first instance by a human being," and not a non-human machine, to be eligible for copyright protection. *See Thaler v. Perlmutter*, 130 F.4th 1039, 1041 (D.C. Cir. 2025).

215.    In January 2025, the Copyright Office published the part of its *Copyright and Artificial Intelligence* report addressing the copyrightability of AI-generated works. The report concludes that, "given current generally available technology, prompts alone do not provide sufficient human control to make users of an AI system the authors of the output." *See* https://www.congress.gov/crs-product/LSB10922 (last accessed June 5, 2026), Generative Artificial Intelligence and Copyright Law, July 18, 2025 (citing the Copyright and Artificial Intelligence report).

216.    The Copyright Act's distinction between copyrightable "works" and noncopyrightable "ideas" precludes copyrightability for works generated by artificial intelligence in response to user prompts. *See id.* Specifically, the report argues, "[p]rompts essentially function as instructions that convey unprotectible

150

ideas" and "do not control how the AI system processes them in generating the output." *Id.*

217. Upon information and belief, to the extent any part of the computer program in U.S. Copyright Registration No. 9-574-452 is copyrightable, Knot is not the owner of any copyright relating to the material.

218. On information and belief, Knot used artificial intelligence, whether through the use of prompts or otherwise, to generate the computer program in U.S. Copyright Registration No. 9-574-452.

219. For example, publicly available information supports that Knot uses artificial intelligence and/or artificial intelligence prompts to integrate software-based technology. Per a LinkedIn post, one of its employees, Ms. Rylan Siegenthaler, who is "not an engineer" and "has never shipped code" was asked to "integrate two of [Knot's] core products – CardSwitcher and TransactionLink – into a sample banking app from scratch." Ms. Siegenthaler stated that the "only direction I got was: use AI, use the docs, and get creative."



**Rylan Siegenthaler** ✓ · 3rd+                              **+ Follow**     ···
GTM @ Knot | Texas Ex
1w · 🌐

The most impactful thing I did in my first month in GTM at Knot had nothing to do with selling.

I built.

My manager asked me to integrate two of our core products - CardSwitcher and TransactionLink - into a sample banking app from scratch.

I'm not an engineer. I've never shipped code.

The only direction I got was: use AI, use the docs, and get creative.

So I did. And just kept going until it worked.

It took a couple of hours.

And honestly, that experience changed how I think about my role.

I went from knowing what the product does to understanding what it feels like to use it.

You see where things click, where things don't, and what questions come next.

A few things that stuck with me:
- You don't fully understand a product until you've tried to build with it.
- The faster someone gets to 'it works', the faster curiosity turns into conviction.
- Great products make anyone feel like they can build with them.

If you're in GTM - close the deck, open the developer docs, and go build something.

Because when you understand what your product can actually do - the real use cases it unlocks and the insights it surfaces - you stop pitching features and start solving problems.

It will change how you sell, how you think, and how you show up in every conversation.

 52                                    5 comments · 3 reposts

https://www.linkedin.com/feed/update/urn:li:activity:7450560683823280128/ (last

accessed June 2, 2026).

220.   If Knot is encouraging its non-engineers to use artificial intelligence and/or artificial intelligence prompts to solve software-related problems, the single most reasonable inference is that Knot used artificial intelligence and/or artificial intelligence prompts to create its allegedly copyrighted software, including U.S. Copyright Registration No. 9-574-452.

221.   For this and other reasons to be established through discovery, Atomic is entitled to a declaratory judgment that Knot does not own U.S. Copyright Registration No. 9-574-452 and that the asserted U.S. Copyright Registration No. 9-574-452 is invalid.

222.   Moreover, U.S. Copyright Registration No. 9-574-452 is invalid at least because it consists of uncopyrightable subject matter, lack originality, and was obtained by making material misrepresentations to the Copyright Office.

223.   As the prevailing party, Atomic is also entitled to its attorneys' fees and costs under 17 U.S.C. § 505.

## COUNTERCLAIM 7: Tortious Interference with Prospective Economic Advantage

224.   Counterclaim-Plaintiff incorporates by reference each of their responses set forth in Paragraphs 1 through 223 in their counterclaims as if fully set forth herein.

225.   Atomic has valuable prospective economic relationships and business opportunities with third party banks, customers, investor and prospective investors,

153

from which Atomic derives economic gain, and from which Atomic had a reasonable expectancy of deriving future economic gain.

226. Knot was aware of these relationships. Knot, through the acts alleged herein, wrongfully, knowingly and intentionally acted to interfere with and destroy or harm Atomic's existing and/or prospective business relationships.

227. Knot's wrongful acts alleged herein have actually interfered with and disrupted Atomic's relationships and/or prospective relationships, and these acts designed to interfere with and disrupt these relationships have been a substantial factor in causing Atomic's harm through the loss of prospective economic advantage.

228. Atomic is entitled to, and should be, awarded damages caused by Defendant's actions, including without limitation, monetary loss from harm to Atomic's reputation and good will, loss of product sales and the profits therefrom, interference with and damage to Atomic's relationships with its customers and investors, loss of business opportunity for its products, and impairment of Atomic's ability to continue to grow.

229. Knot acted with malice, malicious intent, and with intent to cause the foregoing harm to Atomic.

## **PRAYER FOR RELIEF**

WHEREFORE, Atomic respectfully requests that this Court enter judgment against Knot as follows:

1. A judgment in favor of Counterclaim-Plaintiff and against Knot on each of the claims in Knot Complaint;

2. A judgement dismissing Knot's claims in their entirety, with prejudice;

3. A judgment in favor of Counterclaim-Plaintiff on each of their Counterclaims against Knot;

4. A judgment that Knot has infringed, directly or indirectly, each of the Atomic Asserted Patents;

5. A judgment that Knot has willfully infringed each of the Atomic Asserted Patents;

6. A judgment awarding Atomic damages adequate to compensate Atomic for Knot's infringement of each of the Atomic Asserted Patents, including compensatory damages, costs, and expenses, under 35 U.S.C. §§ 284 and 287;

7. A judgment requiring Knot to pay Atomic pre-judgment and post-judgment interest on the damages assessed;

8. A judgment requiring Knot to pay Atomic enhanced damages pursuant to 35 U.S.C. § 284;

9. A judgment requiring Knot to pay supplemental damages to Atomic, including interest, with an accounting, as needed;

10. An award of such further relief at law or in equity as the Court deems just and proper;

11. An award of reasonable attorneys' fees, including pursuant to 35 U.S.C. § 285; and

12. Any and all other relief that the Court deems just and equitable.

## **JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Atomic respectfully requests a jury trial of all issues triable to a jury in this action.

Dated: June 9, 2026

| OF COUNSEL: | DORSEY & WHITNEY (DELAWARE) LLP |
|---|---|
| Mark A. Miller (*pro hac vice*) | By: /s/ *Alessandra Glorioso* |
| DORSEY & WHITNEY LLP | Alessandra Glorioso (#5757) |
| 111 South Main Street, Suite 2100 | 300 Delaware Avenue, Suite 1010 |
| Salt Lake City, UT 84111 | Wilmington, DE 19801 |
| Tel: (801) 933-7360 | Tel: (302) 425-7171 |
| miller.mark@dorsey.com | glorioso.alessandra@dorsey.com |

156

Geoffrey M. Godfrey (*pro hac vice*)
Erin Kolter (*pro hac vice*)
DORSEY & WHITNEY LLP
701 Fifth Avenue, Suite 6100
Seattle, WA 98104
Tel: (206) 903-8800
godfrey.geoff@dorsey.com
kolter.erin@dorsey.com

Benjamin Yaghoubian (*pro hac vice*)
DORSEY & WHITNEY LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626
Tel: (714) 800-1400
yaghoubian.benjamin@dorsey.com

*Attorneys for Defendant/
Counterclaim Plaintiff Atomic FI, Inc.*

157

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 9, 2026, the foregoing document was electronically filed using the Court's CM/ECF system, which will transmit the document electronically to all registered participants as identified on the Notice of Electronic Filing.

*/s/ Alessandra Glorioso*
Alessandra Glorioso (DE Bar No. 5757)