# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| MYCARD, INC. d/b/a KNOT,<br><br>    *Plaintiff*,<br><br>v.<br><br>ATOMIC FI, INC.,<br><br>    *Defendant*. | C.A. No. 26-290-CFC<br><br><br>**JURY TRIAL DEMANDED** |

**OPENING BRIEF IN SUPPORT OF PLAINTIFF'S
PARTIAL MOTION TO DISMISS
DEFENDANT'S AMENDED COUNTERCLAIMS**

OF COUNSEL:

Justin K. Victor
Jacob R. Dean
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA  30305

Gregory S. Bombard
Greenberg Traurig, LLP
One International Place, Suite 2000
Boston, MA  02110

Justin A. MacLean
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY  10017

Dated: August 4, 2026

Benjamin J. Schladweiler (#4601)
Greenberg Traurig, LLP
222 Delaware Avenue, Ste. 1600
Wilmington, DE 19801
302.661.7000
schladweilerb@gtlaw.com

*Attorneys for Plaintiff and Counterclaim-
Defendant MyCard, Inc. d/b/a/ Knot*

# TABLE OF CONTENTS

**Page**

I.  STAGE OF PROCEEDINGS ..................................................................................1

II.  LEGAL STANDARD ........................................................................................1

III.  ARGUMENT ....................................................................................................1

    A.  Counterclaim 15 (Tortious Interference) Should Be Dismissed ...........1

        1.  Atomic Fails to Plead Necessary Facts .......................................1
        2.  Statements Made in This Litigation and "News Article Describing" This Litigation Are Privileged ..............................4

    B.  Counterclaims 1 and 2 Should Be Dismissed ......................................7

        1.  The Two-Step Alice Framework ................................................7
        2.  The Asserted Patents ..................................................................8
        3.  Representative Claims ................................................................9
        4.  The '118 Patent is Invalid .........................................................9

            (i)  *Alice* Step One—The Claims of the '118 Patent are Directed to an Abstract Idea .............................................9
            (ii)  *Alice* Step Two—The Claims of the '118 Patent Lack an Inventive Concept .............................................17

        5.  The '443 Patent is Invalid Under 35 U.S.C. § 101 ...................20

    C.  Counterclaims 3, 5, 7, 9, 11, and 13 Should Be Dismissed ................22

IV.  CONCLUSION .................................................................................................23

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*,
   581 F. Supp. 2d 654 (D. Del. 2008)................................................................1, 3, 4

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)..........................................................................................7

*Ancora Techs. v. HTC Am., Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018) .......................................................................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................1

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................1

*Content Extraction & Transmission LLC v. Wells Fargo Bank Nat'l
Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014) ...................................................................9

*CosmoKey Sols. GMBH & Co. KG v. Duo Sec., LLC*,
   15 F.4th 1091 (Fed. Cir. 2021) .......................................................................15

*Diamond v. Diehr*,
   450 U.S. 175 (1981)..........................................................................................16

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) .......................................................................16

*Fed. Trade Comm'n v. AbbVie Inc.*,
   976 F.3d 327 (3d Cir. 2020) .............................................................................4

*Feenix Payment Sys., LLC v. Blum*,
   2022 WL 215026 (Del. Super. Ct. Jan. 25, 2022) .............................................6

*Ficep Corp. v. Peddinghaus Corp.*,
   587 F. Supp. 3d 115 (D. Del. 2022), *aff'd* 2023 WL 5346043 (Fed.
   Cir. Aug. 21, 2023) ...................................................................................17, 18

*Florcsk v. Unstoppable Domains Inc.*,
  No. 22-1230-CFC, 2024 WL 492384 (D. Del. Feb. 8, 2024) .........................4, 5

*Fraud Free Transactions LLC v. Ping Identity Corp.*,
  780 F. Supp. 3d 460 (D. Del. 2025)....................................................................18

*Innovation Scis., LLC v. Amazon.com, Inc.*,
  778 F. App'x 859 (Fed. Cir. 2019) .....................................................................20

*Lucent Info. Mgmt., Inc. v. Lucent Techs. Inc.*,
  5 F. Supp. 2d 238 (D. Del. 1998).....................................................................2, 3

*Malibu Media, LLC v. Does 1*,
  2013 WL 1702549 (E.D. Pa. Mar. 6, 2013) ......................................................23

*Media Content Prot. LLC v. Intel Corp.*,
  812 F. Supp. 3d 416 (D. Del. 2025)..............................................................13, 17

*Myport Techs., Inc. v. Apple Inc.*,
  2025 WL 2711946 (D. Del. Sept. 23, 2025).......................................................12

*Organovo Holdings, Inc. v. Dimitrov*,
  162 A.3d 102 (Del. Ch. June 5, 2017)..................................................................2

*Page v. Oath Inc.*,
  2021 WL 528472 (Del. Super. Ct. Feb. 11, 2021) ...............................................6

*Peoplechart Corp. v. Wintrust Bank, N.A.*,
  543 F. Supp. 3d 594 (N.D. Ill. 2021)..................................................................13

*PersonalWeb Tech. LLC v. Google, LLC*,
  8 F.4th 1310 (Fed. Cir. 2021) ............................................................................17

*Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*,
  674 F. Supp. 2d 562 (D. Del. 2009)...............................................................22, 23

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
  696 F. App'x 1014 (Fed. Cir. 2017) ...................................................................13

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)..........................................................................................5, 6

iv

*Roxul USA, Inc. v. Armstrong World Indus., Inc.*,
2018 WL 810143 (D. Del. Feb. 9, 2018)................................................................2

*Secure Authentication Techs.*,
2026 WL 894232 (D. Utah Apr. 1, 2026)....................................................12, 20

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
873 F.3d 1364 (Fed. Cir. 2017) ....................................................................13, 17

*SRI Int'l, Inc. v. Cisco Sys.*,
930 F.3d 1295 (Fed. Cir. 2019) ............................................................................16

*Strikeforce Techs., Inc. v. SecureAuth Corp.*,
2017 WL 8808122 (C.D. Cal. Dec. 1, 2017), *aff'd,* 753 F. App'x
914 (Fed. Cir. 2019)...............................................................................................13

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ............................................................................16

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ..............................................................................8

*Uniloc USA, Inc. v. ADP, LLC*,
772 F. App'x 890 (Fed. Cir. 2019) .......................................................................16

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) ........................................................12, 14, 15

*Universal Secure Registry LLC v. Apple Inc.*,
469 F. Supp. 3d 240 (D. Del. 2020)..............................................................18, 22

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
793 F.3d 1306 (Fed. Cir. 2015) ............................................................................11

**Statutes**

35 U.S.C. § 101.........................................................................................................7

Counterclaim-Defendant MyCard, Inc. d/b/a Knot ("Knot") hereby moves to dismiss Counterclaim-Plaintiff Atomic FI, Inc.'s ("Atomic") Amended Counterclaims 1, 2, 3, 5, 7, 9, 11, 13, and 15 for failure to state a claim. (D.I. 80, "Counterclaims" or "CC").

## I.   STAGE OF PROCEEDINGS

This is Atomic's second bite at the apple. After Knot moved to dismiss Atomic's previous set of counterclaims, Atomic filed an amended set of counterclaims that contains the same deficiencies as its first set and adds no new factual averments. (D.I. 50, 80; **Exhibit A** (showing comparison)).

## II.   LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 660 (D. Del. 2008).

## III.   ARGUMENT

### A.   <u>Counterclaim 15 (Tortious Interference) Should Be Dismissed</u>

#### 1.   *Atomic Fails to Plead Necessary Facts*

Atomic's tortious interference counterclaim should be dismissed because it contains no facts and is nothing more than a "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To state a claim for tortious interference with prospective economic advantage, Atomic has the burden to plead: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." *Lucent Info. Mgmt., Inc. v. Lucent Techs. Inc.*, 5 F. Supp. 2d 238, 243 (D. Del. 1998). Atomic does not adequately plead any of these factors.

First, Atomic's pleading does not "identify a specific party who was prepared to enter[] into a business relationship but was dissuaded from doing so by the defendant," which is fatal to its claim. *Roxul USA, Inc. v. Armstrong World Indus., Inc.*, 2018 WL 810143, at *8 (D. Del. Feb. 9, 2018) ("A plaintiff cannot plead this element by alleging a 'nebulous, unascertainable class' of business relationships."). Instead, Atomic vaguely alleges that Knot interfered with "valuable prospective economic relationships and business opportunities with [unnamed] third party banks, customers, investor[,] prospective investors," and "others in the industry." (CC, ¶¶322, 324). This is exactly the type of unspecific language Delaware courts have found deficient. *See Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 123 (Del. Ch. June 5, 2017) (dismissing claim defendant interfered with "valuable prospective economic relationships and business opportunities with its bankers,

2

customers, lenders, investors and prospective investors"). Atomic also vaguely alleges that "Knot was aware of these relationships" but pleads no facts demonstrating such awareness. (CC, ¶323).

Second, Atomic fails to plead any facts showing that the alleged interference caused the required "breach or termination" of a business relationship or expectancy. *Lucent*, 5 F. Supp. 2d at 243. Indeed, Atomic deleted the allegation from its original pleading that Knot "acted to [] **destroy**" Atomic's "existing and/or prospective business relationships," and never pleads that Knot's actions prevented it from entering any such relationships. (*See* **Exhibit A**, ¶323). The closest Atomic comes is its vague recitation that Knot "interfered with and disrupted Atomic's [unnamed] relationships and/or prospective relationships" and this was "a substantial factor in causing Atomic's harm." (CC, ¶325). This is just an improper formulaic recitation of legal elements without facts. Moreover, interfering with, disrupting, or harming a business relationship is not the same as terminating that relationship or preventing a party from entering into or continuing a business relationship, which Atomic does not plead. *Accenture*, 581 F. Supp. 2d at 665 (dismissing tortious interference where "there is no allegation that [a third-party] elected to terminate its relationship with [plaintiff] due to any wrongful or improper conduct on the part of" defendant).

Third, the only "wrongful acts" identified in the Counterclaims are (1) Knot's filing of this lawsuit, (2) Knot's alleged circulation of an unidentified "news article

3

describing its meritless claims" to "others in the industry, including Atomic customers and potential investors," and (3) Knot's alleged "false and/or misleading statements regarding Atomic to others in the industry." (CC, ¶¶321-327, 53-56). The first two actions are privileged and all allegations are barebones—they do <u>not</u> identify the article, explain where or when it was published, describe the substance of the article (other than to say it "describ[ed]" Knot's claims), allege that any of the statements in the article were false or otherwise "wrongful," or identify the parties to whom it was disseminated. (*Id.*). They also do not describe the alleged "false and misleading statements" or describe any prospective customer who saw those statements.

### 2.    *Statements Made in This Litigation and "News Article Describing" This Litigation Are Privileged*

Counterclaim 15 should also be dismissed to the extent it relies on statements Knot allegedly made in this lawsuit and the unidentified "news article describing" this lawsuit. (CC, ¶¶224-29, 53-55). As explained below, these statements are privileged and cannot form the basis for any tortious interference claim.

The statements made in this litigation are protected by the *Noerr-Pennington* doctrine, which protects "[t]hose who petition [the] government for redress" in federal court. *Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 359 (3d Cir. 2020); *see also Florcsk v. Unstoppable Domains Inc.*, No. 22-1230-CFC, 2024 WL 492384, at *2 (D. Del. Feb. 8, 2024) ("courts have applied [the *Noerr-Pennington*] doctrine

4

universally to business torts"). This includes a plaintiff's "good-faith effort to enforce intellectual property rights." *Florcsk*, 2024 WL 492384, at *2.

On its face, Counterclaim 15 implicates the type of protected activity—the enforcement of Knot's intellectual property rights—that is barred under the *Noerr-Pennington* doctrine. Indeed, Atomic's allegation that "Knot's litigation has caused direct damage to Atomic reputationally and economically" (CC, ¶56) is precisely the type of claim the doctrine forbids.

While there is a "sham" exception to *Noerr-Pennington* immunity, that exception is narrow and applies only if: (1) the litigation is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (2) the litigation conceals "an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993).

Atomic does not come close to pleading the "sham litigation" exception. While Atomic pleads that Knot's claims are "meritless" and "caused direct damage to Atomic reputationally and economically" (CC, ¶¶53-56), it does not allege that Knot filed this action in bad faith or that no reasonable litigant could expect to succeed on the merits of Knot's claims. *Pro. Real Est. Invs.*, 508 U.S. at 60-61. Nor could it. Knot's claims of trade secret misappropriation are well-supported and based on the discovery

5

of Knot's distinctive 37-character honeypot code in Atomic's source code. (D.I. 2, ¶¶1, 5, 109). Thus, Knot has probable cause to pursue its claims, which "irrefutably demonstrates" *Noerr-Pennington* immunity. *Pro. Real Est. Invs.*, 508 U.S. at 63.

Additionally, under Delaware law, "statements of judges, parties, witnesses and attorneys offered in the course of judicial proceedings" are protected by the "absolute litigation privilege," which provides an absolute defense to Atomic's tortious interference claims. *Feenix Payment Sys., LLC v. Blum*, 2022 WL 215026, at *6 (Del. Super. Ct. Jan. 25, 2022) (barring tortious interference claim because of privilege). "[T]he protection afforded by the absolute privilege is absolute; so long as the statement is pertinent to, and made in the course of, a judicial proceeding, even a showing of malice will not divest the statement of its immune status." *Id.* at *7. Thus, the absolute privilege bars Atomic from using statements made in Knot's pleadings and filings to support its tortious interference claims.

Finally, the unidentified "news article describing" Knot's claims (CC, ¶53), is covered by the fair reporting privilege, which protects news articles that accurately report on litigation, including statements and contentions made in that litigation. *Page v. Oath Inc.*, 2021 WL 528472, at *4 (Del. Super. Ct. Feb. 11, 2021). While Atomic takes issue with the merits of Knot's contentions allegedly "describ[ed]" in that article, it never alleges that the article inaccurately described those contentions, and nothing more is required for the fair reporting privilege to apply. (CC, ¶53).

6

### B.    Counterclaims 1 and 2 Should Be Dismissed

Counterclaims 1 and 2 should be dismissed because U.S. Patent Nos. 12,120,118 ("the '118 patent") and 12,445,443 ("the '443 patent") are invalid under 35 U.S.C. § 101. Specifically, the Asserted Patents claim the abstract idea of visually verifying the identity of a user to facilitate a transaction. The claims recite a process that can be performed manually by, for instance, having a person visually analyze information to determine that a user is authenticated. The patents add nothing to this abstract idea. Indeed, the specification concedes that the claims use "general component[s]" to carry out the claimed inventions, including generic "processors," "computing devices" with "one or more servers," and "user devices" such as a "mobile device." (D.I. 51, Ex. G, 2:30-39, 2:62-65, 3:37-50).

Atomic's Amended Counterclaims—which add no factual averments and recycle the same conclusory allegations—are just as deficient as its original Counterclaims.

### 1.    The Two-Step Alice Framework

Under *Alice*, the Court first determines whether the claims are directed to an abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). If they are, the Court then determines whether other claim elements add "significantly more" to the abstract idea—i.e., something "inventive," that makes the abstract idea patent-eligible. *Alice*, 573 U.S. at 217–22. Merely implementing an abstract idea

7

using "conventional computer and network components operating according to their ordinary functions" does not supply an inventive concept. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017). Nor may claims recite "generic functional language to achieve the[] purported solutions" without claiming "how the desired result is achieved." *Id*.

### 2.    *The Asserted Patents*

The Asserted Patents share a common specification, a common parent application, and the '443 patent was terminally disclaimed to the '118 patent to get over an obviousness-type double patenting rejection during prosecution. (D.I. 51, Exs. G-H). Both patents are directed to methods and systems for (1) providing a user with a selection of third-party options, whereby providing the credentials as to one of the third-party options removes the need to provide credentials to an intermediary, (2) determining that the user is authenticated by the third-party, and (3) in response to the determination that the user was authenticated, performing one other task automatically.  (*Id*.; CC, ¶82).

The Asserted Patents purport to improve on prior methods/systems wherein login credentials were provided to an "intermediary service" for authentication, which allegedly risked having a "malicious actor [] obtain the user's login credential." (D.I. 51, Ex. G, 1:30-50, 3:13-18).

### 3.    Representative Claims

The '118 patent includes 16 claims and the '443 patent includes 20 claims. Atomic's original and Amended Counterclaims (and its pre-suit correspondence) only identify and chart two claims: claim 14 of the '118 patent and claim 16 of the '443 patent. (*See generally* D.I. 50).  (CC, ¶¶105-126, 154-176; D.I. 51, Exs. G-H). As demonstrated in **Exhibit B**, these two claims are representative of all independent claims because they are "substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). The dependent claims do not provide a separate basis for eligibility. They merely add generic components, such as user interfaces, password managers, machine learning, a backend server, and visual text. As such, all claims are ineligible as set forth herein.

### 4.    The '118 Patent is Invalid

#### (i)    *Alice* Step One—The Claims of the '118 Patent are Directed to an Abstract Idea

The claims of the '118 patent are "directed to" the abstract idea of visually verifying the identity of a user to facilitate a transaction—a concept that existed well before computers were invented. While Atomic alleges that Knot is "overgeneraliz[ing] the claims of the '118 patent by characterizing them at a high level of abstraction untethered from the actual claim language" (CC, ¶105), Atomic's own characterization of claim 14 confirms its abstraction (*id*., ¶107):

9

> [T]he first step involves ***providing*** a webview of a native login page that removes the need to provide a user's login credentials to an intermediary service; the second step involves ***determining*** that a user has been authenticated by analyzing visual page elements in a response page displayed via the webview; and the third step involves ***automating tasks to perform a function requested by the user***.

This generic process is similar to methods that have been performed by humans years before computers existed—e.g., a concierge escorts someone to the front desk of a building with multiple offices, the person gives his/her credentials to the person at the desk, once the concierge sees evidence that the person was successfully admitted—e.g., visually inspects the person's badge—they automatically escort the person to the office listed on the person's badge. Moreover, the claimed "determining that a user has been authenticated" step expressly requires an analysis of "visual page elements," and humans can easily perform this "visual" analysis themselves. Indeed, Figure 7 of the patent (shown below) purports to be an "example of a user interface displaying visual elements in a response page," and these "visual elements" readily tell anyone looking at them that a user has been authenticated:



**FIG. 7**

(D.I. 51, Ex. G, Figure 7, 2:7-9). This further demonstrates that the '118 patent claims an abstract idea. *See Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1335 (Fed. Cir. 2015) (idea is abstract if it "could be performed via pen and paper or in a person's mind").

As the Federal Circuit has held, "[i]n cases involving authentication technology," such as here, "patent eligibility often turns on whether the claims provide sufficient specificity to constitute an improvement to computer functionality

11

itself." *Universal Secure Registry LLC*, 10 F.4th 1342, 1346 (Fed. Cir. 2021). Claim 14 does not provide any tangible technological innovation. The only alleged improvement over the prior art identified in the specification is displaying a "native login page corresponding to the select third-party system" that allegedly eliminates the need to use an "intermediary service" to authenticate the login.[1] (D.I. 51, Ex. G, 3:9-44). This is like showing your credentials directly to the concierge to become authenticated instead of using the person at the front desk as an intermediary. There is nothing inventive about that alternative. This is especially true because the claims "simply recite[] conventional actions in a generic way"—e.g., receiving a transaction request, verifying the identity of a user, allowing a transaction. *Secure Authentication Techs.*, 2026 WL 894232, at *4 (D. Utah Apr. 1, 2026). Importantly, the specification does not recite any "new encryption method or authentication algorithm that signals an improvement." *Myport Techs., Inc. v. Apple Inc.*, 2025 WL 2711946, at *5 (D. Del. Sept. 23, 2025).

The Federal Circuit has invalidated claims materially similar to those in the '118 patent. *See Universal Secure Registry*, 10 F.4th at 1349 (invalidating claims directed to "abstract idea of obtaining the secure verification of a user's identity to

---

[1] During prosecution, Atomic admitted that the prior art discloses an "authentication instruction step" where the user's login credentials are sent directly to a "third-party service provider" (D.I. 50, Ex. 2 at 8), and thus acknowledges that eliminating an "intermediary" during authentication was in the prior art.

enable a transaction"); *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1371-72 (Fed. Cir. 2017) (claims involving "acquiring identification data from a bankcard, using the data to verify the validity of the bankcard, and denying access [] if the bankcard is invalid" directed to abstract idea of "collection, storage, and recognition of data"); *Media Content Prot. LLC v. Intel Corp.*, 812 F. Supp. 3d 416, 418 (D. Del. 2025) ("Authentication, i.e., '[c]ontrolling access to resources,' is an abstract idea that 'is pervasive in human activity, whether in libraries (loaning materials only to card-holding members), office buildings (allowing certain employees entrance to only certain floors), or banks (offering or denying loans to applicants based on suitability and intended use)"); *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1016-17 (Fed. Cir. 2017) ("systems and methods that control access to protected computer resources by authenticating identity data" are directed to the abstract idea of "providing restricted access to resources"); *Strikeforce Techs., Inc. v. SecureAuth Corp.*, 2017 WL 8808122, at *4 (C.D. Cal. Dec. 1, 2017), *aff'd,* 753 F. App'x 914 (Fed. Cir. 2019) (patents involving "multichannel security systems and methods for authenticating a user seeking to gain access to a secure network" are abstract); *Peoplechart Corp. v. Wintrust Bank, N.A.*, 543 F. Supp. 3d 594, 602 (N.D. Ill. 2021) ("[t]o the extent that Peoplechart's claim is directed at using multiple authentication methods for information security, this

13

Court joins several other courts, including the Federal Circuit, in concluding that the claim is directed to an abstract idea").

The *Universal Secure Registry* case is particularly instructive. The claims there were "directed to a method for enabling a transaction between a user and a merchant"—much like the asserted claims here are directed to enabling a transaction between a "user" and a "third-party"—which includes any "business" such as a "financial institution" or "financial technology company." *Universal Secure Registry*, 10 F.4th at 1349; (CC, ¶107; D.I. 51, Ex. G, claim 14, 2:58-62). The claims there also contained an authentication step, where "the merchant is given a time-varying code" that "indicates any restrictions on the user's transactions with the merchant"—much like how the '118 patent "determin[es] that a user has been authenticated by analyzing visual page elements in a response page displayed via the webview." *Universal Secure Registry*, 10 F.4th at 1349; (CC, ¶107). Finally, the claims there "enabled" the merchant to automatically "perform the transaction"—much like how the '118 patent "automat[es] tasks to perform a function requested by the user" such as "initiate" a financial transaction. *Id*.; (D.I. 51, Ex. G, 1:20-29).

Just like here where Atomic asserts that the patented authentication method "improves security for an individual user's login credentials and financial assets by removing the requirement to provide the user's login credentials to an intermediary

services that could be compromised by malicious actors" (CC, ¶110),[2] the plaintiff

in *Universal Secure Registry* claimed that the benefit of the patent over the prior art

was to "allow[] a person to purchase goods without providing" sensitive information

such as "credit card information" to prevent such information "from being stolen or

used fraudulently." *Universal Secure Registry*, 10 F.4th at 1345.

Nonetheless, the court still found that the claims were directed to the "abstract

idea of obtaining the secure verification of a user's identity to enable a transaction,"

and thus the asserted patent was invalidated. *Id.* at 1349.

Atomic cites to multiple cases in its Counterclaims as alleged support, but

those cases are inapposite and most predate *Universal Secure Registry*.[3] None of

---

[2] Atomic lists other purported advantages in its Counterclaims, but those relate to the same abstract concept of removing the intermediary during the authentication process. (CC, ¶¶110-114 (purported advantages of "reduc[ing] the ability of malicious actors to obtain from a single source the login credentials for many users," "streamlin[ing]" or "improv[ing]" the "login experience")).

[3] The only authority cited by Atomic that post-dates *Universal Secure Registry* is *CosmoKey Sols. GMBH & Co. KG v. Duo Sec., LLC*, 15 F.4th 1091, 1098 (Fed. Cir. 2021). Atomic cites *CosmoKey* for the proposition that a patent survives a 101 challenge if it "discloses a technical solution to a security problem." (CC, ¶175). But as this Court noted in *Media Content* and at this case's Rule 16 conference, the differences between the solutions discussed in *Universal Secure Registry* (patent held invalid) and *CosmoKey* (patent eligibility upheld) are subtle (D.I. 72, 07/09/26 Tr. 38:2-3). Nonetheless, the technology claimed in this case is more like the technology disclosed in *Universal Secure Registry* as the patents in *CosmoKey* are directed solely at an authentication step (and describe multiple steps to perform that authentication), whereas like the patents here, the patents in *Universal Secure Registry* were directed to the abstract idea of verifying the identity of a user to facilitate a transaction. *See id.* (noting the Court's "instincts are going to go to the

15

them involved patents directed to the abstract idea of verifying the identity of a user to facilitate a transaction, but rather address "computer security" or storage and retrieval of information more generally. (CC, ¶117); *see, e.g.*, *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343, 1347-49 (Fed. Cir. 2018) (unlike here, claims directed to specific method for verifying software licenses and described "how that functionality improvement is effectuated in an assertedly unexpected way"); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020) (unlike here, invention directed to specific encryption method); *SRI Int'l, Inc. v. Cisco Sys.*, 930 F.3d 1295, 1303-04 (Fed. Cir. 2019) (unlike here, claims directed to "specific technique" for using "plurality of network monitors"); *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 898 (Fed. Cir. 2019) (unlike here, patent related to "application management"); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (patent related to database architecture).

Atomic points to the purported novelty of claim 14 and the alleged commercial success of TruthAuth to show that its invention is not an abstract idea. (CC, ¶124). But these are irrelevant to the Court's Section 101 analysis and should be rejected. *See Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981) ("The 'novelty' of

---

way I ruled in both" *Universal Secure Registry* and *CosmoKey*). The asserted claims here do not describe how this "authentication" process is carried out other than to claim it is based on "visual page elements."

any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter."); *Ficep Corp. v. Peddinghaus Corp.*, 587 F. Supp. 3d 115, 126, n.4 (D. Del. 2022), *aff'd* 2023 WL 5346043 (Fed. Cir. Aug. 21, 2023) ("I do not think it is appropriate to consider secondary considerations of nonobviousness in determining patentability under § 101.").

### (ii)    *Alice* Step Two—The Claims of the '118 Patent Lack an Inventive Concept

The '118 patent "does not contain additional limitations, whether considered individually or as an ordered combination, that 'transform' the claimed abstract idea into patent-eligible subject matter." *Media Content*, 812 F. Supp. 3d at 424.

The specification states the claimed invention can be carried out using "general components," including generic "processors," "computing devices" with "one or more servers," and "user devices" such as a "mobile device, cell phone, smart phone, tablet, laptop, desktop, server, smart watch, IoT device, etc." (D.I. 51, Ex. G, 2:30-39, 2:62-65, 3:37-50). Using generic components to perform conventional functions cannot supply the "inventive concept" under *Alice* step two. *PersonalWeb Tech. LLC v. Google, LLC*, 8 F.4th 1310, 1319 (Fed. Cir. 2021) (claims that merely "automate or otherwise make more efficient traditional [methods]" fail step two); *see also Smart Sys. Innovations*, 873 F.3d 1364 at 1374 (claims "lack an inventive concept because they recite general computer and

17

technological components like 'processor,' 'hash identifier,' 'identifying token,' and 'writeable memory,' the technical details of which are not described"); *Fraud Free Transactions LLC v. Ping Identity Corp.*, 780 F. Supp. 3d 460, 475 (D. Del. 2025) ("the recitation of the phrase 'fraud prevention application' does not add an inventive concept because [] 'conventional generic computer components employed in a customary manner' is 'insufficient to transform [an] abstract idea into a patent-eligible invention'"); *Universal Secure Registry*, 469 F. Supp. 3d at 240 ("The system disclosed to accomplish this abstract task is comprised of generic components—a device, a biometric sensor, a processor, and a transceiver—performing routine functions—retrieving, receiving, sending, authenticating—in a customary order"); *Ficep*, 587 F. Supp. 3d at 126 ("Merely automating a process, however, is not an inventive concept").

Atomic alleges that "[p]erforming the method recited in claim 14 requires using multiple computing devices and specialized software, examples of which are depicted [in] Figure 1 of the '118 patent," but Figure 1 merely depicts a cell phone, a backend server, and a third-party "system." (CC, ¶107):

18



While Figure 1 shows a "decision engine," this component is not discussed in, or required by, the claims, and the specification describes this component in a purely functional manner—e.g., it determines whether authentication occurred. (D.I. 51, Ex. G, 7:55-8:12).[4]

The "ordered combination" of claimed elements also cannot provide the "inventive concept." This is especially true since the specification makes clear the

---

[4] Atomic also conclusory alleges that a "person of ordinary skill in the art would recognize that the inventions recited in the claims of the '118 patent, including claim 14, require specialized software and cannot be performed merely using generic components performing routine functions in a customary order" (CC, ¶118). Not only does this argument contradict the specification (which expressly says "general components" are used), Atomic never describes this "specialized software" or how the components function in a non-routine manner. (D.I. 51, Ex. G, 2:30-39).

19

steps of the claimed method can be performed in any order. (*Id.*, 2:30-31 ("the order of the steps of disclosed processes may be altered within the scope of the invention")).

Atomic argues, in conclusory fashion, that the '118 patent contains several "inventive concepts," including: "providing a webview of a native login page," "determining that a user has been authenticated," "improving security," "streamlin[ing a] process," "enabling use of a password manager," and making the process "faster." (CC, ¶¶110-114, 118, 119, 122). But all these concepts involve the abstract idea of verification and authentication and the use of generic computer components. A "claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *Secure Authentication Techs.*, 2026 WL 894232, at \*5; *see also Innovation Scis., LLC v. Amazon.com, Inc.*, 778 F. App'x 859, 863 (Fed. Cir. 2019) ("There is no inventive concept in the claim's use of a generic payment server to perform well-understood, routine, and conventional activities commonly used in industry").

### 5.   *The '443 Patent is Invalid Under 35 U.S.C. § 101*

The '443 patent fares no better because its specification and claims are nearly identical to those of the '118 patent. Indeed, according to Atomic, the only

differences between the two patents are the ones identified below from the second and third steps:

| Representative Claim 14, '118 patent CC, ¶ 107 | Representative Claim 16, '443 patent CC, ¶ 156 |
| --- | --- |
| The second step involves determining that a user has been authenticated by analyzing ***visual page elements in a response page displayed via the webview***. The third step involves automating tasks to perform a function requested by the user. | The second step involves determining that a user has been authenticated by analyzing ***a response page displayed via the provided webview***. The third step involves automating tasks to perform a function requested by the user, ***using an API request that conforms to the request structure implemented by a selected third-party system***. |

Apart from the language differences above, Atomic asserts identical validity arguments for both representative claims 14 and 16. (CC, ¶¶105-126, 154-176). For this reason, the aforementioned arguments regarding the invalidity of the '118 patent apply to the '443 patent.

21

Just like the '118 Patent, the '443 Patent is "directed to" the abstract idea of verifying the identity of a user to facilitate a transaction.[5] Both alleged inventions are analogous to activity that can be performed without a computer. The second step in both representative claims can be performed by a human.[6] Atomic's addition of "using an API request that conforms to the request structure implemented by a selected third-party system" to step 3 of representative claim 16 does nothing to change the fact that the claim is merely comprised of generic components providing routine functions. *Universal Secure Registry*, 469 F. Supp. 3d at 240. Therefore, there is nothing "inventive" about representative claim 16. Accordingly, the '443 patent is also abstract and fails to supply an inventive concept.

### C.    Counterclaims 3, 5, 7, 9, 11, and 13 Should Be Dismissed

"A counterclaim for declaratory relief may be dismissed as redundant where there is complete identity of factual and legal issues between the complaint and the counterclaim." *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Tr.*, 674 F. Supp. 2d 562, 566 (D. Del. 2009).

Counterclaims 3, 5, 7, 9, 11, and 13 seek declarations that Atomic does not infringe Knot's copyrights because "Atomic independently developed its software"

---

[5] The '443 patent makes clear authentication can be performed visually. (D.I. 51, Ex. F, 6:15-18 (authentication performed using "visual text"); claims 17-18 (claiming authentication using "visual elements")).

[6] Although the authentication step is performed using "code," claim 16 takes an activity humans perform and says do it on a generic computer.

and "Atomic's software is not substantially similar to the protectable elements of Knot's work." (CC, ¶¶177, 180–81, 201 204–05). These counterclaims are identical to Atomic's defenses to Knot's copyright claims, where Atomic alleges non-infringement, "independent creation," and that the standard, customary, or obligatory elements of Knot's copyrights are not protectable or "have entered the public domain." (*Id.*, Affirmative Defenses, ¶¶15-21).

Accordingly, Atomic's declaratory judgment counterclaims are "no more than a restatement of [Atomic]'s general denial of liability" and should be dismissed. *Malibu Media, LLC v. Does 1*, 2013 WL 1702549, at *10 (E.D. Pa. Mar. 6, 2013) (dismissing counterclaim for copyright non-infringement).

## IV.    CONCLUSION

Therefore, the Court should dismiss Atomic's Counterclaims 1, 2, 3, 5, 7, 9, 11, 13 and 15.

GREENBERG TRAURIG, LLP

Dated: August 4, 2026

/s/ Benjamin J. Schladweiler

OF COUNSEL:

Benjamin J. Schladweiler (#4601)
Greenberg Traurig, LLP
222 Delaware Avenue, Ste. 1600
Wilmington, DE 19801
302.661.7000
schladweilerb@gtlaw.com

Justin K. Victor
Jacob R. Dean
Jennifer Simon
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA  30305
678.553.2100
victorj@gtlaw.com
deanj@gtlaw.com
Jennifer.Simon@gtlaw.com

*Attorneys for Plaintiff and Counterclaim-Defendant MyCard, Inc. d/b/a Knot*

Gregory S. Bombard
Greenberg Traurig, LLP
One International Place
Suite 2000
Boston, MA  02110
617.310.6000
Gregory.Bombard@gtlaw.com

Justin A. MacLean
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY  10017
212.801.9200
Justin.MacLean@gtlaw.com